# Exhibit D

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G
New Jersey State Prison
Po Box 861
Trenton, New Jersey
08625-0861

| | |
|---|---|
| State of New Jersey | Supreme Court of New Jersey |
| Plaintiff/ | S. Ct. Dkt. No. _____ |
| Respondent | App. Div. Dkt. No. A-004519-18-T3 |
| v. | **Criminal Action** |
| Caleb L. Mcgillivary | On Appeal from Superior Court of New |
| Defendant/ | Jersey, Appellate Division |
| Petitioner | Sat Below:   Hon. Alvarez,J.A.D. |
| | Hon. Geiger. J.A.D. |

**Defendant's Petition for Certification**

**DEFENDANT IS CURRENTLY CONFINED**

**DATED: August 26, 2021**

## Table of Contents

Statement of the Matter Presented                    ...1

Questions Presented                                  ...5

Errors Complained of                                 ...8

Point I: The Trial Court's failure to clearly relate the burden
of proof for intoxication; to either the requisite mental state
of murder as required by Sette; or to lesser included offenses
as required by Warren: deprived Defendant of his right to Due
Process by failing to communicate clearly the State's burden to
prove the requisite element of mental state for murder beyond a
reasonable doubt; which impermissibly shifted the burden of
proof for that element onto the Defendant (Dpa32-33; 16T13-22 to
16-23)                                               ...8

Point II: The absence of Cameron factors meant that an
intoxication charge should never have been given to the jury
(Dpa32-33; 16T13-22 to 16-23)

                                                     ...9

Point III: The Trial Court's denial of Defendant's January 7,
2019 sua sponte motion during a hearing in open court to proceed
pro se was substantial and structural error which requires
reversal (Dpa34-35; 6T4-3 to 6-13)

                                                     ...10

Point IV: the Appellate Division's declination to review the
issues raised in Defendant's pro se supplemental brief is in

conflict with many of This Court's decisions, and a review of the issues by this Court is in the interest of justice (Dpa31-36) ...14

A.The Trial Court's failure to change the venue or recuse itself or the prosecutor was substantial and structural error which requires reversal (4T34-10 to 35-15)

...14

B.The Trial Court's inclusion of an involuntary intoxication jury instruction over Defendant's objection and without applying Cameron factors or relating it to lesser included offenses was substantial error requiring reversal (16T13-22 to 16-23)

...15

C.Irregular influences on the jurors and the Trial Court's refusal to provide courtroom video as evidence to prove such were substantial errors requiring reversal (13T11-3 to 13-11; 13T158-14 to 162-6; 19T53-8 to 57-16) ...16

D.The Trial Court's prohibition on calling and confronting witnesses was substantial error requiring reversal (13T160-17 to 18; 20T26-12 to 16) ...16

E.The Trial Court's Admission of Defendant's illegally quid pro quo May 16, 2013 statement; prohibition of testimony concerning the circumstances of it; and inclusion of his "fruits of the poisonous tree" trial testimony: were substantial errors

requiring reversal (1T92-2 to 96-14)

...17

F.The Trial Court's Refusal to remedy the destruction of Brady material with an adverse inference jury instruction was substantial error requiring reversal (15T38-18 to 45-19)

...18

G.Trial Counsel's performance at trial deprived Defendant of his substantial right to effective assistance of counsel, a substantial error contained completely within the trial record; which required reversal (19T51-7 to 57-16)

...18

Reasons for Certification                          ...19

Conclusion                                         ...20

Certification of Petitioner                        ...20

**<u>TABLE OF JUDGMENTS, ORDERS, AND RULINGS BEING APPEALED</u>**

Trial Court's Order denying Defendant's Motion to Suppress his 05/16/13 Statement                     ...1T92-2 to 96-14

Trial Court's Order denying Defendant's Motion to recuse the Union County Criminal Bench             ...4T35-10 to 35-15

Trial Court's Ruling Denying Defendant's Request to Argue His Case Pro Se                             ...6T4-3 to 6-13

Trial Court's Ruling Denying Defendant's Request to Remedy Irregular Influences on the Jury

        ...13T11-3 to 13-11; 13T158-1 to 162-6; 19T53-8 to 57-16

Trial Court's Ruling Prohibiting Defendant from calling Scott Peterson as a witness        ...13T160-17 to 18; 20T26-12 to 16

Trial Court's Order Denying Defendant's Motion for Adverse Inference                                  ...15T38-18 to 45-19

Trial Court's Ruling on Defendant's Pro Se Objection to the Inclusion of the Jury Instruction on 2C:2-8(d)

                                        ...16T13-22 to 16-23

Trial Court's Order Denying Defendant's Pro Se Motion for New Trial                                   ...19T51-7 to 57-16

Judgement of Conviction and Order of Commitment        ...Da 204

Appellate Division's Judgment and Opinion Affirming the Trial Court's Judgment of Conviction                  ...Dpa1-36

## **Table of Citations**

**Caselaw**

Condella v. Cumberland Farms 298 N.J. Super. 531 (Law Div. 1996)

...16

Crane v. Kentucky 476 U.S. 683 (1986)                ...7,17

Davis v. Alaska 415 U.S. 308 (1974)                  ...6,17

Denike v. Cupo 196 N.J. 502 (2008)                   ...5,15

Dorman v. Wainwright 798 F.2D 1358 (11th Cir. 1986)    ...11

Faretta v. California 422 U.S. 806 (1975)      ...3,7,11,12,14

Harrison v. United States 392 U.S. 219 (1968)      ...7,17

Hayes v. Delamotte 231 N.J. 373 (2018)             ...6,16

Mayberry v. Pennsylvania 400 U.S. 455 (1971)       ...5,15

McCoy v. Louisiana 138 S.Ct. 1500, 200 L.Ed.2d 821 (2018)

...6,7,18

McKernan v. Sci 849 F.3d 557 (3d Cir. 2017)        ...5,15

Miller v. Fenton 474 U.S. 104 (1985)               ...7,17

Panko v. Flintkote Co. 7 N.J. 55 (1951)            ...6,16

Quercia v. United States 289 U.S. 466 (1933)       ...6,17

State v. Bey 112 N.J. 45 (1988)                    ...6,16

State v. Caleb L. McGillvary App. Div. Dkt. No. 004519-18-T3

...5

State v. Cameron 104 N.J. 42 (1986)         ...3,6,9,10,15

State v. Coon 314 N.J Super. 426 (App. Div. 1998)    ...4,11

State v. Crisafi 128 N.J. 499 (1992)        ...3,7,11,12,13,14

State v. Dabas 215 N.J. 114 (2013) ...7,18

State v. Dalal 221 N.J. 601 (2015) ...5,14

State v. Figueroa 186 N.J. 589 (2006) ...4,7,13,14

State v. Fritz 105 N.J. 42 (1987) ..7,19

State v. Hollander 201 N.J. Super. 453 (App. Div.), Cert. Den. 101 N.J. 335 (1985) ...18

State v. Jiminez 188 N.J. 390, 411 (2006) ...5,8,9

State v. Johnson 309 N.J. Super. 237 (App. Div.), Cert. Den. 156 N.J. 387 (1998) ...10

State v. Kordower 229 N.J Super. 566 (App. Div. 1988) ...7,11

State v. Medina 147 N.J. 43, 50 (1996) ...5,8,9

State v. Muhammed 359 N.J. Super. 361 (App. Div. 2003) ...6,16

State v. R.T. 205 N.J. 493 (2011) ...6,9,10,15,18

State v. R.T. 411 N.J. Super. 35 (App. Div. 2009) ...10,15

State v. Rose 458 N.J. Super. 610 (App. Div. 2019) ...7,11,12

State v. Sette 259 N.J. Super. 156 (App. Div. 1992) ...5,8,9

State v. Thomas 362 N.J. Super. 229 (App. Div. 2009) ...7,11

State v. Warren 104 N.J. 571 (1986) ...3,6,8,9,16

State v. W.B. 205 N.J. 588 (2011) ...7,18

Sullivan v. Louisiana 508 U.S. 275 (1993) ...8

Turner v. Louisiana 379 U.S. 466 (1965) ...6,16

United States v. Cronic 466 U.S. 648 (1984) ...19

United States v. Pellulo 105 F.3d 117 (3d Cir. 1997) ...7,18

United States v. Valenzuela-Bernal 458 U.S. 858 (1982) ...6,17

<u>Young v. United States Ex Rel Vuitton et Fils</u> 481 U.S. 787
(1987)                                            ...5,15


**Court Rules**

<u>N.J.C.R. R.</u> 1:4-3                                ...2,5,14

<u>N.J.C.R. R.</u> 1:6-2(a)                             ...4

<u>N.J.C.R. R.</u> 1:12-1(d)                            ...5,14

<u>N.J.C.R. R.</u> 1:12-1 (e)                           ...5,14

<u>N.J.C.R. R.</u> 1:12-1 (f)                           ...5,14

<u>N.J.C.R. R.</u> 2:5-5(a)                             ...4

<u>N.J.C.R. R.</u> 2:10-1                               ...1

<u>N.J.C.R. R.</u> 2:10-2                               ...1

<u>N.J.C.R. R.</u> 2:12-3(a)                            ...1

<u>N.J.C.R. R.</u> 2:12-4                               ...19


**Statutes**

<u>N.J.S.A.</u> 2C:2-8(d)                               ...3,8

<u>N.J.S.A.</u> 2C:11-3(a)                              ...4

<u>N.J.S.A.</u> 2C:11-3(b)                              ...4

## **Table of Appendix**

Per Curiam Opinion <u>State v. Caleb McGillvary</u> Docket No. A-004519-18-T3 ...Dpa1-36

Notice of Petition ...Dpa37-38

## Statement of the Matter Presented[1]

This Petition under N.J.C.R. R. 2:12-3(a) challenges the propriety of an Appellate Division opinion rejecting Defendant Caleb L. McGillvary's (Hereinafter "Defendant") Argument inter alia that the Trial Court's judgment of conviction was substantially erroneous and should be overturned in accordance with N.J.C.R. R. 2:10-1, 2:10-2.

Defendant adopts by reference the preliminary statement and statement of facts and procedural history from his pro se

---

[1] The following citation form is used:
"Da" refers to Defendant's Appendix to His Pro Se Supplemental Plenary Brief
"Dpa" refers to Defendant's Petition Appendix filed herewith
"1T" refers to the transcript of the January 8, 2016 proceeding
"2T" refers to the transcript of the September 30, 2016 proceeding
"3T" refers to the transcript of the July 19, 2017 proceeding
"4T" refers to the transcript of the February 8, 2018 proceeding
"5T" refers to the transcript of the March 26, 2018 proceeding
"6T" refers to the transcript of the January 7, 2019 proceeding
"7T" refers to the transcript of the March 21, 2019 proceeding
"8T" refers to the transcript of the April 2, 2019 proceeding
"9T" refers to the transcript of the April 3, 2019 proceeding
"10T" refers to the transcript of the April 9, 2019 proceeding
"11T" refers to the transcript of the April 10, 2019 proceeding
"12T" refers to the transcript of the April 11, 2019 proceeding
"13T" refers to the transcript of the April 16, 2019 proceeding
"14T" refers to the transcript of the April 17, 2019 proceeding
"15T" refers to the transcript of the April 18, 2019 proceeding
"16T" refers to the transcript of the April 22, 2019 proceeding
"17T" refers to the transcript of the April 23, 2019 proceeding
"18T" refers to the transcript of the April 24, 2019 proceeding
"19T" refers to the transcript of the May 23, 2019 proceeding
"20T" refers to the transcript of the May 30, 2019 proceeding
"21T" refers to the transcript of the September 23, 2020 proceeding

Supplemental Brief and Supplemental Reply Brief in Support of his Plenary Appeal herein pursuant to N.J.C.R. R. 1:4-3.

On May 12, 2013, Joseph Galfy drugged and sexually assaulted Defendant; during the course of which Defendant awoke and fought off Mr. Galfy from underneath, unintentionally killing the rapist. On May 13, 2013, Mr. Galfy was found dead and an investigation began, headed by the admitted personal friend of the rapist, head prosecutor Theodore Romankow. At the rape scene, the investigators destroyed evidence which could corroborate the sexual assault by Mr. Galfy upon Defendant, including:

1.)Pill bottles from the fridge

2.)The drinking glass used by the Defendant

3.)The carpet where the sexual assault took place

Defendant was arrested on May 16, 2013 and charged with murder.

In the 6 years leading up to trial, Defendant filed 2 motions to change the venue: once after discovering the head criminal judge was on the rapist's speed dial; and again after discovering the same judge was allegedly present at the rape scene, when exculpatory evidence was destroyed. Prior to the second motion hearing, the head judge was replaced and ex-parte communications were discovered wherein the new head judge coached the recused judge as to what to say when he was called as a witness.

On January 7, 2019, Defendant filed a pro se motion to dismiss the indictment and during a hearing in open court moved sua sponte to assert his Sixth Amendment right:

1.)To litigate his motion, pro se

2.)To argue his case, pro se

The Trial Court struck his motions without consideration, and no Faretta/Crisafi inquiry was done at that time. At a pre-trial media access hearing, the trial judge expressed his opinion that Defendant's statements were "self-serving"; based on the judge's internet research into Defendant. The Trial Court denied Defendant's mid-trial motion for adverse inference for the destroyed evidence; so Defendant sought to exclude the jury instruction on N.J.S.A. 2C:2-8(d). The Trial Court included the burden-shifting instruction anyways: without applying Cameron factors nor relating it to lesser included offenses per Warren. During summation, defense counsel told the jury: "my client is full of crap. He did this intentionally. He purposely ran out of the house." The jury returned their verdict of guilty to first degree murder on April 24, 2019.

On May 23, 2019, the Trial Court denied Defendant's Motion for New Trial and Application to Proceed Pro Se. On May 30, 2019, Defendant was sentenced to 57 years imprisonment. On June 20, 2019, Defendant filed a Notice of Appeal. Defendant

discharged Appellate Counsel on July 29, 2020 and moved to represent himself on August 5, 2020

On September 23, 2020, a State v. Coon 314 N.J Super. 426 (App. Div. 1998) hearing was held on remand before the trial judge, Hon. Robert A. Kirsch, J.S.C.; during which Defendant moved to settle the record pursuant to R. 2:5-5(a); proffered briefing papers onto the record; and moved to recuse Judge Kirsch. The trial judge refused to entertain the motions, despite their comportment with R. 1:6-2(a).

On October 30, 2020, the Trial Court issued an order denying Defendant's Motion to Relieve Counsel and ore tenus Motion to Settle the Record. In its attached written opinion, the Trial Court sarcastically referred to Defendant's September 23, 2020 "motions" as "interruptions"; and attempted in a longwinded footnote to re-litigate the case and make ex post facto findings on Defendant's January 7, 2019 ore tenus motion to proceed pro se. The Trial Court mischaracterized the request as for "hybrid" representation, despite not having engaged in the scope inquiry mandated by the Court in Figueroa.

In a per curiam opinion decided on August 4, 2021, the Appellate Division affirmed the Trial Court's judgment of conviction for First Degree Murder (2C:11-3(a),(b)); and sentence of 57 years imprisonment with 85% parole ineligibility period under the No Early Release Act; declining to address many issues contained

4

within Defendant's supplemental brief. See attached per curiam opinion, State of New Jersey v. Caleb McGillvary App. Div. Dkt. No. 004519-18-T3 (Dpa1-36). A Notice of Petition for Certification was filed by the Defendant on August 12, 2021 (Dpa37-38).

## Questions Presented

Defendant reasserts all issues presented before the Appellate Division through adoption by reference to his supplemental brief in support of his plenary appeal by R. 1:4-3. Additionally, the Court's attention to the following questions is respectfully directed:

1.) Did the Trial Court's failure to make clear the burden of proof for intoxication, as it relates to the requisite element of mental state for murder, conflict with This Court's decisions on Due Process requirements in State v. Medina and State v. Jiminez, and with State v. Sette?

2.) Did the Trial Court correctly apply the guidelines for recusal of judges as set forth in Denike v. Cupo, State v. Dalal, Mayberry v. Pennsylvania, McKernan v. Sci, and N.J.C.R. R. 1:12-1(d),(e),(f)?

3.) Did the Trial Court correctly apply the guidelines for recusal of the prosecutor as set forth in Young v. U.S. ex rel Vuitton?

4.)Was inclusion of the 2C:2-8(d) jury instruction over Defendant's objection in conflict with McCoy v. Louisiana and/or State v. R.T.?

5.)Did the Trial Court correctly apply the guidelines for inclusion of the intoxication jury instruction as set forth in State v. Cameron and State v. R.T.?

6.)Was the intoxication instruction properly related to lesser included offenses as required by State v. Warren?

7.)Did the Trial Court correctly apply the guidelines for requests for courtroom video surveillance playback as evidence as set forth in State v. Muhammed and Hayes v. Delamotte?

8.)Did the Trial Court correctly apply the guidelines for polling the jury mid-trial irregular influence as set forth in State v. Bey?

9.)Did the Trial Court correctly apply the guidelines for granting a new trial because of irregular influences as set forth in Panko v. Flintkote and Turner v. Louisiana?

10.)Was the Trial court's preclusion of calling Mr. Peterson as a witness substantial error under Davis v. Alaska or United States v. Valenzuela-Bernal?

11.)Was the Trial Court's making itself a material fact witness substantial error under Davis v. Alaska or Quercia v. United States?

12.)Was the Trial Court's admission of Defendant's quid pro quo May 16, 2013 statement substantial error under Miller v. Fenton?

13.)Was the prohibition of Defendant's testimony concerning conditions of his custodial interrogation substantial error under Crane v. Kentucky?

14.)Is Defendant's trial testimony "fruits of the poisonous tree" as set forth in Harrison v. United States or United States v. Pellulo?

15.)Did the Trial Court correctly apply the guidelines for including an adverse inference jury instruction as set forth in State v. Dabas and State v. W.B.?

16.)Was Trial Counsel's performance at trial substantially ineffective as set forth in State v. Fritz and McCoy v. Louisiana?

17.)Did the Trial Court correctly apply the guidelines for applications to proceed pro se to Defendant's sua sponte motion to proceed pro se during the January 7, 2019 hearing in open court as set forth in State v. Thomas and Faretta v. California?

18.)Did the Trial Court correctly inquire as to scope of Defendant's request to proceed pro se as required by State v. Crisafi, State v. Figueroa, State v. Kordower, and State v. Rose?

## Errors Complained of

**Point I: The Trial Court's failure to clearly relate the burden of proof for intoxication; to either the requisite mental state of murder as required by Sette; or to lesser included offenses as required by Warren: deprived Defendant of his right to Due Process by failing to communicate clearly the State's burden to prove the requisite element of mental state for murder beyond a reasonable doubt; which impermissibly shifted the burden of proof for that element onto the Defendant (Dpa32-33; 16T13-22 to 16-23)**

"The Federal Due Process Clause requires that the State bear 'the burden of proving all elements of a crime beyond a reasonable doubt'" State v. Jiminez 188 N.J. 390, 411 (2006)(Quoting Sullivan v. Louisiana 508 U.S. 275, 277-78 (1993)). "[A] Jury instruction that fails to communicate the State's burden to prove guilt beyond a reasonable doubt is not amenable to harmless-error analysis and requires reversal." State v. Medina 147 N.J. 43, 50 (1996). The Appellate Division in State v. Sette 259 N.J. Super. 156 (App. Div. 1992), found that such communication of the State's burden, in the context of an intoxication instruction, would only happen if: "the Judge made it clear that [the shifted burden of N.J.S.A. 2C:2-8(d)] only went to the absolute defense"; Id. at 184; and if the Judge further made clear to the jury, "That the State had to prove

8

beyond a reasonable doubt that Defendant was not intoxicated to an extent which prevented him from acting purposely or knowingly; lack of such proof would result in the failure to establish an element, the requisite mental state, of the crime of murder." Id. at 171.

However, the clarity described in Sette was clearly lacking in this case: although the Trial Court made the ambiguous reminder to the jury that the burden of proving Defendant guilty beyond a reasonable doubt never shifts; It failed to make clear that such reminder had any bearing on the burden of proof for intoxication as it related to the requisite mental state element of murder or lesser included offenses. A reasonable juror could so infer that the shifted burden for intoxication extended to the element of requisite mental state for murder; and that the Trial Court's reminder was limited to causation or mental states other than intoxication. The Appellate Division's decision is therefore in conflict with This Court's decisions in Jiminez, Medina, and State v. Warren 104 N.J. 571 (1986).

### Point II: The absence of Cameron factors meant that an intoxication charge should never have been given to the jury (Dpa32-33; 16T13-22 to 16-23)

In State v. R.T. 205 N.J. 493 (2011); This Court found that an intoxication charge was not "clearly indicated" on the record; and was "[in]consistent with other New Jersey case law

declining to authorize a voluntary intoxication charge on similar evidence"; when: "considering the Cameron factors, during the requisite time frame there was no evidence of Defendant's blood-alcohol level, the amount of alcohol he consumed or over what period of time he had been drinking, or that he smelled of alcohol or had any other physical manifestations of intoxication." R.T. 205 N.J. at 513 (Quoting State v. R.T. 411 N.J. Super 35, 50 (App. Div. 2009)); See also State v. Johnson 309 N.J. Super. 237, 267-68 (App. Div.) (Finding no factual or legal basis for voluntary intoxication charge when absence of "meaningful expert testimony or reliable observations of intoxication" compared to Defendant's recollection of events), Cert. Den. 156 N.J. 387 (1998).

Considering the Cameron factors in this case, there were none present. Therefore, the Appellate Division's decision to affirm the Trial Court's inclusion of an intoxication instruction to the jury, in the complete absence of Cameron factors, was in conflict with This Court's decisions in R.T. 205 N.J. 493 (2011), and State v. Cameron 104 N.J. 42 (1986).

**Point III: The Trial Court's denial of Defendant's January 7, 2019 ore tenus motion during a hearing in open court to proceed pro se was substantial and structural error which requires reversal (Dpa34-35; 6T4-3 to 6-13)**

10

The Trial Court improperly applied the guidelines for applications to proceed pro se as set forth in Faretta v. California 422 U.S. 806, 818-819 (1975) and interpreted by New Jersey Courts in several cases; which is substantial error requiring reversal under State v. Thomas 362 N.J. Super. 229 (App. Div. 2009).

To begin with, State v. Thomas indicates that, contrary to this case, "a different judge conducted [the post trial Coon] hearing." 362 N.J. Super. 229, 232 (App. Div. 2003).

The Court in State v. Kordower found that the trial judge erred in not conducting a full Crisafi inquiry upon an "ore tenus" motion by Kordower during a pre-trial hearing, noting Kordower's "purported waiver of counsel was somewhat equivocal … however, we need not decide the issue of whether her words and conduct constituted a waiver … the Law Division's failure to determine whether the waiver was knowing and intelligent requires reversal of defendant's jury convictions." 229 N.J Super. 566, 582 (App. Div. 1988).

The Court in State v. Rose held that "in making the request, a Defendant need not "recite some talismanic formula. Whether "orally or in writing," a Defendant need only make the request "unambiguously … so that no reasonable person can say the request was not made."" 458 N.J. Super. 610, 627 (App. Div. 2019); quoting Dorman v. Wainwright 798 F.2D 1358, 1366 (11th

Cir. 1986). Contrary to the Trial Court's ruling on Defendant's ore tenus request not "trigger"-ing a Crisafi inquiry, "in response to defendant's request, the court was obliged to conduct a Faretta hearing." Rose 458 N.J. Super. At 629. Contrary to the Trial Court's misapplication of law, the Court in Rose did not hold that "failure to persist in inquiries constitutes a waiver"; but rather the opposite: "we are not prepared to hold that his failure to persist in inquiries is conclusive proof of waiver" Id. at 630. "Mere acquiescence through silence in representation by counsel is not proof enough [of waiver of the right to self-representation]." Id. at 636. In fact, the Trial Court's 22 month ex post facto denial of Appellant's request notwithstanding, "the failure to rule on a Defendant's request has been treated as an explicit denial." Id. at 630; and "if Defendant reasonably believed his request was denied, he was not obliged to continually renew it." Id. at 638. The Court overturned Rose's conviction when, as in this case, "rather than hold a Faretta hearing, the Trial Court deflected Defendant's oral request." Id. at 628.

Regardless of the scope of the request, the Trial Court admits that when Appellant was represented by a public defender, he made an "ore tenus" motion choosing to proceed pro se on January 7, 2019. "when the alternative is representation by the public defender, choosing to proceed pro se constitutes a voluntary

waiver of counsel." State v. Crisafi 128 N.J. 499, 517 (1992). "The Appellate Division has consistently required judges to engage in a searching inquiry with Defendants seeking to proceed pro se." Id. at 510. The Trial Court's attempt to super-impose upon the record an ex post facto finding of scope limiting Appellant's request to proceed pro se to his motion; fails to account for the fact that Appellant equally specified his request to "argue [his] case" pro se. There were, in fact, two specific requests: as the record shows. Both were unequivocal; but assuming arguendo that the Trial Court recognized only one as unequivocal, it's belated denial of it was in conflict with State v. Figueroa: "when confronted with a Defendant's unequivocal request for self-representation, the Trial Court must carefully question the Defendant to determine the scope of his request." 186 N.J. 589, 593 (2006). Because the Trial Court failed to do so, here as in Figueroa, "the record in this case is not sufficiently clear to determine precisely the scope of Defendant's request: whether he was requesting the right of self-representation or, instead, the opportunity to engage in hybrid representation." Id. at 595. Despite the Trial Court's substitution of an ex post facto footnote finding "hybrid" scope for a true Figueroa inquiry, "to the extent the record does not disclose the true nature of Defendant's request, we are

compelled to conclude that a Faretta/[Crisafi] violation is present." Id. at 596.

**Point IV: the Appellate Division's declination to review the issues raised in Defendant's pro se supplemental brief is in conflict with many of This Court's decisions, and a review of the issues by this Court is in the interest of justice (Dpa31-36)**

A short exposition of the issues raised in Defendant's Pro Se Supplemental Brief will show the Court that the Appellate Division's decision not to review those issues on their merits, was in conflict with numerous decisions of This Court and Higher Courts::

Defendant adopts by reference the legal arguments from his pros se supplemental brief and supplemental reply brief in support of his plenary appeal and asserts the same herein, pursuant to N.J.C.R. R. 1:4-3

**A.The Trial court's failure to change the venue or recuse itself or the prosecutor was substantial and structural error which requires reversal(4T34-10 to 35-15)**

Prior to trial, two head criminal judges from the county in which venue was laid had to be recused pursuant to R. 1:12-1(d),(e), and (f); which warrants a change of venue under State v. Dalal 221 N.J. 601, 609 (2015). The trial judge admitted to forming opinions on Defendant's credibility based on a pre-trial

14

"deep dive" into internet research "on Facebook"; which required recusal under McKernan v. Sci 849 F.3d 557, 560-561 (3d Cir. 2017). the trial prosecutor had a $55 million interest in the outcome of trial; which required recusal under Young v. United States ex rel Vuitton et Fils 481 U.S. 787, 811 (1987). The trial judge failed to recuse himself after admittedly becoming the subject of arguably well-deserved personal attacks on his character, as required by Mayberry v. Pennsylvania 400 U.S. 455, 465-466 (1971). It was widely publicized that the alleged victim was a prominent attorney in the county in which venue was laid; and that he was personal friends with judges and prosecutors in that county; which created the appearance of impropriety and required recusal of the Union County criminal bench under Denike v. Cupo 196 N.J. 502, 517 (2008).

**B.The Trial Court's inclusion of an involuntary intoxication jury instruction over Defendant's objection and without applying Cameron factors or relating it to lesser included offenses was substantial error requiring reversal (16T13-22 to 16-23)**

The Trial Court failed to apply to its decision to include the intoxication jury charge the factors set forth in State v. Cameron 104 N.J. 42, 56 (1986). The Trial Court included said charge over Defendant's objection and admittedly using as its sole basis statements made by Defendant, in conflict with State v. R.T. 411 N.J. Super. 35, 50-51 (App. Div. 2009), aff'd State

15

v. R.T. 205 N.J. 493 (2011). The Trial Court failed to relate intoxication to lesser included offenses as required by State v. Warren 104 N.J. 571 (1986).

**C. Irregular influences on the jurors and the Trial Court's refusal to provide courtroom video as evidence to prove such were substantial errors requiring reversal (13T11-3 to 13-11; 13T158-14 to 162-6; 19T53-8 to 57-16)**

The Trial Court's refusal to poll the jury upon request as to irregular influences by the prosecutor, deceiving the jury with a laser pointer on an x-ray depicting injuries to the alleged victim, was in conflict with State v. Bey 112 N.J. 45 (1988). The Trial Court's refusal to review, or provide as evidence, courtroom video surveillance was in conflict with Condella v. Cumberland Farms 298 N.J. Super. 531, 536 (Law Div. 1996); State v. Muhammed 359 N.J. Super. 361, 379 (App. Div. 2003); and Hayes v. Delamotte 231 N.J. 373, 388 (2018). Irregular influence by sheriff's officers, to be inferred from courtroom video surveillance, was substantial error requiring reversal under Turner v. Louisiana 379 U.S. 466, 472-474 (1965); and Panko v. Flintkote Co. 7 N.J. 55, 61 (1951).

**D. The Trial Court's prohibition on calling and confronting witnesses was substantial error requiring reversal (13T160-17 to 18; 20T26-12 to 16)**

The Trial Court's prohibition on calling Scott M. Peterson as a witness was in conflict with *United States v. Valenzuela-Bernal* 458 U.S. 858, 867 (1982). The Trial Court made itself a witness to material facts, in conflict with *Quercia v. United States* 289 U.S. 466, 470 (1933); then refused to permit cross-examination of itself; in conflict with *Davis v. Alaska* 415 U.S. 308, 318 (1974).

**E. The Trial Court's Admission of Defendant's illegally quid pro quo May 16, 2013 statement; prohibition of testimony concerning the circumstances of it; and inclusion of his "fruits of the poisonous tree" trial testimony: were substantial errors requiring reversal (1T92-2 to 96-14)**

The Trial Court's admission of Defendant's May 16, 2013 statement, obtained through quid pro quo negotiation of an addictive substance which the in-custody Defendant was in withdrawals from in exchange for the statement, was in conflict with *Miller v. Fenton* 474 U.S. 104 (1985). The Trial Court's prohibition on Defendant from testifying concerning the circumstances of his custodial interrogation was in conflict with *Crane v. Kentucky* 476 U.S. 683 (1986). Defendant's trial testimony was compelled by the trial court's inclusion of the illegally obtained May 16, 2013 statement in conflict with *Harrison v. United States* 392 U.S. 219, 222-223, 225 (1968); and

by the destruction of Brady material, in conflict with <u>United</u> <u>States v. Pellulo</u> 105 F.3d 117 (3d Cir. 1997).

**F.The Trial Court's Refusal to remedy the destruction of Brady material with an adverse inference jury instruction was substantial error requiring reversal (15T38-18 to 45-19)**

The Trial Court's preclusion of consideration of the bad faith of the prosecutor improperly applied to its April 18, 2019 decision on the destruction of evidence the criteria set forth in <u>State v. Hollander</u> 201 N.J. Super. 453, 479 (App. Div.), Cert. Den. 101 N.J. 335 (1985). The Trial Court improperly applied the guidelines for providing an adverse inference instruction as set forth in <u>State v. W.B.</u> 205 N.J. 588 (2011); and <u>State v. Dabas</u> 215 N.J. 114, 141 (2013).

**G.Trial Counsel's performance at trial deprived Defendant of his substantial right to effective assistance of counsel, a substantial error contained completely within the trial record; which requires reversal (19T51-7 to 57-16)**

Trial Counsel's request for an affirmative defense involuntary intoxication instruction, admittedly over his client's expressed objection, was a concession of actus reus and was substantial error which requires reversal under <u>State v. R.T.</u> 205 N.J. 493, 511 (2011); and <u>McCoy v. Louisiana</u> 138 S.Ct. 1500, 1509, 1511, 200 L.Ed.2d 821 (2018). Trial Counsel's summation conceded guilt implicitly and explicitly in conflict with <u>McCoy v. Louisiana</u>

18

138 S.Ct. at 1511; <u>United States v. Cronic</u> 466 U.S. 648, 654, 658 (1984); and <u>State v. Fritz</u> 105 N.J. 42, 58 (1987).

## **Reasons for Certification**

Certification should be granted under <u>R.</u> 2:12-4; because the Appellate Division Opinion is in conflict with This Court's and also Higher Court's decisions in the cases cited heretofore in "errors complained of". Inconsistent standards as indicated heretofore in "errors complained of" warrant the Court to exercise its supervisory power and grant certification for purposes of clarification and correction. Certification should be granted because interpretation of statutes and case law cited heretofore in "errors complained of" is at issue. Certification should be granted because this petition presents a question of general public importance that should be decided by the Supreme Court.

## Conclusion

For the foregoing reasons, it is respectfully urged that the Court grant Defendant's Petition for Certification.

Respectfully Submitted,

Date: AUGUST 26, 2021

Caleb L. McGillvary, Pro Se

#1222665/SBI#102317G

New Jersey State Prison

Po Box 861

Trenton, New Jersey

08625-0861

## Certification of Petitioner

I am representing myself, pro se, in this matter. The above issues present substantial questions of law which merits review by this Court. This petition is made in good faith and not for the purposes of delay.

Date: AUGUST 26, 2021

Caleb L. McGillvary, Pro Se

#1222665/SBI#102317G

New Jersey State Prison

Po Box 861

Trenton, New Jersey

08625-0861

> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4519-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CALEB L. MCGILLVARY,

     Defendant-Appellant.

―――――――――――――――

     Submitted May 12, 2021 – Decided August 4, 2021

     Before Judges Alvarez and Geiger.

     On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-05-0344.

     Meyerson & O'Neill, attorneys for appellant (Matthew L. Miller, on the briefs).

     Gurbir S. Grewal, Attorney General, attorney for respondent (Amanda G. Schwartz, Deputy Attorney General, of counsel and on the briefs).

     Appellant filed pro se supplemental briefs.

PER CURIAM

DPa 1

Tried by a jury, defendant Caleb McGillvary was convicted of first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2). On May 30, 2019, the court sentenced defendant to fifty-seven years of imprisonment, subject to the No Early Release Act's (NERA) eighty-five percent parole ineligibility. See N.J.S.A. 2C:43-7.2. He appeals by way of counseled and uncounseled briefs, alleging that the court committed prejudicial errors during trial, and that the representation he received was ineffective. We affirm.

The charges against defendant arose from the May 13, 2013 discovery of the victim, Joseph Galfy, Jr., a seventy-four-year-old attorney. Police found Galfy beaten to death, lying face-down on his bedroom floor. Officers collected a variety of items and swabs from the scene, including a one-way train ticket from Rahway to Asbury Park from the day before, Sunday, May 12, 2013. Following that lead, Union County Prosecutor's Office Homicide Task Force Sergeant Johnny Ho located surveillance footage from the New Jersey Transit Rahway station, in which Galfy is seen that morning accompanied by another person, later identified as defendant. The video depicted Galfy purchasing a ticket from a vending machine and handing it to defendant, who then hugged the victim. The two men walked towards a train platform.

2

A-4519-18

DPa 2

Galfy's cell phone contact list included a number for "Kai" Lawrence, matching the telephone number on a piece of paper found in the bedroom. The victim and defendant exchanged calls on the evening of May 12, 2013. Galfy told defendant via text message at 5:33 p.m. that he would be at the train station in about ten minutes.

As a result, officers obtained a court order permitting the retrieval of defendant's phone and phone GPS records. However, the phone had been recently deactivated, and the final recorded location was Clark, the town where Galfy lived.

Defendant's last phone contact was with Kimberly Conley-Burns. She testified at trial that she contacted defendant on Facebook, as he was an internet personality, informing him that if he were ever in New Jersey, she could find him a place to stay. On Saturday, May 11, the day before the murder, defendant told Conley-Burns that he had met a man in Times Square who drove him to New Jersey, and was planning to stay in Newark, which defendant mistakenly believed was where the victim lived. Defendant mentioned that the person was older, his name was Joe, and that he was a lawyer.

3

A-4519-18

DPa 3

In a voicemail and text exchange, Conley-Burns warned defendant that Newark was dangerous and that he needed to be careful. He responded that he had found someone: "a good person who put [him] up for the night."

Defendant and Conley-Burns planned to meet in Asbury Park on May 12, which was Mother's Day. Because of a family brunch, Conley-Burns did not appear when defendant arrived that morning, so they changed their plan, agreeing to go to Philadelphia the following day. Defendant texted Conley-Burns that he had "to head up to Newark."

Conley-Burns then received a series of calls from defendant, which she was unable to answer. He told her that the place in Newark "fell through," asking if she could pick him up.

At approximately 10:00 to 10:15 p.m., defendant appeared at the White Diamond Diner in Clark, where he encountered Robert McNamara and his brother, initiating conversation and showing them an online video of himself. Defendant asked for directions to Rahway.

Alexander McCue was working at a 7-11 in Clark at around 11:30 p.m. when he saw defendant, whom he recognized from the internet because of defendant's distinctive face tattoo. Defendant asked McCue for directions to the Rahway train station, and McCue told him he thought there might be a train

A-4519-18

DPa 4

station in Clark.  Defendant interrupted him, saying he was not returning to

Clark, and was looking for the quickest way out.  McCue told defendant to walk

across the street since that was the border of Rahway, and defendant left.

Robert Scully, a New Jersey Transit train conductor, testified that while

working the night shift, traveling between Long Branch and New York City, he

collected defendant's ticket, noticing it was for Asbury Park.  Scully explained

defendant needed to catch a connecting train at Long Branch but would have to

wait since none operated at that hour.  Defendant borrowed Scully's phone to

ask his ride to meet him at Long Branch, although defendant had to place

multiple calls, possibly because no one was answering at the other end.  The

train arrived in Long Branch shortly after 2:30 a.m.

The following day, Monday, May 13, defendant left another voicemail for

Conley-Burns, describing his appearance so she could identify him when she

arrived at the Asbury Park train station.  Once they met, he immediately told her

he had just been "raped."  Defendant added that he had contacted police, but that

they would not do anything because the assailant was an attorney.  Defendant

also told her that he had awakened to find that he had ejaculate in his mouth, on

the side of his face, and on the side of his cheek.  He said something to the

A-4519-18

DPa5

perpetrator about it but Galfy denied that he did anything, so defendant just left. Defendant did not mention the rape again.

Conley-Burns saw no bruises, cuts, scratches, or scrapes on defendant's hands or face. Defendant told her he had cut his hair short, to about an inch or two, with a knife. He did not give a reason.

On the way to Philadelphia, Conley-Burns stopped to pick up a friend. She remembered defendant during that day as "very friendly," "talking to people," "rapping or beat boxing with these kids," "joking around," and "animated and playful." Defendant was "chatty. Off-beat. Quirky," and acted "weird." After spending time in Philadelphia, Conley-Burns drove defendant to the home of Marjory Erin Wagner, a friend who lived near Glassboro, because Wagner had agreed to let defendant stay there for the night.

Wagner testified that after Conley-Burns left, she, defendant, and her boyfriend spent the evening "listening to stories and drinking some beers." The following day, they drove defendant to a train station in Haddonfield around 7:00 or 8:00 in the evening. Defendant never said he had been raped, and she described his demeanor as "interesting" and "weird."

Defendant was eventually located in the Greyhound Bus terminal in Philadelphia on May 16, 2013, and taken to a precinct station. Ho and others

6

A-4519-18

DPa6

arrived at approximately 9:00 p.m. and interviewed defendant after advising him that he was being charged with murder. Defendant waived his Miranda[1] rights and gave a lengthy recorded statement, ending when he requested counsel. The video was shown to the jury.

When officers questioned defendant initially about what happened, defendant asked: "he died?" Defendant then told Ho that he met Galfy in Times Square by the bus depot, and told Galfy he was headed to New Jersey. The two got dinner from a restaurant near Galfy's house, and at first defendant "thought [Galfy] was real nice and then he [f***ing] raped me." After dinner, they drank beer while watching television in the living room, and defendant said Galfy wanted to put defendant's beer in a glass instead of leaving it in the bottle. Defendant drank about five beers and felt kind of groggy but walked to the guest bedroom by himself.

Defendant told detectives that before going to bed, Galfy asked defendant to shower with him. Defendant refused and showered alone before going to sleep. He awakened with a metallic taste in his mouth, a bad headache, and when he looked in the mirror in the morning, he thought he saw dried ejaculate on the side of his face. He did not confront Galfy and said he did not "really

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4519-18

DPa7

know what to think about it." Galfy drove him to a train station and purchased him a ticket to Asbury Park.

Defendant claimed that when he returned to Galfy's that night, they had dinner and a couple of beers. Defendant awakened on Galfy's bedroom floor, only to find Galfy pulling his pants. At that point, defendant began to hit him. Defendant could not remember how he struck Galfy. He said he "could have elbowed him. . . . kneed him. I don't know." He left the house, and remembered going to a diner and catching a train to Long Branch.

At trial, defendant explained his "home-free" lifestyle in which he played music and worked construction jobs when he needed money, but otherwise spent his time surfing. Around 2012 to 2013 he traveled from his home in Canada to the United States to continue this lifestyle. In February 2013, he achieved internet fame following an incident in California. He continued across the country, being offered food and places to stay by people who knew him from the internet.

Defendant testified that he encountered Galfy in New York City, that Galfy asked where he was headed, and remarked that he looked lost. Galfy put him up for the night, and he left after breakfast. Galfy told him to call if he was in the area and needed a place to stay. Defendant thanked Galfy and hugged

8

A-4519-18

DPa8

him goodbye because he did not know "what he had done to [him] at the time." He gave Galfy his phone number and email address.

On the stand, defendant said he cut his hair short on May 12, 2013, because he was warm. He testified he was going to travel to Atlanta, and it would be "really hot" there. Defendant cut his jeans into shorts because he wanted to exercise.

After his original plans with Conley-Burns fell through, defendant decided to spend a second night at Galfy's house. He thought he was still in the greater Newark area, which Conley-Burns had described as a dangerous place. Defendant took the train to Long Branch, hoping that if he was geographically closer to Galfy, Galfy would be more likely to let him stay at his home. After getting off the train, defendant called and asked if Galfy could host him again. Galfy agreed but added he would have to wait to be picked up since Galfy was in New York City. Defendant waited approximately forty-five minutes.

Once back at Galfy's home, Galfy again gave defendant beer poured into a glass. After dinner and a few beers, defendant "was feeling like really warm and fuzzy and like relaxed." He recalled Galfy putting the dishes in the dishwasher; the last thing he remembered was hearing the Jeopardy theme song. He came to on the floor in Galfy's room on his back.

A-4519-18

DPa9

Defendant testified:

> [T]he next thing I knew he was shoving me into the bed
> and I was trying to get him away from me and then I
> was hitting him and then he shoved my head on the
> floor and body slammed me and I couldn't breathe. And
> I was trying to get out from underneath him and he kept
> humping and grinding me. And he, he was trying to put
> my dick in his mouth and I was trying to get him away
> from me. I -- that's, that's all I can remember.

After the incident, defendant could not recall how he left Galfy's house or where he went. He knew he "came to" in a parking lot, his muscles were sore, he had a headache, and a metal taste in his mouth. Defendant remembered going to the diner and the 7-11. At the diner, he went into the bathroom, dry heaved into a toilet, and splashed water on his face. He showed a video of himself on the internet to the other men in the diner, ate something, and went outside to smoke. Defendant had problems with his phone, and by the time he was on the train to Long Branch, had thrown it out because it smelled like urine and would not turn on.

Defendant could not recall the whereabouts of the things he wore during the alleged sexual assault, which he said were soaked in blood and urine. He wore different clothes when speaking to the detectives in Philadelphia, but "[a]t some point [he] had to have [changed] because when [he] came to," he was dressed differently. He also confirmed that in a photograph taken with an

A-4519-18

DPa10

employee at the diner the night after the alleged sexual assault he was wearing different clothing. He claimed he was unaware that Galfy died until informed by the detectives.

Pre-trial, defendant unsuccessfully moved to suppress his initial statement, and to recuse the Union County criminal bench, or in the alternative, to be granted a change of venue. He also wanted to testify regarding Galfy's vacations outside the country, which he characterized as "kind of creepy" without further explanation, and to cross-examine a neighbor about a young man who had briefly lived with Galfy. We provide greater detail regarding those applications in the relevant sections. That motion was also denied.

Post-conviction, defense counsel filed a motion for a new trial, as did defendant pro se. Both motions were denied. Defendant unsuccessfully moved to represent himself during his sentencing.

Now on appeal, defendant claims the following errors:

### POINT I

[DEFENDANT]'S CONVICTION FOR FIRST DEGREE MURDER WAS AGAINST THE WEIGHT OF THE EVIDENCE.

A.    The Evidence Adduced at Trial Was Not Sufficient to Establish Beyond a Reasonable Doubt that [Defendant] Killed Mr. Galfy Purposely or Knowingly.

11

A-4519-18

DPa11

## POINT II

[DEFENDANT] IS ENTITLED TO A NEW TRIAL BECAUSE HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND THERE EXISTS A REASONABLE PROBABILITY THAT THE RESULT WOULD HAVE BEEN DIFFERENT BUT FOR COUNSEL'S ERRORS.

A.    Trial Counsel's Failure to Move to Strike Inadmissible Portions of Dr. Shaikh's Testimony was a Clear and Prejudicial Error that Prevented [Defendant] From Receiving a Fair Trial.

B.    Trial Counsel's Refusal to Cross-Examine a Key Witness Prejudiced [Defendant]'s Ability to Present His Defense.

C.    Trial Counsel Contradicted [Defendant]'s Testimony in His Closing Statement.

## POINT III

THE TRIAL COURT'S FAILURE TO STRIKE INADMISSIBLE AND HIGHLY PREJUDICIAL EXPERT TESTIMONY WAS A CLEAR ERROR THAT PREVENTED DEFENDANT FROM RECEIVING A FAIR TRIAL AND NECESSITATES REVERSAL ON APPEAL.

## POINT IV

PROSECUTORIAL MISCONDUCT PREJUDICED [DEFENDANT]'S RIGHT TO A FAIR TRIAL.

A.    The State Misconstrued and Exaggerated the Evidence Concerning the Manner in Which

12

A-4519-18

DPa12

Decedent Sustained His Injuries in Direct Contravention of the Record.

B.    The State Mischaracterized [Defendant]'s Defense to Make it Appear Implausible and Absurd.

C.    The Prosecutor's Improper Characterization of the Evidence and Defendant's Theory of the Case Contributed to the Cumulative Errors that Rendered this Trial Unreliable and Unfair.

## POINT V

THE TRIAL COURT'S APPLICATION OF AGGRAVATING FACTOR [ONE] WAS IMPROPER BECAUSE IT DOUBLE COUNTED THE EVIDENCE USED TO ESTABLISH THE OFFENSE.

A.    The Trial Court Improperly Applied Aggravating Factor [One].

## POINT VI

THE TRIAL COURT ERRED BY BARRING [DEFENDANT]'S TESTIMONY CONCERNING THE ALLEGED 'CREEPINESS' OF MR. GALFY'S VACATIONS AND THE 'YOUNG FRIEND' HE HAD LIVING WITH HIM.

## POINT VII

CUMULATIVE ERROR PREVENTED [DEFENDANT] FROM RECEIVING A FAIR TRIAL.

In his pro se brief, defendant raises the following claims of error:

13

A-4519-18

DPa13

## POINT I

DENIAL OF [DEFENDANT]'S MOTION TO CHANGE THE VENUE WAS AN ABUSE OF DISCRETION AMOUNTING TO REVERSIBLE ERROR.

## POINT II

CHARGING JURY BURDEN SHIFTING [N.J.S.A.] 2C:2-8(d) INSTRUCTION OVER [DEFENDANT]'S OBJECTION DEPRIVES HIM OF HIS SUBSTANTIAL RIGHT TO DUE PROCESS AND REQUIRES REVERSAL.

## POINT III

IRREGULAR INFLUENCES ON THE JURY WERE PLAIN ERROR AFFECTING [DEFENDANT]'S SUBSTANTIVE DUE PROCESS RIGHTS AND REQUIRES REVERSAL AND A NEW TRIAL.

## POINT IV

TRIAL COURT'S PROHIBITION ON CALLING OR CONFRONTING WITNESSES WAS STRUCTURAL ERROR REQUIRING REVERSAL.

## POINT V

THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO SUPPRESS [DEFENDANT'S] [MAY 16, 2013] STATEMENT; AND ITS ADMISSION AT TRIAL AND ALSO [DEFENDANT]'S TESTIMONY WERE FRUITS OF THE POISONOUS TREE.

A-4519-18

DPa 14

## POINT VI

TRIAL COURT ABUSED ITS DISCRETION BY NOT PROVIDING AN ADVERSE INFERENCE INSTRUCTION TO REMEDY [BRADY[2]] VIOLATIONS BY THE STATE, WHICH REQUIRES A NEW TRIAL.

## POINT VII

DEFENSE COUNSEL['S] . . . PERFORMANCE AT TRIAL DEPRIVED [DEFENDANT] OF HIS SUBSTANTIAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, A STRUCTURAL ERROR REQUIRING REVERSAL.

## POINT VIII

DENIAL OF [DEFENDANT]'S SUBSTANTIAL SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS A STRUCTURAL ERROR REQUIRING REVERSAL OF [DEFENDANT]'S CONVICTION.

I.

We first address defendant's contention that the first-degree murder conviction was against the weight of the evidence. He posits that because the evidence did not demonstrate the requisite state of mind, the judge should have granted his motion for a new trial.

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

A-4519-18

DPa15

Rule 3:20-1 provides that a trial judge may grant such applications where "required in the interest of justice." However, the trial judge shall not "set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." Ibid.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). "There is no 'miscarriage of justice' when 'any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" State v. Jackson, 211 N.J. 394, 413-14 (2012) (quoting State v. Afanador, 134 N.J. 162, 178 (1993)). We "weigh heavily the trial court's 'views of credibility of witnesses, their demeanor, and [its] general feel of the case.'" State v. Carter, 91 N.J. 86, 96 (1982) (alteration in original) (quoting State v. Sims, 65 N.J. 359, 373 (1974)).

N.J.S.A. 2C:11-3(a) provides that "criminal homicide constitutes murder when: [] (1) The actor purposely causes death or serious bodily injury resulting

A-4519-18

DPa 16

in death; or [] (2) The actor knowingly causes death or serious bodily injury resulting in death . . . ." Thus, for serious bodily injury murder (SBI murder), the State needs to prove that a defendant "[(1)] knowingly or purposely inflicted serious bodily injury with actual knowledge that [(2)] the injury created a substantial risk of death, and that [(3)] it was 'highly probable' that death would result." State v. Wilder, 193 N.J. 398, 409 (2008) (alterations in original) (quoting State v. Jenkins, 178 N.J. 347, 363 (2004)). For purposeful SBI murder, the State must prove that "'defendant's conscious object [was] to cause serious bodily injury that then resulted in the victim's death' and that defendant 'knew that the injury created a substantial risk of death and that it was highly probable that death would result.'" Jenkins, 178 N.J. at 362 (alteration in original) (quoting State v. Cruz, 163 N.J. 403, 417-18 (2000)).

To sustain "'knowing' SBI murder, the State must make the same showing, except that, rather than proving that serious bodily injury was defendant's conscious objective, it need only demonstrate that he 'was aware that it was practically certain that his conduct would cause serious bodily injury.'" Id. at 362-63 (quoting Cruz, 163 N.J. at 418).

The Supreme Court has delineated the key differences between aggravated manslaughter and SBI murder. Wilder, 193 N.J. at 409; Jenkins, 178 N.J. at

A-4519-18

DPa 17

362-63; Cruz, 163 N.J. at 417-18.    A defendant commits aggravated manslaughter when "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life." Wilder, 193 N.J. at 409 (alteration in original) (quoting N.J.S.A. 2C:11-4).  Aggravated manslaughter differs in that it "does not require an intention to cause serious bodily injury or an awareness that death is 'practically certain' to follow." Ibid. (quoting Cruz, 163 N.J. at 417-18).  Extreme indifference to human life focuses "not on the defendant's state of mind, but on the circumstances under which the defendant acted." Ibid. (quoting Cannel, N.J. Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:11-4 (2007)).  Therefore, if a "defendant disregarded only a 'possibility' of death, the result is reckless manslaughter." Jenkins, 178 N.J. at 363.

In denying defendant's application, the judge noted the overwhelming proofs that defendant caused the victim's death, satisfying the first element necessary for first-degree murder.  The extent of the injuries, established by the medical examiner's testimony, and corroborated by autopsy photographs and other medical records, included a "broken neck, broken ribs, and . . . the mauling of his head to the point where his ear" was torn, the cartilage visible.  The judge opined the injuries demonstrated that the assault was far more than just an effort to thwart a sexual advance.

A-4519-18

DPa 18

Moreover, defendant's conduct following the attack, including his change of clothing and hairstyle, and his "remarkable memory as to extraordinary details" demonstrated that defendant was not believable.  Despite remembering everything regarding his first meeting with Galfy, and the topics of their conversation, he could not remember the whereabouts of his stained clothing. Defendant discarded his phone and falsely told Conley-Burns that he had reported the alleged assault to police.  He left New Jersey and was on his way to Georgia.  Thus no "manifest denial of justice under the law" occurred, much less one that required a new trial.

The judge's decision was sound, supported by the record, and not a clear abuse of discretion.  The medical examiner testified that Galfy died from blunt force trauma from many blows over his body, including to his eyes, mouth, ears, the back of his head, his neck, his shoulders, arms, and ribs.  Blood splatters in the bedroom surrounded the victim.  Galfy was a seventy-four-year-old man, smaller in stature than defendant, and the severity and number of his injuries supported the jury's conclusion that defendant knew his actions created substantial risk of death, or that he was aware that death was practically certain to result.  The repeated crushing blows demonstrated defendant's intent to cause serious bodily injury.  See Wilder, 193 N.J. at 409.

19

DPa 19

The jury heard and rejected defendant's testimony regarding the defenses of involuntary intoxication and self-defense. The court instructed the jury as to their role as factfinders and their duty to determine the credibility of the witnesses, tracking the model jury charges. Model Jury Charges (Criminal), "Criminal Final Charge, Function of the Jury" (rev. May 12, 2014). It also instructed the jury on purposeful and knowing serious bodily injury murder, as well as the required elements of passion/provocation manslaughter and aggravated/reckless manslaughter.[3] The court further instructed on self-defense and involuntary intoxication.[4] Therefore, the jury was fully apprised and aware of their options to convict defendant of the lesser-included crimes but decided instead that the evidence supported SBI murder.

The record does not suggest a miscarriage of justice occurred. The jury assessed defendant's testimony and proffered defenses and rejected them. The judge did not abuse his discretion by denying defendant's motion for a new trial.

---

[3] Defendant does not challenge these jury instructions.

[4] These instructions are challenged on appeal and will be addressed in Point VIII.

20

A-4519-18

DPa20

## II.

Defendant asserts both in his counseled and uncounseled brief that he received ineffective assistance of counsel.  He anchors this argument on trial counsel's examination of the medical examiner, decision not to cross-examine a State's witness, and discussion in summation of a portion of defendant's testimony.  We do not comment on the merits of any of the claims, deferring to post-conviction review.  These issues cannot be resolved based on the trial record alone.  See State v. Hess, 207 N.J. 123, 145 (2011).  Counsel's trial strategy, which informed the manner in which he conducted his examination of witnesses and the formulation of his closing statement, cannot be gleaned from this record.  See ibid.

## III.

Defendant claims that the court should have struck portions of the medical examiner's testimony sua sponte.  Specifically, he objects to the following:

> Q.    Could [the injury to Galfy's right ear] have been caused, say, from if Mr. Galfy was on the ground and a foot came down, hit the ear and came -- in a downward fashion, something of that nature?

> A.    It could be consistent.

. . . .

21

A-4519-18

DPa 21

Q.    Could [the swelling in Galfy's brain] have come from a knee hitting him somewhere on the head . . . ?

A.    It's possible.

Q.    Could it have come from a fist?

A.    Yes.

Q.    An elbow?

A.    Yes, but I don't see any pattern injury where I can categorically say that it was one of those objects.

Q.    What about a stomp?

Could it have come from a stomp?

A.    Yes.

We review this claim employing the plain error standard of review, as defendant did not object at the time.  Thus, defendant needs to establish that the error was "clearly capable of producing an unjust result."  State v. Prall, 231 N.J. 567, 581 (2018) (quoting R. 2:10-2).

N.J.R.E. 702 informs our analysis.  The answers defendant describes as unreliable were nothing more than responses given by the expert to hypothetical questions.  After the hypotheticals were posed, defendant's attorney thoroughly cross-examined, exploring the expert's use of phrases such as "could have been"

22

A-4519-18

DPa 22

or "possibly," establishing that he was not rendering an opinion to a medical certainty. See State v. Martini, 131 N.J. 176, 259-60 (1993) (stating opposing counsel may cross-examine an expert witness to question the expert's opinions on hypothetical situations presented on direct).

The mere fact that the medical examiner responded to hypotheticals put to him by the prosecutor did not create error. He was conclusive regarding the injuries suffered by the victim, and that the injuries caused his death. That defense counsel appropriately elicited that the expert could not identify what part of the assailant's body caused which injuries, does not in any way weaken the foundation of his testimony—that the multiple injuries inflicted upon Galfy constituted homicide.

Furthermore, the trial court instructed the jury that it could either accept or reject expert testimony at its discretion. Model Jury Charges (Criminal), "Expert Testimony" (rev. Nov. 10, 2003). The court's failure to sua sponte strike the testimony was not clearly capable of producing an unjust result.

## IV.

Defendant also contends that the prosecutor's summation unfairly mischaracterized his testimony and that of the medical examiner. If a prosecutor makes impermissible commentary in his or her summation, the court must weigh

23

A-4519-18

DPa23

"the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial . . . ." State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).  The reviewing court will review a conviction based on prosecutorial misconduct if "the conduct was so egregious as to deprive defendant of a fair trial." Ibid. (quoting Papasavvas, 163 N.J. at 625).

For a prosecutor's comment to require a new trial, however, "there must have been 'some degree of possibility that [the prosecutor's comments] led to an unjust result.'" State v. McNeil-Thomas, 238 N.J. 256, 276 (2019) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)).  The possibility of an unjust result "must be real, one sufficient enough to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting R.B., 183 N.J. at 330).

"Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Jackson, 211 N.J. at 409 (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)). Whether the comments had the capacity to deprive defendant of a fair trial is

A-4519-18

DPa24

decided "within the context of the trial as a whole." State v. Feaster, 156 N.J. 1, 64 (1998).

"In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial," the reviewing court considers "the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred." State v. Timmendequas, 161 N.J. 515, 575 (1999). The consideration includes "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Id. at 575-76 (quoting State v. Ramseur, 106 N.J. 123, 322-23 (1987)).

Generally, if counsel does not object to the remarks at trial, "the remarks will not be deemed prejudicial." Id. at 576. By not making a timely objection, defense counsel indicates a belief that "the remarks were [not] prejudicial at the time they were made." Ibid. The lack of an objection "also deprives the court of the opportunity to take curative action." Ibid. Nevertheless, even if defense counsel does not object, the "prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved." Ibid. (quoting State v. Long, 119 N.J. 439, 483 (1990)).

A-4519-18

DPa25

Because defense counsel did not object to the prosecutor's summation statements, defendant must demonstrate plain error.  See ibid.  "Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the meris of his defense.'"  Ibid. (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

Defendant cites to the following as an example of prosecutorial misconduct:

> Ladies and gentlemen, as you watched Dr. Shaikh testify, there was a reason for this.  There is a reason we went through every single mark.  Every time I asked him, Doctor, could that have been a different hit?  Absolutely, it could have been another hit . . . .  Remember that over and over and over?

Additionally, defendant contends that the prosecutor presented the killing in an inflammatory manner, introducing the unfounded theory that defendant "stomped" the victim to death.  We do not agree.  The prosecutor's statements were reasonable inferences drawn from the medical examiner's testimony.  It was up to the jury to accept or reject those inferences.  See R.B., 183 N.J. at 330.

With regard to defendant's contention that the prosecutor mischaracterized defendant's testimony, he points us to the following:

26

A-4519-18

DPa26

> Now, let's just play the game this did happen. Why would [seventy-four]-year-old [Galfy], the heart condition [sic], then try in any way to drag a six-foot, 175 pound [defendant] -- whatever he weighs -- back to the bedroom? Why not just assault him where he lies? Wouldn't that be a heck of a lot easier than trying to get him to the bedroom? But not even in the bed, allegedly dump[ing] him on the floor? But we know who's found on the floor and it's not [defendant] because he's here. None of that makes sense.  But the memory keeps getting better as last week's story continues.

These comments were unobjectionable.

At trial, defendant said he recalled sitting with the victim in the living room, "feeling warm and fuzzy, and the last thing [he] remember[ed] [was] hearing the Jeopardy theme and then [he] was on the floor of [Galfy's] room on [his] back." The prosecutor's comments pointed out to the jury the weakness in defendant's description of the manner in which the killing occurred.  He drew permissible inferences from the evidence, which the jury was free to accept or reject.

## V.

Defendant also contends that the trial court's application of aggravating factor one during sentencing was improper double counting of the evidence used to establish the offense.  He argues that the nature of the attack, namely, a beating resulting in death, satisfied the statutory element for murder and

A-4519-18


DPa27

therefore made the circumstances unavailable as support for aggravating factor one.

But as the Court said in <u>State v. Fuentes</u>, 217 N.J. 57, 75 (2014), "a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." So long as the injuries exceeded those required to satisfy the statutory element, this factor is available because the conduct "extended to the extreme reaches of the prohibited behavior." <u>Ibid.</u> (quoting <u>State v. Henry</u>, 418 N.J. Super. 481, 493 (Law Div. 2010)).

In this case the injuries exceeded those necessary to cause death. Therefore, it was not error for the court to find aggravating factor one.

VI.

Defendant also contends that the court erred in barring testimony from him and others regarding the victim's vacations out of the country, which defendant described as "like kind of creepy." Additionally, defendant claims the victim told him about a "young friend" that lived with him and who, whenever guests were present, would become very intoxicated. Defendant asserts the testimony was relevant under N.J.R.E. 404(b) to help establish for

28

A-4519-18

DPa28

the jury his reasonable belief of the need to defend himself from Galfy's sexual advances.

When considering the trial court's evidentiary rulings, we employ a deferential abuse of discretion standard, reviewing the rulings "only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). An appellate court may "not substitute [its] judgment for the trial court's unless its 'ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

For evidence to be admissible at trial, it "must be relevant—that is, it must have 'a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" State v. Sanchez-Medina, 231 N.J. 452, 462 (2018) (quoting N.J.R.E. 401). The court's "inquiry focuses on 'the logical connection between the proffered evidence and a fact in issue,'" and "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar." State v. Buckley, 216 N.J. 249, 261 (2013) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 15 (2004)). The court should ask "whether the thing sought to be established is more logical with the evidence than without it." Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)).

A-4519-18

DPa29

"Even if relevant, 'evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury.'"  Sanchez-Medina, 231 N.J. at 462 (alteration in original) (quoting N.J.R.E. 403).  For evidence to be admissible it "must be 'relevant to a material issue,' and its probative value 'must not be outweighed by its apparent prejudice.'"  Id. at 465 (quoting State v. Cofield, 127 N.J. 328, 338 (1992)).

The court did not err in keeping this testimony out.  Barring cross-examination of a neighbor regarding a prior occupant of the victim's home, or defendant from testifying about Galfy's alleged "creepy" vacations was a reasonable exercise of discretion.  The evidence was not of "other crimes, wrongs, or acts," N.J.R.E. 404(b), and was not relevant.  It constituted highly speculative suggestions intended to bolster defendant's theory that he needed extreme force to fend off Galfy's alleged sexual overtures.  Galfy's vacations and that he previously lived with a young man had little relevance to the trial issues.  Any minimal probative value it had was substantially outweighed by the potential for undue prejudice or confusion.  See Sanchez-Medina, 231 N.J. at 462; N.J.R.E. 403.

A-4519-18

DPa 30

## VII.

Defendant also argues that cumulative error prevented him from receiving a fair trial.  Since we conclude no error occurred, the point does not warrant further discussion in a written opinion.  R. 2:11-3(e)(2).

## VIII.

Defendant in his uncounseled brief raises many points for which there is little support in the record.  Overall, they do not warrant extended discussion in a written opinion.  R. 2:11-3(e)(2).

Defendant revisits the denial of his motions for change of venue.  The victim was a former law partner of the criminal presiding judge in the county where he was tried.  The partnership ended some thirteen years before the trial. So long as that judge did not preside over any aspect of the matter, the Assignment Judge who heard defendant's motion did not consider removal necessary.  See In re Advisory Letter No. 7-11 of the Sup. Ct. Comm., 213 N.J. 63, 77 (2013). We agree.

Additionally, the trial judge on the record commented that he had seen the video that launched defendant to internet fame.  Defendant views this act as highly prejudicial but does not identify the prejudice.

31

A-4519-18

D Pa31

Defendant asserts there were multiple times in the courtroom during which he claims he was treated disrespectfully. Occasionally, the record establishes the judge became frustrated with the proceedings, and with defendant's conduct in the courtroom. These instances were rare, did not affect the legal rulings, and could not have prejudiced the jury's verdict.

Defendant also seems to argue that the court erred in instructing the jury on involuntary intoxication because there was insufficient evidence to warrant the charge being given. During the charge conference, counsel said he wanted the instruction, but that his client did not. A trial judge may deliver a charge when a defendant objects to it only if the facts "clearly indicate" that the proposed charge is appropriate. State v. Choice, 98 N.J. 295, 298 (1985).

"[W]here counsel requests a charge on a defense, it will be given if there is a rational basis in the evidence to do so." State v. R.T., 205 N.J. 493, 509 (2011) (Long, J., concurring). The Supreme Court has also stated that "[t]rial courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal." State v. Perry, 124 N.J. 128, 162 (1991).

Applying these standards, the instruction was not error. Defendant testified that the victim served him beer, that he experienced an unusual taste in

32

DPa 32

his mouth the following morning and felt "fuzzy" after consuming it. Although defendant did not explicitly say so, he was implying that Galfy drugged him so he could sexually assault him. The judge had to give the charge under these circumstances because the defense depended in part on that claim.

For the first time on appeal, defendant asserts he should have been permitted to call the prosecutor and the judge as witnesses. Defendant believes the State did not do sufficient testing on the material gathered from the crime scene, and that the judge denied seeing sheriff's officers laughing at his recorded statement when it was played to the jury. These requests are procedurally improper and have no foundation in the record.

Defendant requested and was denied an adverse inference instruction during the trial. He alleges the State should have administered a rape kit, tested a towel found at the crime scene for semen, and conducted forensic investigation to support his theory of the case. The adverse inference instruction, however, is appropriate when the alleged "spoliator destroyed or otherwise concealed [evidence that] would have been unfavorable . . . ." State v. Dabas, 215 N.J. 114, 140 n.12 (2013) (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 401-02 (2001)). Failure to test does not, standing alone, justify or constitute a basis for the instruction.

A-4519-18

D Pa 33

Finally, defendant contends that he should have been permitted to represent himself. Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial. Defendant never refiled even though the judge clearly explained to him that the issue would not be reached at that point.

Defendant also complains that his motion for self-representation at sentencing should have been granted. At that time, the judge did ask defendant some of the questions routinely posed to determine if defendant's decision was being made knowingly and intelligently. See State v. Reddish, 181 N.J. 553, 593-95 (2004) (explaining the court must make inquiries about defendant's knowledge regarding the implications concerning his right against self-incrimination, waiver of ineffective-assistance-of-counsel claims, and "the nature and consequences of his waiver," and that these questions must be "open-ended" so defendant describes his understanding "in his own words"); see also State v. King, 210 N.J. 2, 19-20 (2012).

During the oral argument on defendant's motion, the court stressed that defendant's conduct in the courtroom, and relationship with serial attorneys, demonstrated that his wish to proceed pro se was nothing short of an "attempt to manipulate the [c]ourt proceedings as he ha[d] attempted to do so throughout

A-4519-18

DPa34

the entirety of the trial."  In the judge's opinion, the application was a step taken only to delay the process.  The judge noted that under State v. Drew, 383 N.J. Super. 185, 200 (App. Div. 2006), a defendant must demonstrate a willingness to comply with rules of procedure and courtroom protocol in order to effectively waive his right to counsel—which defendant had not.

The judge observed defendant had "been hostile, aggressive, noncompliant, ha[d] repeatedly ignored serial admonitions from [the] [c]ourt over and [over] again," and that "his conduct ha[d] been serially contemptuous" and "deviously calculating."  As an example, the court cited defendant's reference to the viral video of his news interview during his testimony "knowing the great lengths [to which] the lawyers and the [c]ourt went . . . to ensure there would be no such reference to the clearly irrelevant[,] inadmissible and highly prejudicial video interview or the incident that led to the video."  The judge referenced other instances where defendant outright disregarded the court's rulings.  Additionally, during an "unrestrained outburst" outside the presence of the jury, defendant described his trial as a "kangaroo court."  Even as the judge was rendering his decision on defendant's motion to represent himself, defendant continuously interrupted him.  Accordingly, the judge's decision was not an abuse of discretion.

A-4519-18

DPa 35

Any other claim of error not explicitly addressed in this opinion is too lacking in merit to warrant further discussion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

36

A-4519-18

D Pa 36

Caleb L. McGillvary, Pro se
New Jersey State Prison
Third & Cass Street
P.O. Box 861-1222665/102317G
Trenton, New Jersey 08625

|  | SUPREME COURT OF NEW JERSEY |
|---|---|
|  | DOCKET NO. _____ |
| State of New Jersey, | APPELLATE DIVISION DOCKET |
|     Plaintiff-Respondents | No. A-004519-18-T3 |
| vs. | **CRIMINAL ACTION** |
| Caleb L. McGillvary, | NOTICE OF PETITION FOR |
|     Defendant-Appellant | CERTIFICATION |

Sat Below:

Hon. Alavarez, J.A.D.
Hon. Geiger, J.A.D.

TO: Clerk of the Supreme Court
    Hughes Justice Complex
    P.O. Box 970
    Trenton, New Jersey, 08625-0970

    Clerk of the Appellate Division
    Hughes Justice Complex
    P.O. Box 006
    Trenton, New Jersey, 08625-0970

    Amanda Schwarz, Esq.
    Deputy Attorney General
    Criminal Appellate Division
    Hughes Justice Complex
    P.O. Box 086
    Trenton, New Jersey, 08625

    Robert Eppenstein, Div. Mgr.
    Union County Courthouse
    2 Broad Street
    Elizabeth, New Jersey, 07102

DPg 37

Hon. Robert A. Kirsch, J.S.C.
Union County Courthouse
2 Broad Street
Elizabeth, New Jersey, 07102

**PLEASE TAKE NOTICE THAT,** Appellant <u>Caleb L. McGillvary,</u> confined at the New Jersey State Prison in Trenton, New Jersey, 08625, hereby moves before this court, at a date and time to be determined by the Clerk of the Court, upon Notice of Petition For Certification pursuant to <u>R.</u> 2:12-3(a) from the Superior Court of New Jersey-Appellate Division, August 4, 2021 per curiam Order/Opinion which affirmed the Trial Court's judgment of conviction for first degree murder in accordance with the No Early Release Act ("NERA") (<u>N.J.S.A.</u> 2C:11-3(a)) and imposed a sentence of 57 years with an 85% parole ineligibility period.

**PLEASE TAKE ADDITIONAL NOTICE THAT,** Appellant will rely on the attached certification in support thereof.

Respectfully submitted

Caleb L. McGillvary, Pro se

CC: file/clm

Date: August 12, 2021

2

DPa 38

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G
New Jersey State Prison
Po Box 861
Trenton, New Jersey
08625-0861

| State of New Jersey | | Supreme Court of New Jersey |
|---|---|---|
| Plaintiff/ | | S. Ct. Dkt. No. 086174 |
| Respondent | | App. Div. Dkt. No. A-004519-18-T3 |
| v. | | **Criminal Action** |
| Caleb L. McGillvary | | On Appeal from Superior Court of New |
| Defendant/ | | Jersey, Appellate Division |
| Petitioner | | Sat Below: |
| | | Hon. Carmen H. Alvarez,P.J.A.D. |
| | | Hon. Richard J. Geiger. J.A.D. |

**Defendant's Reply to the State's Brief in Opposition to
Defendant's Petition for Certification**

**DEFENDANT IS CURRENTLY CONFINED**

**DATED: September 19, 2021**

## Table of Contents

Statement of Facts and Procedural History                    ...1

Legal Arguments                                              ...3

Point I: The Trial Court's failure to clearly relate the fact of
intoxication, not constituting a defense under N.J.S.A. 2C:2-
8(d), to lesser included offenses: impermissibly forced the jury
to choose between a murder conviction and an acquittal; without
educating them as to the law in regards to their option to find
intoxication and still convict Defendant of Aggravated or
Reckless Manslaughter; which specifically mandates reversal
under State v. Warren (Dpa32-33; 16T13-22 to 16-23)

                                                             ...3

Point II: The Trial Court failed to properly instruct the jury
as to the standard of proof in regards to intoxication for the
mental purposeful/knowing element of murder as required by the
Model Jury Charge and State v. Warren(Dpa32-33; 16T13-22 to 16-
23)                                                          ...7

Conclusion                                                   ...10

Certification of Petitioner                                  ...10

## **TABLE OF JUDGMENTS, ORDERS, AND RULINGS BEING APPEALED**

Trial Court's Order denying Defendant's Motion to Suppress his
05/16/13 Statement                          ...1T92-2 to 96-14

Trial Court's Order denying Defendant's Motion to recuse the
Union County Criminal Bench             ...4T35-10 to 35-15

Trial Court's Ruling Denying Defendant's Request to Argue His
Case Pro Se                              ...6T4-3 to 6-13

Trial Court's Ruling Denying Defendant's Request to Remedy
Irregular Influences on the Jury

        ...13T11-3 to 13-11; 13T158-1 to 162-6; 19T53-8 to 57-16

Trial Court's Ruling Prohibiting Defendant from calling Scott
Peterson as a witness      ...13T160-17 to 18; 20T26-12 to 16

Trial Court's Order Denying Defendant's Motion for Adverse
Inference                                ...15T38-18 to 45-19

Trial Court's Ruling on Defendant's Pro Se Objection to the
Inclusion of the Jury Instruction on 2C:2-8(d)

                                      ...16T13-22 to 16-23

Trial Court's Order Denying Defendant's Pro Se Motion for New
Trial                                    ...19T51-7 to 57-16

Judgement of Conviction and Order of Commitment      ...Da 204

Appellate Division's Judgment and Opinion Affirming the Trial
Court's Judgment of Conviction                   ...Dpa1-36

## Table of Citations

**Caselaw**

Duncan v. Louisiana 391 U.S. 145 (1968)                    ...8

In re Winship 397 U.S. 358 (1970)                    ...7,8

Sparf v. United States 156 U.S. 51 (1895)            ...8

State v. Anderson 127 N.J. 191 (1992)                ...8

State v. Bowens 108 N.J. 622 (1987)                  ...5

State v. Cameron 104 N.J. 42 (1986)                  ...6

State v. Crisantos 102 N.J. 265 (1986)               ...5

State v. Crumb 307 N.J. Super. 204 (App.Div.1997), cert.

den. 153 N.J. 215 (1998)                             ...5

State v. Green 86  N.J. 281 (1981)                   ...4

State v. Green 312 N.J. Super. 456 (App.Div.), cert. den. 156

N.J. 425 (1998)                                      ...5

State v. Grunow 102 N.J. 133 (1986)                  ...4

State v. Klich 321 N.J. Super 388 (App. Div. 1999)   ...4,5,7

State v. Medina 147 N.J. 43 (1996)                   ...7,8,10

State v. Warren 104 N.J. 571 (1986)              ...3,4,5,7,9

Sullivan v. Louisiana 508 U.S. 275 (1993)        ...7,8,10

United States v. Pine, 609 F.2d 106 (3d Cir.1979)    ...7

**Court Rules**

N.J.C.R. R. 1:4-3                                    ...1

N.J.C.R. R. 2:12-3(a)                                ...1

## Statutes

N.J.S.A. 2C:2-2b(3)                                    ...3

N.J.S.A. 2C:2-8(a)                                     ...7

N.J.S.A. 2C:2-8(d)                                     ...3

N.J.S.A. 2C:11-3                                       ...8

N.J.S.A. 2C:11-4                                       ...8

N.J.S.A. 2C:11-4(a)                                    ...3

## Model Jury Charges

Model Jury Charge N.J.S.A. 2C:2-8(a)                   ...7,9

## Statement of Facts and Procedural History[1]

Defendant adopts by reference the statement of the matter presented from his August 25, 2021 pro se Petition for Certification under N.J.C.R. R. 2:12-3(a) challenging the propriety of an Appellate Division opinion affirming the Trial Court's judgment of conviction and sentence of 57 years imprisonment with 85% parole ineligibility period; and asserts same as though fully set forth herein pursuant to R. 1:4-3

---

[1] The following citation form is used:
"Da" refers to Defendant's Appendix to His Pro Se Supplemental Plenary Brief
"Dpa" refers to Defendant's Appendix to His August 25, 2021 Petition for Certification to this Court
"1T" refers to the transcript of the January 8, 2016 proceeding
"2T" refers to the transcript of the September 30, 2016 proceeding
"3T" refers to the transcript of the July 19, 2017 proceeding
"4T" refers to the transcript of the February 8, 2018 proceeding
"5T" refers to the transcript of the March 26, 2018 proceeding
"6T" refers to the transcript of the January 7, 2019 proceeding
"7T" refers to the transcript of the March 21, 2019 proceeding
"8T" refers to the transcript of the April 2, 2019 proceeding
"9T" refers to the transcript of the April 3, 2019 proceeding
"10T" refers to the transcript of the April 9, 2019 proceeding
"11T" refers to the transcript of the April 10, 2019 proceeding
"12T" refers to the transcript of the April 11, 2019 proceeding
"13T" refers to the transcript of the April 16, 2019 proceeding
"14T" refers to the transcript of the April 17, 2019 proceeding
"15T" refers to the transcript of the April 18, 2019 proceeding
"16T" refers to the transcript of the April 22, 2019 proceeding
"17T" refers to the transcript of the April 23, 2019 proceeding
"18T" refers to the transcript of the April 24, 2019 proceeding
"19T" refers to the transcript of the May 23, 2019 proceeding
"20T" refers to the transcript of the May 30, 2019 proceeding
"21T" refers to the transcript of the September 23, 2020 proceeding

Additionally, on April 23, 2021, the Trial Court instructed the jury as follows:

"Intoxication – not self-induced
There is evidence in this case concerning the intoxication of the defendant.
Intoxication means a disturbance of mental or physical capacities resulting from the introduction of substances into the body.
Our law provides that intoxication which is not self-induced is an affirmative defense if by reason of such intoxication the actor at the time of his conduct did not know the nature and quality of the act he was doing, or if he did know it, then he did not know what he was doing was wrong.
The defendant has the burden of proving the affirmative defense of intoxication by clear and convincing evidence. Clear and convincing evidence is that which produces in your mind a firm belief or conviction as to the truth of the facts sought to be proven and is evidence so clear, direct, weighty and convincing as to enable you to come to a clear conviction, without hesitancy, of the truth of the particular facts in issue.
Therefore, to establish intoxication as a defense to the criminal charge in this case, the defendant must prove by clear and convincing evidence that he was intoxicated so as not to know the nature of and quality of what he was doing, or if he did know it, that he did not know what he was doing was wrong, and that the intoxication was not self-induced.
Keep in mind, however, that although the burden rests upon the defendant to establish the defense of intoxication by clear and convincing evidence, the burden of proving the defendant guilty of the offense charged here, beyond a reasonable doubt, is always on the State, and that burden never shifts.
If you find that the defendant has sustained his burden of proof by clear and convincing evidence, then he has established the defense of intoxication and your verdict must be not guilty.
If, however, you find that the State has met its burden and has proven, beyond a reasonable doubt, every element of the offense charged and that the defendant has not sustained his burden of proving the defense of intoxication by clear and convincing

evidence, then your verdict must be guilty." 17T102-12
to 104-6 (Emphasis added)

This Reply Brief is now before the Court.

## Legal Argument

**Point I: The Trial Court's failure to clearly relate the fact of intoxication, not constituting a defense under N.J.S.A. 2C:2-8(d), to lesser included offenses: impermissibly forced the jury to choose between a murder conviction and an acquittal; without educating them as to the law in regards to their option to find intoxication and still convict Defendant of Aggravated or Reckless Manslaughter; which specifically mandates reversal under State v. Warren (Dpa32-33; 16T13-22 to 16-23)**

This Court in State v. Warren held that:

"The basic defect in the charge was the failure to relate the defense of intoxication to the lesser included offenses of manslaughter and aggravated manslaughter. The court defined "recklessness," which is predicated on the defendant's conscious disregard of "a substantial and unjustifiable risk," N.J.S.A. 2C:2-2b(3), but did not explain that defendant's intoxication was immaterial to determining whether defendant so acted. Although the court related the effect of intoxication to the unlawful possession of a weapon, an offense that requires knowledge, it did not charge that intoxication was not a defense to aggravated manslaughter or manslaughter. The court should have told the jury that even if it found defendant's intoxication rendered him incapable of acting knowingly or purposely, it could still find that he consciously disregarded "a substantial and unjustifiable risk," N.J.S.A. 2C:2-2b(3) (manslaughter), or that he caused the victim's death "under circumstances manifesting extreme indifference to human life," N.J.S.A. 2C:11-4a (aggravated manslaughter). Furthermore, the court should have

3

instructed the jury not to consider defendant's
intoxication in determining whether he consciously
disregarded the risk to the victim, but to view
defendant's conduct objectively, as if he were sober,
in determining whether he consciously disregarded that
risk. By failing to instruct the jury that it could
accept defendant's intoxication as a defense to murder
and still convict him of manslaughter, the court
permitted the jury to believe that defendant's
intoxication prevented a conviction for manslaughter.
In effect, the court unintentionally prevented
defendant's conviction on the lesser included offenses
of aggravated manslaughter or manslaughter, and forced
the jury to choose between a murder conviction and an
acquittal.
It is the duty of the trial court to instruct the jury
on the relevant legal principles, "and counsel may
justifiably assume that fundamental matters will be
covered in the charge." State v. Green 86 N.J. 281,
288 (1981). Because of this duty, we have found plain
error where the jury instructions failed to explain
material issues, even in the absence of an objection.
 State v. Grunow 102 N.J. 133, 148-49 (1986)." State
v. Warren 104 N.J. 571, 578-9 (1986)

In a similar case, State v. Klich, the Appellate Division

found that:

"the State contends when consideration is given to the
charge as a whole, there was no reversible error.
Specifically, the State asserts that the trial judge
charged intoxication relating to the "purposeful" or
"knowing" elements of murder and then told the jury
that if the elements were not proved beyond a
reasonable doubt to consider aggravated manslaughter
and "recklessness" and did not charge intoxication,
thereby implying that intoxication was not a viable
defense to aggravating manslaughter. The argument
flies in the face of the clear mandate of Warren that
the jury must be specifically advised that
intoxication is not a defense to manslaughter or
aggravated manslaughter and that failure to instruct
is plain error mandating reversal. Warren 104 N.J. at
579
We also cannot accept the argument that the omission
in the charge was harmless error in light of the

strong proof of defendant's guilt for murder. Incorrect jury instructions are poor candidates for rehabilitation under the harmless error doctrine. State v. Bowens 108 N.J. 622, 640 (1987); State v. Crisantos 102 N.J. 265, 273 (1986); Warren 104 N.J. at 579. On the contrary, erroneous instructions on matters material to jury deliberation are presumed to be reversible error in criminal cases. Warren 104 N.J. at 579; State v. Green 312 N.J. Super. 456, 461, (App.Div.), cert. den. 156 N.J. 425 (1998); State v. Crumb 307 N.J. Super. 204, 248 (App.Div.1997), cert. den. 153 N.J. 215 (1998). [...] Reversible error results from the lack of a fulsome charge under Warren." State v. Klich 321 N.J. Super 388, 397-8 (App. Div. 1999)

The Appellate Division even went so far in Klich as to hold that "While the proof of defendant's guilt can fairly be described as overwhelming, we are constrained to reverse." Klich 321 N.J. Super at 396.

The Trial Court in this case specifically instructed the jury that "There is evidence in this case concerning the intoxication of Defendant." 17T102-14 to 15. The only physical evidence of intoxicants found at the scene were beer bottles. Although pill bottles were photographed in the fridge; but not collected: the jury was not instructed that they were permitted to infer that the pill bottles may have contained evidence favorable to Defendant. The only other evidence of intoxication was Defendant's statements of feeling "fuzzy" and waking up on the floor; (14T168-22 to 25); which "are no more than conclusory labels, of little assistance in determining whether any

[intoxicants] produced a prostration of faculties." State v. Cameron 104 N.J. 42, 56 (1986).

As defendant admitted to drinking beer voluntarily; (14T167-21 to 168-7); the jury may, in the absence of an adverse inference instruction regarding the pill bottles, have found that the only "clear and convincing evidence" of intoxication were the beer bottles: and that the consumption thereof was self-induced. That being the case, the jury may have found that Defendant was intoxicated, even to the point of a prostration of faculties; but, having voluntarily consumed the beer, they were specifically instructed that, since: "the Defendant has not sustained the burden of proving the defense by clear and convincing evidence, then your verdict must be guilty." 17T104-3 to 6.

At no point was the jury instructed that; if they found intoxication, but that they found that it was self-induced, it could still negative the purposeful/knowing element of murder: nor that, having done so, they could still convict Defendant of manslaughter. So even if the jury found that Defendant "was intoxicated so as not to know the nature and quality of what he was doing, or if he did know, that he did not know what he was doing was wrong"; 17T103-11 to 14; if the jury found that Defendant's voluntary consumption of the beer meant that the intoxication was self-induced, they were instructed that

"[their] verdict must be guilty." 17T104-5 to 6. This misapplies the law; because if the jury were to find prostration of faculties, even in the absence of being not self-induced: then the intoxication negatives the purposeful/knowing element of murder. "Intoxication is not a defense unless it negatives an element of the offense." N.J.S.A. 2C:2-8(a).

For these reasons, "the lack of a fulsome charge under Warren"; Klich 321 N.J. Super. At 398; cannot be considered harmless; and so it mandates a reversal of the Trial Court's judgment of conviction.


**Point II: The Trial Court failed to properly instruct the jury as to the standard of proof in regards to intoxication for the mental purposeful/knowing element of murder as required by the Model Jury Charge and State v. Warren (Dpa32-33; 16T13-22 to 16-23)**

The Court in State v. Medina held of the burden or proof required in criminal prosecutions:

> "In a criminal prosecution, the State bears the burden of proving beyond a reasonable doubt every element of an offense. In re Winship 397 U.S. 358, 364 (1970). The due process clauses of the Federal Constitution, Sullivan v. Louisiana 508 U.S. 275, 277-78 (1993); Winship 397 U.S. at 364; United States v. Pine, 609 F.2d 106, 107 (3d Cir.1979); and the New Jersey Constitution, State v. Anderson 127 N.J. 191, 200-01 (1992) compel this standard.

Under the Sixth Amendment, the jury, not the court, determines guilt in a serious criminal case. See Duncan v. Louisiana 391 U.S. 145, 149 (1968); Sparf v. United States 156 U.S. 51, 105-06 (1895). Due process mandates that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." Sullivan 508 U.S. at 278. A jury instruction that fails to communicate the State's burden to prove guilt beyond a reasonable doubt is not amenable to harmless-error analysis and requires reversal. Id. at 278-81.

The reasonable-doubt standard provides "concrete substance for the presumption of innocence," and reduces the risk of wrongful conviction. Winship 397 U.S. at 363. It assures that a defendant will not be convicted if reasonable doubt exists about his or her guilt. Id. at 363-64." State v. Medina 147 N.J. 43, 49-50 (1996) (Emphasis added)

The New Jersey Statutes provide that:

"a. Except as provided in N.J.S.A. 2C:11-4, criminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3.

In this case, the Trial Court instructed the jury that, "one of the elements that the State must prove beyond a reasonable doubt is that the Defendant acted purposely or knowingly"; 17T85-17 to 19; and that, "there is evidence in this case concerning intoxication of Defendant." 17T102-14 to 15.

However, the Trial Court failed to instruct the jury that, if they found that said evidence was of self-induced

intoxication, producing a prostration of faculties: it would negative the purposeful/knowing element of murder; but would not provide a defense to manslaughter. Compounding this constitutional and structural error, the Trial Court also failed to instruct the jury that; should they find said self-induced intoxication: "once a defendant produces evidence of his intoxication, the State must prove beyond a reasonable doubt that such intoxication did not render him incapable of acting purposely or knowingly." State v. Warren 104 N.J. 571, 574 (1986) (Quoting Model Jury Charge N.J.S.A. 2C:2-8(a))

The Trial Court, having found that "there is evidence in this case concerning intoxication of Defendant"; 17T102-14 to 15; should have instructed the jury as to the proper burden of proof in regards to the purposeful/knowing element of murder, in relation to the defense of self-induced intoxication, as clearly laid out in the Model Jury Charge:

"If after considering all the evidence you have a reasonable doubt whether defendant's intoxication was such as to render him incapable of acting purposely or knowingly, then you must acquit him of murder." Model Jury Charge N.J.S.A. 2C:2-8(a).

Therefore, the failure of the Trial Court to "communicate the State's burden to prove guilt beyond a reasonable doubt"; in relation to the effect of intoxication on the purposeful/knowing element of murder; "is not amenable to

9

harmless-error analysis and requires reversal." <u>Medina</u> 147 N.J. at 50 (Quoting <u>Sullivan v. Louisiana</u> 508 U.S. 275, 278-81 (1993)).

## Conclusion

For the foregoing reasons, it is respectfully urged that the Court grant Defendant's Petition for Certification.

Date: SEPTEMBER 19, 2021

Respectfully Submitted,

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G
New Jersey State Prison
Po Box 861
Trenton, New Jersey
08625-0861

## Certification of Petitioner

I am representing myself, pro se, in this matter. The above issues present substantial questions of law which merits review by this Court. This petition is made in good faith and not for the purposes of delay.

Date: SEPTEMBER 19, 2021

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G
New Jersey State Prison
Po Box 861
Trenton, New Jersey
08625-0861

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G
New Jersey State Prison
Po Box 861
Trenton, New Jersey
08625-0861

| State of New Jersey | Supreme Court of New Jersey |
|---|---|
| Plaintiff/ | S. Ct. Dkt. No. 086174 |
| Respondent | App. Div. Dkt. No. A-004519-18-T3 |
| v. | **Criminal Action** |
| Caleb L. McGillivary | On Appeal from Superior Court of New |
| Defendant/ | Jersey, Appellate Division |
| Petitioner | Sat Below: |
| | Hon. Carmen H. Alvarez, P.J.A.D. |
| | Hon. Richard J. Geiger. J.A.D. |

**Brief in Support of Defendant's Motion for Reconsideration**

**DEFENDANT IS CURRENTLY CONFINED**

**DATED: December 16, 2021**

## Table of Contents

Preliminary Statement ...1

Statement of Facts and Procedural History ...3

1.) Investigation and Pro Se Motion ...3

2.) The Jury Charge and Verdict ...6

3.) Direct Appeal ...8

Legal Arguments ...3

Point I: The Trial Court's Denial of Defendant's January 7, 2019
Motion to Proceed Pro Se was a Structural Error Requiring
Reversal ...9

Conclusion ...12

Certification of Petitioner ...13

i

## <u>TABLE OF JUDGMENTS, ORDERS, AND RULINGS BEING APPEALED</u>

Trial Court's Order denying Defendant's Motion to Suppress his
05/16/13 Statement                     ...1T92-2 to 96-14

Trial Court's Order denying Defendant's Motion to recuse the
Union County Criminal Bench            ...4T35-10 to 35-15

Trial Court's Ruling Denying Defendant's Request to Argue His
Case Pro Se                            ...6T4-3 to 6-13

Trial Court's Ruling Denying Defendant's Request to Remedy
Irregular Influences on the Jury
        ...13T11-3 to 13-11; 13T158-1 to 162-6; 19T53-8 to 57-16

Trial Court's Ruling Prohibiting Defendant from calling Scott
Peterson as a witness        ...13T160-17 to 18; 20T26-12 to 16

Trial Court's Order Denying Defendant's Motion for Adverse
Inference                              ...15T38-18 to 45-19

Trial Court's Ruling on Defendant's Pro Se Objection to the
Inclusion of the Jury Instruction on 2C:2-8(d)
                                       ...16T13-22 to 16-23

Trial Court's Order Denying Defendant's Pro Se Motion for New
Trial                                  ...19T51-7 to 57-16

Judgement of Conviction and Order of Commitment      ...Da 204

Appellate Division's Judgment and Opinion Affirming the Trial
Court's Judgment of Conviction         ...Dpa1-36

Supreme Court of New Jersey's December 12, 2021 Order Denying
Defendant's petition for certification          ...Dma1

## Table of Citations

**Caselaw**

Arizona v. Fulminante 499 U.S. 279 (1991)                ...11

Brady v. Maryland 373 U.S. 83 (1963                      ...4

Faretta v. California 422 U.S. 806 (1975)              ...passim

McKaskle v. Wiggins 465 U.S. 168 (1984)                ...10,11

**Court Rules**

N.J.C.R. R. 2:11-6(a)                                    ...9

## **Preliminary Statement**

There is no factual dispute about what the transcript in this case contains; and the transcript clearly shows the federal constitutional question presented. The fact found below of the very high-profile nature of this case, with an upcoming Netflix movie about it; creates an instant public significance for any decision this court may render.

The very common nature of this case is also the epitome of why the common American "feels that the law contrives against him." First, a defendant stands up in court and asserts his <u>Faretta</u> right to litigate his pretrial motions and argue his criminal case pro se. The trial court ignores him and foists counsel upon him against his will; specifically forbidding him from filing any further pro se motions to renew his request. At trial, that very counsel asks for a jury instruction that shifts the burden of proof onto the defendant; despite the record showing the defendant's urgent objection to having to meet that shifted burden. That shifted burden fell upon the shoulders of one hobbled by the destruction of exculpatory evidence by the State, which he hoped to remedy with his pre-trial motion. It fell upon the shoulders of one hamstrung by the Trial Court's failure to remedy that destruction with an instruction to the jury: that they could draw adverse inferences to meet that

1

burden, upon the evidence the State destroyed. This shifted burden fell upon one who was denied the right to litigate and argue his case the way he wanted to.

The Appellate Division acknowledged the denial of this Defendant's <u>Faretta</u> rights; but held that they were voided by the Trial Court's "procedural missteps prior to the start of trial." The Appellate Division further reasoned that this defendant "did not renew his request"; despite the Trial Court having forbidden any further pro se motions. This Court declined to review this prime example of a recurring American Nightmare.

So from the investigators destroying evidence at the crime scene; all the way to the Highest State Court denying review of a structural error in the verdict; this common defendant received abundant proof that "the law contrives against him."

2

## <u>Statement of Facts and Procedural History[1]</u>

### 1.) The Investigation and Defendant's Pro Se Motion

On May 13, 2013, Joseph J. Galfy III was found dead in his home. The Union County Prosecutor's Office found evidence that Mr. Galfy was last seen with Caleb L. McGillvary; who indicated being drugged and sexually assaulted by Mr. Galfy. The investigators returned to the crime scene on May 15, 2013, to

---

[1] The following citation form is used:
"Da" refers to Defendant's Appendix to His Pro Se Supplemental Plenary Brief
"Dpa" refers to Defendant's Appendix to His August 25, 2021 Petition for Certification to this Court
"Dma" refers to Defendant's Appendix to this Motion
"1T" refers to the transcript of the January 8, 2016 proceeding
"2T" refers to the transcript of the September 30, 2016 proceeding
"3T" refers to the transcript of the July 19, 2017 proceeding
"4T" refers to the transcript of the February 8, 2018 proceeding
"5T" refers to the transcript of the March 26, 2018 proceeding
"6T" refers to the transcript of the January 7, 2019 proceeding
"7T" refers to the transcript of the March 21, 2019 proceeding
"8T" refers to the transcript of the April 2, 2019 proceeding
"9T" refers to the transcript of the April 3, 2019 proceeding
"10T" refers to the transcript of the April 9, 2019 proceeding
"11T" refers to the transcript of the April 10, 2019 proceeding
"12T" refers to the transcript of the April 11, 2019 proceeding
"13T" refers to the transcript of the April 16, 2019 proceeding
"14T" refers to the transcript of the April 17, 2019 proceeding
"15T" refers to the transcript of the April 18, 2019 proceeding
"16T" refers to the transcript of the April 22, 2019 proceeding
"17T" refers to the transcript of the April 23, 2019 proceeding
"18T" refers to the transcript of the April 24, 2019 proceeding
"19T" refers to the transcript of the May 23, 2019 proceeding
"20T" refers to the transcript of the May 30, 2019 proceeding
"21T" refers to the transcript of the September 23, 2020 proceeding

collect evidence of drugs and sexual assault; but failed to collect or preserve samples of the carpet upon which Mr. Galfy was found, nor drinking glasses in the kitchen sink. On May 16, 2013, Mr. McGillvary was arrested and charged with murder in the death of Mr. Galfy. Mr. McGillvary gave a statement upon arrest that Mr. Galfy drugged and raped him; but the investigators never brought him thereafter to a medical professional for a rape kit nor drug testing.

On December 27, 2018, Mr. McGillvary filed a pro se motion to dismiss the indictment for Brady[2] violations; or, in the alternative, for an adverse inference: with the Trial Court.

On January 7, 2019, at a pre-trial hearing, the transcript shows the following exchange:

"CALEB L. MCGILLVARY, THE DEFENDANT, AFFIRMED

THE DEFENDANT: I'd like to affirm.

THE DEPUTY: Okay. State your name for the record.

THE DEFENDANT: Caleb McGillvary.

THE DEPUTY: Alright.

THE DEFENDANT: For the record, judge, **I assert my Sixth Amendment right to litigate my motion pro se and I have requested pro se to argue my case.**

THE COURT: Sit down.

THE DEFENDANT: Thank you. For the record.

---

[2] Brady v. Maryland 373 U.S. 83 (1963)

4

THE COURT: Gentlemen, welcome here. We're here for the issuance of a trial memorandum. This is the first time that Mr. McGillvary and I have set eyes upon each other, as far as I can recall.

MR. CITO: Yes.

THE COURT: The matter was, I believe, re-calendared to this Court, got to be about a year ago, give or take. Sound about right, Mr. Cito?

MR. CITO: About 11 months ago, yeah.

THE COURT: Yeah, Okay.

MR. CITO: I would say so.

THE COURT: And I've granted a new – a number of extensions of time due to the severity of the allegations, the severity of the punishments, which are at stake for Mr. McGillvary, in the event that he's convicted, the complexity of the case, and the need for various expert testimonies. Or experts' testimony, rather. We're here for the issuance of a trial memorandum. And I understand that Mr. McGillvary is refusing to sign same which, of course, is his right. The Court received on eCourts a filing of a motion pro se by the defendant. It's a motion to dismiss. First of all, while of course a motion to dismiss can be filed at any time, this matter has been pending for years. I know there was a prior motion to dismiss, I believe on different grounds, filed and Judge Caulfield had an evidentiary hearing and then issued a rather voluminous opinion on that. Correct, Mr. Cito?

MR. CITO: Yes, Your Honor.

THE COURT: I was advised by the – I don't even know the correct title for Ms. Howard. She is the deputy – what is Mr. Eppenstein's title? It's her deputy.

MR. CITO: Court Administrator?

THE COURT:

No, she's not a court administrator, but she's in charge of criminal. In any event, she advised us that

the matter was mistakenly filed, that it was improperly filed in light of the fact that it was during basically a court hiatus with a skeletal staff. It was mistakenly filed. It would not have been filed – it never would have been filed on eCourts and I never would have known about it, frankly. It would have been returned to you, Mr. Cito. The Court will not accept the motion, will not entertain the motion. I am striking it. First of all, it didn't – it failed to comply with the rules. The filing itself. Secondly, **Mr. Cito, any and all motions will be filed through you**, Okay? So I am striking it. I will issue an order to that effect." 6T3-20 to 6-13(emphasis added)

## 2.) The Jury Charge and Verdict

On April 22, 2019, a jury charge conference was held in this matter. Mr. McGillvary objected to defense counsel's inclusion of a burden shifting instruction on intoxication in the following exchange:

"THE COURT: ... Mr. Cito, are the proposed modifications, corrections, redactions acceptable to the defense?

MR. CITO: Yes, your Honor, it is to me, but I wanted to put in something my client requests which I am differing from. He wants me to not present to the jury the defense involuntarily intoxication.

THE COURT: On what grounds?

MR. CITO: Your Honor, the burden of proof is quite strong and he's concerned he hasn't met it, but my position the whole defense – not the whole defense but a lot of his testimony regarding that involuntary intoxication, a lot from my point was self-defense, but involuntary intoxication through a drug.

THE COURT: His testimony certainly alluded to what he viewed to be the odd manner in which Mr. Galfy poured

6

his beer. He went through a number of descriptions that he would turn his back; and much of your cross-examination, Mr. Cito, to a number of State's witnesses, went to did you test the vitamins in the refrigerator, did you test the empty bottles. I think you even opened on this aspect.

MR. CITO: Yes, Your Honor. And also the other thing is when Dr. Wang — he even testified about the combination of alcohol and heart medication pills could cause dizziness and the like so —

THE COURT: Much of the defense's case is an attempt to portray the State's investigation as shoddy slip-shod.

MR. CITO: Correct, your Honor.

THE COURT: And an aspect of this, whether credited or not by the jury, is up to the jury. But included in that is that the State failed, including as recently as Friday afternoon outside the presence of the jury. Your argument to the court for an adverse inference[3] and frankly a dismissal of the indictment based on the State's failure to test a number of items and/or containers that — that clearly the inference from the defendant was that Mr. Galfy may indeed have had some sort of date drug secreted in a Vitamin C container or fish oil or one of the empty bottles and that the State in its slip-shod rush to judgment never properly tested it. Consistent with Mr. McGillvary's own recitation that he felt groggy, he made special notice, Mr. McGillvary, among other things in testifying that only one of the beers that Mr. Galfy gave him did he actually see Mr. Galfy pour, clearly drawing a distinction between that and the other times that Mr. Galfy presented him with a beer. He also made mention of some bitter tasting beer, clearly trying to suggest to the jury there was something in that beer. There's no other logical explanation for that. Again, what a jury does with this, it does with it. I'm frankly very surprised that Mr. McGillvary would seek the Court not to include that instruction. It's so

---

[3] Of note, there was no adverse inference instruction provided to the jury in this case whatsoever

7

clearly in his interests and it's so clearly consistent with your defense throughout, Mr. Cito, and I believe there's ample evidence in the record and so you've indicated as a representative of the court that you seek it.

MR. CITO: I seek it. I was putting the record clear what my client's position was for appellate reasons, but I believe it should be in.

THE COURT: And I couldn't agree with you more, Mr. Cito. It's clearly in Mr. McGillvary's interest's to do so. Whether he meets the burden or not, there's no prejudice to him as I see it if the jury believes he didn't meet the burden. They need to still – the burden of proof is still on the State in terms of meeting the requisite elements and it's so consistent with the long-standing theory of the defense that I think for the Court not to include it at this juncture would be tantamount to me sending a signal to the jury that I, the Court, truncated the defense case because as a matter of law the defense didn't meet its burden, and I think that is an improper foreshadowing to this jury. So I've heard your argument espoused on behalf of your client. I agree, Mr. Cito, and you, Mr. Peterson, that the intoxication instruction stays."
16T13-19 to 16-23(footnote added)


On April 24, 2019, the jury returned a verdict of guilty of

first degree murder. On May 30, 2019, Mr. McGillvary was

sentenced to 57 years imprisonment with an 85% parole

ineligibility period.

### 3.) Direct Appeal


On direct appeal, Mr. McGillvary argued that the failure of

the Trial Court to conduct a <u>Faretta</u> colloquy, in response to

8

his January 7, 2019 request; violated his Sixth Amendment right to self-representation. The New Jersey Superior Court – Appellate Division, in an unpublished opinion, held that: "Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial. Defendant never refiled even though the Judge clearly explained to him that the issue would not be reached at that point."

Mr. McGillvary thereafter filed a pro se petition for certification to the Supreme Court of New Jersey: renewing his arguments that the Trial Court's actions violated his <u>Faretta</u> rights under the Sixth Amendment. The Supreme Court of New Jersey denied the petition on December 10, 2021.

This Motion for Reconsideration pursuant to N.J.C.R. R. 2:11-6(a) is now before the Court.

<u>**Legal Argument**</u>

**Point I: The Trial Court's Denial of Defendant's January 7, 2019 Motion to Proceed Pro Se was a Structural Error Requiring Reversal**

The undisputed record below provides a clear illustration of the question presented; and pits the decision of the Court Below in square conflict with the U.S. Supreme Court's holdings.

9

The New Jersey Superior Court — Appellate Division held that, "Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial. Defendant never refiled even though the Judge clearly explained to him that the issue would not be reached at that point." See Dpa 34. Although the U.S. Supreme Court has never held that a defendant is required to refile a denied Faretta[4] request; the Trial Court's specific ruling that, "Mr. Cito, any and all motions will be filed through you"; made such a refiling by Mr. McGillvary impossible.

The U.S. Supreme Court in McKaskle v. Wiggins held that filing pre-trial motions is an integral structural right under Faretta; Mckaskle 465 U.S. 168, 174 (1984); so the Trial Court's denial of Mr. McGillvary's January 7, 2019 request is in square conflict with the U.S. Supreme Court's decisions in Faretta and McKaskle.

The right to self-representation created by Faretta can be waived by a defendant's acquiescence in standby counsel; McKaskle 465 U.S. at 182; but that presupposes a "standby counsel" was actually appointed as a result of a proper Faretta colloquy. McKaskle 465 U.S. at 170-171. Without a proper Faretta colloquy, the counsel which a defendant seeks to waive does not

---

[4]Faretta v. California 422 U.S. 806, 835 (1975)

suddenly become "standby counsel" for the purpose of a waiver of self-representation.

Indeed, the very premise of waiver-by-acquiescence, as held by this Court in <u>McKaskle</u>; is that the Trial Court first conducted a <u>Faretta</u> colloquy; then appointed standby counsel; thereafter the defendant acquiesced to standby counsel's representation. This case is in square conflict with the 3 stages of acquiescence as held by <u>McKaskle</u>: there was no <u>Faretta</u> colloquy on January 7, 2019 accompanying the Trial Court's denial of Mr. McGillvary's request to self-represent. There can therefore be no waiver-by-acquiescence under <u>McKaskle</u>; because standby counsel was never appointed after a proper <u>Faretta</u> colloquy. The U.S. Supreme Court held in <u>Arizona v. Fulminante</u>, that denial of a defendant's <u>Faretta</u> rights is a structural error that requires immediate reversal without further inquiry as to effect. <u>Fulminante</u> 499 U.S. 279 (1991).

## Conclusion

For the foregoing reasons, it is respectfully urged that the Court grant Defendant's Motion for Reconsideration of the Court's December 10, 2021 Denial of Defendant's Petition for Certification.

Respectfully Submitted,

Date: 12/16/21

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G
New Jersey State Prison
Po Box 861
Trenton, New Jersey
08625-0861

12

## <u>Certification of Petitioner</u>

I am representing myself, pro se, in this matter. The above issues present substantial questions of law which merits review by this Court. This petition is made in good faith and not for the purposes of delay.

Date: 12/16/21

_____

Caleb L. McGillvary, Pro Se

#1222665/SBI#102317G

New Jersey State Prison

Po Box 861

Trenton, New Jersey

08625-0861

13