Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ 08625


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Caleb L. McGillvary | ) CIVIL ACTION NO. |
|     PLAINTIFF | ) 1:22-cv-04185-MRH |
| | ) |
|     V. | ) Hon. Mark R. Hornak, USDJ |
| | ) Hon. Richard A. Lanzillo, USMJ |
| Bruce Davis, Administrator | ) Motion Date: September 16, 2024 |
| NJSP, Attorney General of NJ | ) |
|     DEFENDANT | ) |
| | ) |

NOTICE OF MOTION FOR SUMMARY JUDGMENT ON GROUND TWO OF THE HABEAS
PETITION PURSUANT TO CARTER V RAFFERTY, 826 F.2d 1299, 1303
(CA3 1987); WILSON V BEARD, 589 F.3d 651, 657 n.1 (CA3 2009);
AND FED. R. CIV. P. 56

TO: CLERK, ALL CAPTIONED PARTIES

Please take notice that, on September 16, 2024, at 10am. at
the U.S. District Court for the District of New Jersey, U.S.
Courthouse 4th & Cooper Sts., Camden, NJ 08101, Petitioner Caleb L.
McGillvary ("Petitioner"), will move the Court pursuant to Carter
v Rafferty 826 F.2d 1299, 1303 (CA3 1987), Wilson v Beard 589 F.3d
651, 657 n.1 (CA3 2009), and Fed. R. Civ. P. 56 for an order
granting him summary judgment on his 5th, 6th, and 14th Amendment
Brady v. Maryland, 373 U.S. 83, 87 (1963) Claim, pleaded as Ground
Two to his habeas petition, and issuing declaratory relief and the
writ of habeas corpus.

1

As grounds for this motion, Plaintiff relies upon his attached Declaration, Statement of Material Facts Not In Dispute, and Memorandum in support of this motion.

A proposed form of order is attached.

Date: 8/12/24

_____
Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ
08625-0861

2

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ 08625


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

|  |  |
|---|---|
| | ) |
| Caleb L. McGillvary | ) CIVIL ACTION NO. |
|     PLAINTIFF | ) 1:22-cv-04185-MRH |
| | ) |
|     V. | ) Hon. Mark R. Hornak, USDJ |
| | ) Hon. Richard A. Lanzillo, USMJ |
| Bruce Davis, Administrator | ) Motion Date: September 16, 2024 |
| NJSP, Attorney General of NJ | ) |
|     DEFENDANT | ) |
| | ) |

---

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON GROUND TWO
OF THE HABEAS PETITION PURSUANT TO CARTER V RAFFERTY, 826 F.2d
1299, 1303(CA3 1987); WILSON V BEARD, 589 F.3d 651, 657 n.1 (CA3
2009); AND FED. R. CIV. P. 56**

---

## TABLE OF CONTENTS

MOTION FOR SUMMARY JUDGMENT

...1

STATEMENT OF FACTS

...1

1. PETITIONER'S TESTIMONY

...1

2. CORROBORATION OF PETITIONER'S TESTIMONY

...4

3. THE STATE'S POSITION AT TRIAL

...10

4. THE JURY CHARGE

...11

5. THE JURY'S DELIBERATION

...12

PROCEDURAL HISTORY

...12

1.) The December 27, 2018 Written Brady Motion

...12

2.) The January 7, 2019 Transcript

...13

3.) The March 21, 2019 Transcript

...14

4.) Trial

...14

5.) Petitioner's June 3, 2020 Pro Se Direct Appeal Brief

...14

6.) The NJ Super. Ct. - App. Div.'s August 4, 2021 Opinion

...15

7.) Petitioner's August 25, 2021 Petition for Discretionary Review
to the Highest State Court

...15

8.) The NJ Supreme Court's December 7, 2021 Order Denying
DIscretionary Review

...15

STANDARD OF REVIEW

...16

A. PETITIONER IS PRO SE, AND ALL OF HIS DOCUMENTS ARE ENTITLED TO
LIBERAL CONSTRUCTION, WHETHER FILED IN STATE OR FEDERAL COURT

...16

B. SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56

...16

LEGAL ARGUMENT

...18

POINT I: THE THIRD CIRCUIT HAS HELD THAT SUMMARY JUDGMENT, AND IN PARTICULAR RULE 56, IS APPLICABLE TO HABEAS PROCEEDINGS UNDER HABEAS RULE 12, AND THE THIRD CIRCUIT'S BINDING PRECEDENT OVERRULES ANY DISTRICT COURT HOLDINGS TO THE CONTRARY
...18

POINT II: RESPONDENT HAS FAILED TO MEET THEIR BURDEN TO PLEAD AND PROVE THE ADEQUACY AND INDEPENDENCE OF STATE PROCEDURAL GROUNDS
...19

STANDARD OF REVIEW
...19

LEGAL ANALYSIS
...20

POINT III: THE STATE HAS ADMITTED THAT PETITIONER IS IN STATE CUSTODY, HIS PETITION IS TIMELY, AND ALL CLAIMS ARE FULLY EXHAUSTED
...22

POINT IV: 2254(d) DEFERENCE ADMITTEDLY DOES NOT APPLY TO PETITIONER'S CLAIMS; BECAUSE THERE WAS NO ALTERNATIVE ADJUDICATION OF THE MERITS IN THE APP. DIV.'S CLEAR AND EXPRESS RELIANCE ON PROCEDURAL GROUNDS FOR DENIAL OF PLAINTIFF'S 1/7/19 BRADY MOTION, WHICH STRIPS THE STATE TRIAL COURT'S ADJUDICATIONS OF ANY PRECLUSIVE EFFECT
...22

STANDARD OF REVIEW
...22

LEGAL ANALYSIS
...23

POINT V: PETITIONER HAS PLEADED EVERY ELEMENT OF A VALID BRADY CLAIM, INCLUDING BAD FAITH OF THE INVESTIGATORS; THE UNDISPUTED RECORD SUPPORTS THIS; AND RESPONDENT'S CONCLUSORY STATEMENTS TO THE CONTRARY ARE CONTRADICTED BY THE ADMITTED RECORD; CUMULATIVE ANALYSIS FOR PREJUDICE APPLIES, AND RESPONDENT HAS FAILED TO OPPOSE THE MATERIALITY, SUPPRESSION, AND PREJUDICE PRONGS OF BRADY CLAIM
...25

STANDARD OF REVIEW
...25

LEGAL ANALYSIS
...26

CONCLUSION
...40

**TABLE OF AUTHORITIES**

**CASELAW**

Allegheny General Hospital v NLRB, 608 F.2d 965, 970 (CA3 1979)
...18

Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)
...17

Arizona v Youngblood, 488 U.S. 51, 58 (1988)
...25

Bennett v Superintendent, 886 F.3d 268, 283-83 (CA3 2018)
...22

Brady v. Maryland, 373 U.S. 83, 87 (1963)
...In passim

Branch v Sweeney, 758 F.3d 226, 241-42 (CA3 2014)
...27

Browder v Director, 434 U.S. 257, 266 n.10 (1978)
...18

Carter v Rafferty, 826 F.2d  1299, 1303 (CA3 1987)
...1, 16, 18, 19

Celotex Corp. v Catrett, 477 U.S. 317, 322 (1986)
...16, 17

Coleman v Thompson, 501 U.S. 722, 750 (1991)
...19

Cone v Bell, 566 U.S. 449, 472 (2009)
...22, 25

Dennis v Secretary, 834 F.3d 263, 291-92 (CA3 2016)
...26

Doe v Luzerne Cty., 660 F.3d 169, 175 (CA3 2011)
...17

Erickson v Pardus, 551 U.S. 89, 94 (2007)
...16

Everett v Beard, 290 F.3d  500, 508 (CA3 2002)
...22

Faretta v California, 422 U.S. 806 (1975)
...15

Haines v Kerner, 404 U.S. 519, 520 (1972)
...16

Haskell v Superintendent, 866 F.3d 139, 150-51 (CA3 2017)
v25

Huffman v Florida, 435 U.S. 1014, 1015 (1978)
...20

James v Kentucky, 466 U.S. 103, 124 (1984)
...19

Johnson v Lee, 195 L.Ed.2d 92, 96 (2016)
...19

Johnson v Mississippi, 486 U.S. 578, 587 (1988)
...19

Kimmelman v Morrison, 477 U.S. 365, 389, 390 n.10 (1986)
...24

iv

**Lee v Kemna**, 534 U.S. 362, 366, 385 (2002)

...19, 20

**Matsushita Elec. Indus. Co. v Zenith Radio Corp.**, 475 U.S. 574, 587 (1986)

...17

**McGillvary v Galfy**, 2022 U.S. Dist Lexis 134998 at *29-30 (D.N.J. 2022)

...26

**McGillvary v Galfy**, 2:21-cv-17121-MCA-CLW (DNJ 2021)

...26

**Munchinski v Wilson**, 694 F.3d 308, 335 (CA3 2012)

...19

**Nara v Frank**, 488 F.3d 187, 199 (CA3 2007)

...19, 20, 22

**Osborne v Ohio**, 495 U.S. 103, 124 (1990)

...21

**Pearson v Component Tech. Corp.**, 247 F.3d 471, 482 n.1 (CA3 2001)

...16

**Rainey v Robinson**, 2021 U.S. Dist. LEXIS 94930 at *4 (D.N.J. May 18, 2021)

...19

**Robertson v Allied Signal, Inc.**, 914 F.2d 360, 382 n.12 (CA3 1990)

...17

**Rogers v Richmond**, 365 U.S. 534, 547 (1961)

...24

**Rolan v Coleman**, 680 F.3d 311, 318-19 (CA3 2012)

...19

**Scott v FCI Fairton**, 2010 U.S. Dist LEXIS 60908 at *7 (D.N.J. June 16, 2010)

...19

**Shotts v Wetzel**, 724 F.3d 364, 371 (CA3 2013)

...19

**Simmons v Beard**, 590 F.3d 223, 232-33 (CA3 2009)

...23, 26

**Slutzker v Johnson**, 393 F.3d 373, 387 (CA3 2004)

...26

**State v Coon**, 314 N.J. Super. 426 (App. Div. 1998)

...24

**State v Dabas**, 215 N.J. 114 (2013)

...23, 24

**Strickler v Greene**, 572 U.S. 263, 281-82 (1999)

...25

**Thomas v Horn**, 570 F.3d 105, 115 (CA3 2009)

...22

**United States v Bagley**, 473 U.S. 667, 676 (1985)

...25

**United States v Mitlo**, 714 F.2d 294, 298 (CA3 1983)

...18

*Walker v Johnston*, 312 U.S. 275, 284 (1941)

...18

*Wilson v Beard*, 589 F.3d 651, 657 n.1 (CA3 2009)

...1, 16, 18, 19, 23, 26, 28

*Workman v Superintendent*, 915 F.3d 928, 941 (CA3 2019)

...16

**STATUTES**

28 U.S.C. 2254(d)

...22, 25, 26, 40

28 U.S.C. 2254(e)(1)

...28

28 U.S.C. 2254(e)(2)

...27

**COURT RULES**

Fed. R. Civ. P. (c)

...1

Fed. R. Civ. P. 56

...1, 16, 18

Fed. R. Evid. 201(b)

...27

Rules Governing Section 2254 Cases In The District Courts, Rule 7

...27

Rules Governing Section 2254 Cases In The District Courts, Rule 8

...18

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amdt. V

...15, 40

U.S. Const. Amdt. VI

...15, 32

U.S. Const. Amdt. XIV

...15, 40

**OTHER AUTHORITY**

Drug Enforcement Administration "Drug Fact Sheets"

...10

Federal Habeas Corpus Practice & Procedure 17.3

...18

NJ Attorney General Guidelines for Providing Services to Victims of Sexual Assault

...6, 7, 29

## MOTION FOR SUMMARY JUDGMENT

Petitioner Caleb L. McGillvary ("Petitioner") hereby moves the Court pursuant to Fed. R. Civ. P. 56, Carter v Rafferty, 826 F.2d 1299, 1303 (CA3 1987), and Wilson v Beard, 589 F.3d 651, 657 n.1 (CA3 2009); for an order granting him summary judgment on Ground Two of his habeas petition and issuing the writ of habeas corpus to order the Respondent forthwith to release him from his unconstitutional confinement and restraint.

### STATEMENT OF FACTS

Petitioner adopts by reference his "Statement of material facts not in dispute" in support of this motion under Rule 10(c). The Respondent has previously admitted without reservation the truth of another Statement of Material Facts on June 6, 2023; ECF 20; and is judicially estopped from disputing those facts, which are also adopted by reference herein under Rule 10(c) from where they are found on the docket; ECF 15.6. Petitioner also adopts by reference his habeas traverse and reply; ECF 16. These very facts entitle Petitioner to the writ of habeas corpus as a matter of law:

## 1. PETITIONER'S TESTIMONY

During the time from February 1, 2013, until May 11, 2013, Petitioner was in a unique position for a homeless person: he was a well-known hero who saved people's lives, and so hundreds of random strangers were offering to let him stay at their houses. ECF 12.42, P104L7-16. Nonetheless, during the evening of May 10, 2013, Petitioner found himself sleeping very little, having been rained out in New York City (NYC). Id. at P109L5-25. After a long day of busking and walking around NYC in this sleep-deprived state, standing on a crowded street corner near Times Square, Petitioner was approached by the alleged victim in this case, Joseph J. Galfy, Jr. (Galfy). Id. at P110L1-P111L4.

Galfy, noticing that Petitioner appeared lost and hungry, zeroed in on Petitioner and offered him a ride to New Jersey and

1

some food. Petitioner, being accustomed to people approaching him with such offers in the past couple months, saw nothing amiss in the offer. Id. at P110L25-P111L22. Petitioner went to Galfy's house, ate food and drank beers, and messaged back and forth with a female fan of his, Kim Conley (Kim), who had expressed an interest in meeting him. Id. at P113L1-P130L18. The last beer of the night tasted bad, and there was a lingering aftertaste like metal, and Petitioner thought perhaps he had a loose filling. Id. at P130L23-P131L8. Galfy then propositioned Petitioner to take a shower with him, at which point Petitioner realized Galfy was homosexual, but Petitioner had stayed at gay people's house before without incident and didn't see it as cause for alarm. Id. at P131L9-24. Petitioner stayed in the guest room that night. Id at P131L25-P134L4.

When he woke up the next morning, he went to the bathroom and noticed a crusty residue on the side of his face, but didn't realize what it was, thinking it was probably drool. Id. at P134L5-P135L10. He left the house with Galfy,  who gave Petitioner his number and told him he could stay at his place anytime; Galfy dropped him off at the Rahway train station and bought  Petitioner a ticket. As was his judicially-noticeable (well-documented in online photographs) custom with people, Petitioner gave Galfy a hug goodbye; then Petitioner took the train to Asbury Park, and waited for Kim to show up. Id. at P135L13-P143L12

At Asbury Park, Petitioner had some lunch at a church, taking a bag of dinner rolls with him afterwards. Id. at P143L13-P145L15. Petitioner, who is from Northern Canada and had plans to travel to Georgia, considered how hot it already seemed in New Jersey and how much hotter it would be in the American South. With this in mind, he cut his hair at the Asbury Park Transportation Center bathroom, using his pocket knife. Id. at P145L16-P146L7. Petitioner is an American Indian from Canada, and so his hair was part of his religion. He therefore saved his hair in the grocery bag which his dinner rolls had been in, intending to conduct a

2

religious ceremony with it when he reached a wild place. Id. at P146L7-24. Petitioner waited for Kim for hours, and he became convinced she was about to stand him up. She had warned him that he was in a dangerous place, so he weighed his options and decided he should try to secure what he thought was a safe place to sleep that night. Id. at P14146L25-P150L19. He took the train back to Long Branch and called Galfy to ask for a place to stay. Id. at 150L24-P153L10.

While he was at Long Branch, he made a call to Kim, leaving her a message indicating that he had made other arrangements for the night. A surveillance camera showed him with short hair, on the phone to Kim, during the very time the message indicated he had called her: from 5:11pm-5:13pm on May 12, 2013. Id. at P153L11-P161L13; See also ECF 12.40, P25L25-P26L14 (Kim testified to a dropped call and voice message from Petitioner at 5:11pm on May 12, 2013). Petitioner went back to Galfy's house with Galfy, who made them both food and poured Petitioner's beer into a glass. ECF 12.42, P161L14-P168L13. After eating and drinking, Petitioner saw Galfy rinse the plates and put the dishes in the dishwasher, but Galfy did not run the dishwasher. Petitioner began to feel fuzzy and relaxed, then cannot remember anything until waking up on the floor of the master bedroom. Id. at P168L16-P169L7. This is because the effects of rape drugs include amnesia, which inhibits the formation of memories after the drug has been ingested. See Exhibit A to Declaration, (Document created by Respondent including admission against party interest by Respondent that, contrary to Respondent's claims at trial, the timeframe and effects of rape drugs matches Petitioner's symptoms); See also ECF 1.17 (Judicially noticeable public records of the Drug Enforcement Administration describing "amnesia" and "memory impairment" as effects of common rape drugs GHB and ketamine).

3

**Petitioner noticed Galfy over top of him, tugging on Petitioner's pants, and so Petitioner sat up abruptly and punched Galfy in the face. Id. at P169L12-L25. Petitioner blacked out after sitting up so fast, and the next thing he can remember is Galfy shoving Petitioner's head into the side of the bed, then frantically fighting his way out from under Galfy as Galfy slammed into him from over top and began writhing on top of him. Id. at 170L1-P172L7. His phone, which he kept in the pocket of his pants, was inundated with urine during the struggle from underneath Galfy. Id. at P178L9-13, P180L4-8; See also Id. at P209L7-P210L19 (Petitioner had urinated underneath Galfy, and the urine had soaked his pants and inundated his phone), P223L13-P224L15 (Same).**

**Petitioner can't remember leaving the house or changing out of his bloody and urine-soaked clothes, which is consistent with the effects of amnesia from the rape drugs, the effects of his pre-existing post-traumatic stress disorder being triggered, or a combination of both. See ECF 12.47, P33L13 (Petitioner suffers from post traumatic stress disorder); Id. at P37L14-17 (His PTSD results from childhood physical and sexual abuse).**

**2. CORROBORATION OF PETITIONER'S TESTIMONY**

**A mixture of short and long dark hairs, such as would be expected from being cut with a pocket knife, were found on the vertical side of the bed near where Petitioner's head was while he was sitting on the carpet and Galfy was shoving his head into the bed. ECF12.41, P89L19-P91L20. Dark hairs were also found on the palms of Galfy's hands, from where he was shoving Petitioner's head into the side of the bed. ECF 12.7, P43a. The carpet under where Galfy was found was not examined for hairs, which would've further corroborated Petitioner's testimony that he awoke on the floor and fought his way out from under Galfy. ECF 12.41, P100L7-25.**

**Junaid Shaikh, the medical examiner who performed the autopsy, found that there were grab marks on Galfy's wrists consistent with Petitioner's statement of shoving Galfy away from him while his**

4

head was being shoved into the bed. ECF 12.39, P50L3-P51L25. There were broken ribs and related brusing on the right side of Galfy's sternum consisten with a kick upwards from underneath. Id. at P48L20-P49L6, P52L22-P54L13. Galfy had 3 neck fractures from his head being hyperextended backwards (as opposed to sideways or forwards). Id. at P43L8-P45L4. These fractures must have been caused by "significant force", much more force than what caused the grab mark bruising on the wrists, consistent with a kick to the face from underneath. Id. at P44L13-19. There were no grab mark bruises on the face, head, or neck. Id. at P19L25-P37L14. There were, however, 3 fractures to the skull; Id. at P37L15-P39L21; which were caused by a "significant impact to the face region"; Id. at P38L13-14, P39L16-21. This is crucially important, as Galfy was found laying facedown on the carpet; See ECF 12.38, P45L13-17 ("Upon getting to the entrance  of what I believe was the master bedroom, I looked inside at the entrance and I saw who was later identified as Joseph Galfy laying face down on the floor"); and there was no furniture in disarray to suggest he ahd been kicked in the face with enough force to send him flying backwards into furniture; Id. at P69L14-16. Galfy's ear was torn by one injury with a linear force, which means that the force was horizontal from Petitioner who was on his back on the carpet, as opposed to overhead stomping down. ECF 12.39, P26L23-P27L8. The abrasion was caused by fabric from Petitioner's pants being down over his heel, and the fabric of it swiping across Galfy's ear as he kicked Galfy away from him; the abrasion could not be caused by rugburn. Id. at P23L22-P24L5; See also ECF 12.38, P108L22-P109L8 (Bloody footprints indicate Petitioner's "Pants fabric was under the heel of the foot"). A large stain on the carpet was photographed under Galfy's chest and head, where Petitioner's crotch was  urinating as he was struggling out from underneath Galfy. Id. at P99L13-P101L3. There was no urine evident near where Galfy's crotch was, Id. at P100L7-11. The carpet stain was never collected nor sampled by

investigators, despite their recognition that it likely contained other fluids besides blood. ECF 12.41, P100L7-25. That large carpet stain is a different color and characteristic than the bloody footprints around Galfy, and samples of the stain itself would've been exculpatory: they  would show the presence of Petitioner's hair and urine, and metabolites from the rape drugs which Galfy surreptitiously administered him. A rape kit was collected from Galfy, showing conclusively that Galfy was not raped; but no rape kit was performed on Petitioner despite his statement that he was raped by Galfy. The rape kit on Galfy did, however, show the presence of Galfy's semen and unidentified blood on Galfy's penis. Id. at P101L9-P103L10. The regulatory and therefore judicially noticeable NJ Attorney General Guidelines for Providing Services to Victims of Sexual Assault (AGVSA), mandates that samples must be taken of the surface underneath where the rape was alleged to occured, in this case the carpet where the large stain was found.

Adrian Gardner was an investigator at the crime scene at 46 Starlite Drive, Clark, NJ in the state criminal matter underlying this habeas action. At trial, Gardner testified that, while the crime scene was supposed to be secure, an unidentified male broke the crime scene tape, entered the crime scene, and removed a bag of evidence from the scene. She admitted that the person was not authorized to enter the scene, nor to remove evidence, and that she had no idea what he did in the crime scene; nor what he removed from the scene. There is no record of what was in the bag. ECF 12.38, P168L3-P170L15. Gardner also testified that she did not collect the glasses from the dishwasher or the kitchen. Id. at P139L12-P141L3; that she did not collect samples of the carpet, despite it appearing to be covered in evidence; Id. at P143L8-P144L14; and that she did not at any point look inside pill bottles from the fridge to ascertain their contents; Id. at P152L11-P153L3. She admitted that investigators were aware of the exculpatory nature; Id. at P138L14-P139L11; of analysis of the

6

**glasses and containers from the kitchen; Id. at P113L17-P114L18, P117L7-22; Pill bottles from the house; Id. at P156L16-21; and surfaces upon which the sexual assault was alleged to have occured; Id. at P114L19-P115L8; at the time such evidence was lost or destroyed. Finally, Gardner testified that bloody footprints indicated that Petitioner's "Pants fabric was under the heel of the foot." ECF 12.38, P108L22-P109L8.**

**Monica Ghannam, a crime laboratory techinician, testified that the investigators in the state criminal proceeding underlying this habeas action submitted surface fabrics to the crime lab for analysis for blood and semen; and indicated knowledge of the potentially exculpatory nature of such analysis of fabric from surfaces upon which a sexual assault was alleged to have happened for blood and semen. ECF 12.40, P103L23-P105L20, P109L14-P113L9.**

**Cheryl Kestlinger, a crime laboratory techinician, testified that the investigators in the state criminal proceeding underlying this habeas action submitted pill bottles and containers from the crime scene, for the contents to be analyzed for drugs or drug residue; and indicated knowledge of the potentially exculpatory nature of analysis of pill bottles and containers from the scene for drugs or drug residue. Id. at P153L18-P176L6. Kestlinger admitted that the investigators did not submit the pill bottles from the fridge for analysis of drugs nor drug residue. Id at P177L8-20; nor the glasses from the kitchen for analysis for drugs nor drug residue; Id. at P178L11-13.**

**Johnny Ho, a supervising Union County Prosecutor's Office investigator in charge of the crime scene at 46 Starlite Drive during the period from May 13-16, 2013, testified that he was required to follow the AGVSA. ECF 12.41, P117L3-14. Ho testified that the AGVSA mandatorily required him to collect a rape kit if a sexual assault was reported within 5 days of the assault. Id. at P102L2-9; and that Petitioner told him on May 16, 2013 that he was assaulted on May 12, 2013, yet Ho did not collect a rape kit from**

7

Petitioner; Id. at P102L20-P103L10. Ho also testified that no one ever opened the pill bottles from the fridge to ascertain their contents; Id. at P114L16-P115L3; nor collected samples of the carpet visibly stained with evidence, which he admitted contained other bodily fluids than blood; Id. at P100L13-25; nor collected glassware in the dishwasher or the sink; Id. at P101L1-8. Ho also testified that he "obtained all other videos except for that two-hour period of time [at] Asbury Park"; Id. at P96L13-17. Ho admitted that the investigators stopped looking for DNA evidence as soon as a suspect was developed, despite knowing that Petitioner had stated he was sexually assaulted by Joseph Galfy; Id. at P129L1-10.

The invesitgators created a report that an entry for the video surveillance from Asbury Park Transportation Center on May 12, 2024. ECF 1.18. This report shows descriptions for every entry denoting a time period, except that the substance of the description for the time period of 12:44pm onwards on May 12, 2024 is conspicuously missing. Ibid.

Crime Scene expert Leonard Speckin was stipulated by the Respondent to be qualified; ECF 12.42, P15L19-P16L12. Speckin testified that proper police procedures required the investigators to remove the stained area of the carpet and bring it to the crime laboratory for analysis of the body fluids it evidently contained; Id. at P19L2-P20L23, P80L6-8; and to collect the glassware and analyze it for residue of rape drugs; Id. at P20L24-P21L14, P79L9-22.

Over a year before trial, a change of venue hearing was conducted because a defense investigator, Sabine Fleurimond, discovered that Junaid Shaikh, the medical examiner in the state criminal proceeding, apparently saw the head judge of the Union County Superior Court, Robert Mega, together with other judges from that county at the crime scene. ECF 12.32, P8L12-P10L1. At that same hearing, Robert Mega testified that he was a judge at the New

Jersey Superior Court, Union County Vicinage - Criminal Division during May of 2013. Id. at P15L7-16. He stated that he was partners with Joseph Galfy, the alleged victim in this case, at the law firm Kochanski Mega & Galfy prior to acceding to the bench. Id. at P15L17-P16L1. Mega testified that a Clark Police officer called him around 12:30pm on May 13, 2013, and informed him of the circumstances of the crime scene. Id. at P17L13-20. Mega stated that the Clark Police officer who called him was a client of his and Galfy's. Id. at P17L18-20. The time of the call coincides with immediately after Clark Police officer Keith Meehan entered the crime scene, Meehan having arrived at the scene at around 12:26pm on May 13, 2013. Id. at P40L11-P41L6.

Richard DeCaprio was at the crime scene when Meehan arrived. DeCaprio stated to investigators during a video recorded interview on May 13, 2013 that Clark Police Officer Keith Meehan was a law client of Joseph Galfy's, the alleged victim in this case. DeCaprio stated that Meehan regularly had lunch with him at the local restaurant "Just Plain Dave's".

James Galfy was the brother of Joseph Galfy, and the executor of the Estate of Joseph Galfy. James Galfy paid $150,000 to the workplace of Robert Pandina, the Rutgers University Center for Alcohol Studies; and another $150,000 to the workplace of Junaid Shaikh, the UMDNJ; after having met Shaikh on May 14, 2013 at Shaikh's workplace, but prior to Shaikh testifying at trial. Respondent admitted that the payment of $150,000 to Pandina's workplace caused a conflict of interest, and stated that for that reason they would not be calling Pandina to testify. James Galfy certified the will of Joseph Galy on March 21, 2016, and Respondent wrote a letter to Petitioner's then-counsel Peter A. Ligouri two days later, on March 23, 2016, informing him that Pandina had a conflict of interest. See Exhibits A-C to Declaration in SUpport of this Motion.

## 3. THE STATE'S POSITION AT TRIAL

Despite the foregoing evidence, the State argued at trial that the video depicting Petitioner at Long Branch with short hair, on the phone at the exact same time as Kim's phone records indicate the message being left, was not depicting Petitioner at all. ECF 12.44, P40L6-P42L1. The State railed about how Galfy was seen at the Long Branch train station, but Petitioner wasn't seen because he somehow was at the train station, got off the train, yet neither Petitioner nor the length of his hair was shown on video. Id. at P42L9-L16. The State claimed instead that Petitioner cut his hair after the incident, to "change his identity". Id. at P55L2-4.

The State reiterated Petitioner's statement that he had been drugged by Galfy, then said "it didn't happen, because none of the evidence here shows there's any kind of drugs or anything used on [Petitioner]." Id. at P44L1-6. The State claimed that Petitioner would have had to been dragged by Galfy down the hall if he had been drugged in the kitchen, not accounting whatsoever for the amnesia effects of rape drugs and that Petitioner could have been led in a drugged stupor down the hall where he collapsed on the floor, without having any memory of it. Id. at P44L14-P45L4; See also Exhibit K to ECF 1.17 (DEA "Drug Fact Sheets" for ketamine and GHB, showing that effects include "amnesia (no memory of events while under the influence of the drug)" and "memory impairment").

The State claimed that Petitioner knocked Galfy down, somehow hitting him from the front and causing him to fall forward instead of backward, and kicked him from overhead. Id. at P46L22-P47L5, P63L18-21

The State claimed that Petitioner "pull[ed] back on the neck", from overhead, despite the absence of any grab marks on the head, face, or neck. Id. at P47L7-10, P48L2

The state claimed that the urine stain in the carpet, so clearly contrasting with the dark red bloody footprints around it, was nothing but blood. Id. at P48L19-P49L5, P50L19-25.

10

The state claimed that the hairs found on the vertical side of the bed were insignificant. Id. at P50L11-18.

The state claimed that the pill bottles in the fridge were not valid evidence. Id. at P53L23-P54L16.

The state capped their summation by making Petitioner's credibility the centerpiece of their case, indicating that self defense and intoxication hinged upon the jury's determination of Petitioner's credibility. Id. at P63L10-25.

Petitioner wasn't permitted to dispense with his defense counsel and represent himself, so the counsel foisted upon him only bolsterd the State by saying:
"Now, I'm going to go over some of the stuff that the State's going to say well, that shows my client is full of crap. He did this intentionally. He purposely ran out of the house. He hid his appearance." Id. at P25L6-11. Words fail to describe the look on the jury's faces as he said this, it was evident that they stopped listening to anything in petitioner's defense after this tirade. Notwithstanding this, counsel foisted upon petitioner took it upon himself to further contradict Petitioner's testimony by saying that, instead of kicking away from on his back, he "reach[ed] up", "grab[ed the] ear", and "[tore] the ear." Id. at P22L18-21, P53L5-11.

## 4. THE JURY CHARGE

Circumstantial evidence, such as that heretofore described, was a key basis in the jury's verdict. ECF 12.45 P73L5-P74L1, P86L11-14. The jury was instructed that evidence of "all that was said or done by Defendant preceding, connected with, and immediately succeeding the events leading to the death of Joseph Galfy, Jr. are among the circumstances to be considered." Id. P86L15-20. Because Petitioner testified in his own defense, credibility determinations by the jury necessarily affected their verdict. Petitioner testified regarding intoxication, self-defense, and his innocence of the purpose and knowledge element of murder.

11

The jury was instructed that their credibility determinations may be based on evidence such as that which was suppressed by Respondent as heretofore described. See Id. P76L22-P78L4.

The jury was instructed that, if it found the facts of an adequate provocation, it could acquit Petitioner of murder and convict him instead of the lesser offense of passion/provocation manslaughter. Id. at P88L23-P91L19.

The jury was instructed that they could acquit Petitioner if they found he used deadly force reasonably believing he did so to protect himself against aggravated sexual assault or sexual assault. Id. at P99L7-21. Aggravated sexual assault includes sexual contact with a person the assailant believes to be incapacitated by drugs. See N.J.S.A. 2C:14-2(a)(7).

The trial judge also gave the jury a charge that placed the burden of proving intoxication "by clear and convincing evidence" on the Petitioner, without distinguishing intoxication per se from intoxication constituting an affirmative defense. ECF 12.45, P103L9-15.

## 5. THE JURY'S DELIBERATION

On April 24, 2019, during the second day of deliberations, the jury submitted a note stating "We need clarification on passion/provocation." ECF 12.46, P4L4-11. In response to this note, the trial judge stated "passion/provocation is murder"; Id. at P8L4-6; Then re-read the not only the entire passion/provocation charge, but also the entire murder charge as well. Id. at P10L5-18L8. Within 15 minutes after that exchange, a recess was called, and immediately upon return the jury returned a verdict of guilty on the charge of murder. Id. at P18L21-22, P20L21-23.

### PROCEDURAL HISTORY

### 1.) The December 27, 2018 Written Brady Motion

Respondent has submitted an undisputed docket report from the State Court showing that on December 27, 2018, Petitioner filed a motion to dismiss the indictment, which included a notice, proposed

form of order, proof of service, certification/affidavit, and brief that was deleted by order of the trial judge on January 10, 2019. See ECF 12.7, P55a-56a. The brief, also undisputed as having been raised through one complete round of state appellate review, is atached to and incorporated within the habeas petition in this action. See ECF 1.7.

## 2.) The January 7, 2019 Transcript

This undisputed record shows that, 3 months before trial, Petitioner made the clear and unequivocal request to self-represent, indicating that he wanted to do so for his motion and also for his entire case; even invoking the Federal Constitutional Provision to alert the Trial Court of the Claim's Federal nature: "I assert my sixth amendment right to litigate my motion pro se, and I have requested pro se to argue my case." See ECF 1.8, P4L3-5; ECF 12.34, P4L3-5.

It is undisputed that the Trial Court relied on State procedural grounds, with no alternative adjudication of the merits, to deny Petitioner's January 7, 2019 Brady motion and request to self-represent: "The Court will not accept the motion, will not entertain the motion. I am striking it. First of all, it didn't -- it failed to comply with the Rules. The filing itself. Secondly, Mr. Cito, any and all motions will be filed through you. Okay? So, I am striking it. I will issue an order to that effect." Id. at P6L6-13.

It is undisputed that Petitioner tried again to address the Court and make a record; but was forbidden by the Trial Court from doing so:
"THE DEFENDANT: May I -- May I address the Court?
THE COURT: Not just yet. No, thanks." Id. at P19L14-16

And although the Respondent might dispute what was said off record and to whom; it is beyond dispute that the Trial Court went off record for exactly one minute immediately after Petitioner said "excuse me, Your Honor?":

13

"THE DEFENDANT: Okay. Thank you very much, sir. Or, excuse me, Your Honor?

THE COURT: Okay?

(OFF RECORD FROM 3:43PM TO 3:44PM)" Id. at P21L12-15; See also ECF 12, "AFFIRMATIVE DEFENSES POINT I".

**3.) The March 21, 2019 Transcript**

The undisputable record shows that the Trial Court made findings of fact regarding Petitioner's courtroom conduct at the time of his January 7, 2019 request to self-represent:

"He has comported himself lucidly, in my judgment, he -- cooperatively in the number of occaisons where I've had the pleasure of interacting with him in the courtroom." See ECF 12.35, P23L18-21

**4.) Trial**

The State Trial Court found that counsel foisted upon Petitioner did not present the Brady claim to the Trial Court. ECF 12.43, P38L24-P39L3. The Trial Court indicated that presenting evidence that "would impugn somehow bad faith to the prosecutor" would be "inappropriate." ECF 12.41, P125L4-13. The State Trial Court did not make any findings of fact upon the carpet in the master bedroom; the glasses in the dishwasher or sink; the pill bottles in the fridge; nor the 2 hours of missing NJT video surveillance from Asbury Park on May 12, 2013 from 12:44pm to 2:44pm. ECF 12.43, P38L18-P45L15. The Brady claim raised in the instant habeas petition was never presented to the jury for its consideration. Respondent admitted at trial that "There has been no testimony in this case about what a rape kit actually is or how it works. ECF 12.43, P27L22-23.

**5.) Petitioner's June 3, 2020 Pro Se Direct Appeal Brief**

This undisputed record shows that Petitioner raised the Trial Court's denial of his January 7, 2019 request to self-represent and Brady Motion to the NJ Super. Ct. - App. Div. Petitioner specifically alleged that said denial was structural error in

14

conflict with, and violation of, the 5th, 6th, and 14th Amendment; as held by the U.S. Supreme Court in <u>Faretta v California</u>, 422 U.S. 806 (1975), and <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). See <u>ECF</u> 1.7, <u>ECF</u> 1.9 P60-64 (Incorporating by reference <u>ECF</u> 1.7); <u>ECF</u> 12 "9".

**6.) The NJ Super. Ct. - App. Div.'s August 4, 2021 Opinion**

This record undisputably shows the State Appellate Court specifically denied relief for the violation of Petitioner's Faretta Right and <u>Brady</u> Right; unequivocally referring to the pre-trial January 7, 2019 <u>Brady</u> Motion and Faretta request; based on explicitly stated "procedural" grounds, with no alternative adjudication of the merits: "Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial. Defendant never re-filed even though the judge clearly explained to him that the issue would not be reached at that point." See <u>ECF</u> 12.19, P34.

**7.) Petitioner's August 25, 2021 Petition for Discretionary Review to the Highest State Court**

This undisputed record shows that Petitioner raised the Trial Court's denial of his January 7, 2019 request to self-represent and <u>Brady</u> motion to the NJ Supreme Court. Petitioner specifically alleged that said denial was structural error in conflict with, and violation of, the 5th, 6th, and 14th Amendment; as held by the U.S. Supreme Court in <u>Faretta v California</u>, 422 U.S. 806 (1975); and <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); See <u>ECF</u> 1.7, <u>ECF</u> 1.10 (Incorporating by reference <u>ECF</u> 1.7).

**8.) The NJ Supreme Court's December 7, 2021 Order Denying DIscretionary Review**

This undisputed record shows that the highest State Court forewent their opportunity for discretionary review; thereby rendering Petitioner's direct appeal claims fully exhausted, and establishing the NJ Super. Ct. - App. Div.'s August 4, 2021 Opinion as the last reasoned State Court Decision. See <u>ECF</u> 12.21.

15

**9.) Petitioner's June 22, 2022 Habeas Petition**

The State admits that all the Grounds in Petitioner's habeas petition are fully exhausted, legally and factually. See ECF 12, "9" and "13". The State admits that Petitioner is in State Custody pursuant to a State conviction. Id. at "1"-"11". The State also admits that the petition is timely filed. Id. at "18".

**STANDARD OF REVIEW**

**A. PETITIONER IS PRO SE, AND ALL OF HIS DOCUMENTS ARE ENTITLED TO LIBERAL CONSTRUCTION, WHETHER FILED IN STATE OR FEDERAL COURT**

A "Pro se complaint is held to a less stringent standard than formal pleadings drafted by lawyers." Haines v Kerner, 404 U.S. 519, 520 (1972). The U.S. Supreme Court has held that this mandatory liberal construction applies not only to complaints, but to all documents filed by a pro se litigant: "A document filed pro se is to be liberally construed." Erickson v Pardus, 551 U.S. 89, 94 (2007). Accordingly, the 3rd Circuit has held that: "A pro se habeas petition should be read generously ... it is the policy of the Courts to give liberal construction to pro se habeas petitions." Workman v Superintendent, 915 F.3d 928, 941 (CA3 2019).

**B. SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

"We have previously recognized the propriety of the entry of summary judgment in the habeas context, see Carter v Rafferty, 826 F.2d 1299, 1304 (CA3 1987)". Wilson v Beard, 589 F.3d 651, 657 n.1 (CA3 2009). Fed. R. Civ. P. 56 states, "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v Catrett, 477 U.S. 317, 322 (1986); See Also Pearson v Component Tech. Corp., 247 F.3d 471, 482 n.1 (CA3 2001). An issue is "genuine" if it is supported by evidence such that a reasonable jury could find in favor of the non-moving party, and a fact is "material" if a dispute about it might affect the outcome of the

16

suit under governing substantive law. See **Anderson v Liberty Lobby, Inc.**, 477 U.S. 242, 248-49 (1986).

Once the moving party shows the absence of a genuine issue of material fact, the non-moving party must identify, by affidavits or otherwise, specific facts showing a genuine issue for trial. **See Celotex**, 477 U.S. at 323; **Doe v Luzerne Cty.**, 660 F.3d 169, 175 (CA3 2011). While all inferences must be viewed in the light most favorable to the non-moving party; **See Matsushita Elec. Indus. Co. v Zenith Radio Corp.**, 475 U.S. 574, 587 (1986); "An inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." **Robertson v Allied Signal, Inc.**, 914 F.2d 360, 382 n.12 (CA3 1990). Judgment must be en tered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." **Celotex**, 477 U.S. at 322.

Respondent admits that the N.J. Super Ct. - App. Div. clearly and expressly relied solely on procedural grounds to deny relief for Petitioner's Faretta and **Brady** claims; yet fails to cite what procedural rule was firmly established and regularly followed, or to make any "showing sufficient to establish" the independence or adequacy of a State procedural ground. The State has thus failed to meet the burden of their claimed affirmative defense. The State admits that Petitioner's claims are fully exhausted; that he is in State custody pursuant to a State conviction; and that his petition is timely. The State admits that, 3 months before trial, Petitioner stated on the record in open Court: "I assert my 6th Amendment Right to litigate my motion pro se, and I have requested pro se to argue my case." The State even attached exhibits to their Answer showing that Petitioner "has comported himself lucidly [and] cooperatively" at all times leading upto and including the January 7, 2019 request to self-represent and **Brady** Motion. What's more, the exhibits the State attached to their Answer, when taken with

17

the exhibit to Petitioner's Petition which the State admits are exhausted, show all of the elements of a <u>Brady</u> claim entitling this Petitioner to issuance of the Writ of Habeas Corpus and declaratory relief.

LEGAL ARGUMENT

<u>POINT I: THE THIRD CIRCUIT HAS HELD THAT SUMMARY JUDGMENT, AND IN PARTICULAR RULE 56, IS APPLICABLE TO HABEAS PROCEEDINGS UNDER HABEAS RULE 12, AND THE THIRD CIRCUIT'S BINDING PRECEDENT OVERRULES ANY DISTRICT COURT HOLDINGS TO THE CONTRARY</u>

"[A] decision by this Court, not overturned by the Supreme Court[,] is a decision of the Court of last resort of this Federal Judicial Circuit and is therefore binding on all inferior Courts and litigants in the Third Judicial Circuit." <u>United States v Mitlo</u>, 714 F.2d 294, 298 (CA3 1983). Precedents set by higher courts are conclusive on courts lower in the judicial hierarchy "and leave to the latter no scope for independent judgment or discretion." <u>Allegheny General Hospital v NLRB</u>, 608 F.2d 965, 970 (CA3 1979). "We have previously recognized the propriety of the entry of summary judgment in the habeas context, <u>See</u> <u>Carter v Rafferty</u>, 826 F.2d 1299, 1304 (CA3 1987)". <u>Wilson v Beard</u>, 589 F.3d 651, 657 n.1 (CA3 2009).

Habeas Rule 12 specifically provides that, insofar as they do not conflict with the habeas statutes, the Federal Civil Rules of Civil Procedure apply to habeas proceedings. The Supreme Court has approved of summary proceedings in favor of the habeas petitioner in <u>Browder v Director</u>, 434 U.S. 257, 266 n.10 (1978)(Quoting <u>Walker v Johnston</u>, 312 U.S. 275, 284 (1941)). The advisory notes to <u>Habeas Rule</u> 8 specifically authorize it. The "<u>Federal Habeas Corpus Practice & Procedure</u>" even has a whole subchapter devoted to "Petitioner-initiated summary proceedings." See <u>FHCPP</u> 17.3; <u>See also</u> <u>Id.</u> at n.4 (Collecting authorities in support of use of <u>Rule</u> 56 in habeas proceedings). So although there have been two district court decisions flying in the face of this wall of authority, this Court is bound to follow the 3rd Circuit binding precedent and not

18

the flouting of it. Compare Carter, 826 F.2d at 1303 and Wilson, 589 F.3d at 657 n.1; With Scott v FCI Fairton, 2010 U.S. Dist LEXIS 60908 at *7 (D.N.J. June 16, 2010) and Rainey v Robinson, 2021 U.S. Dist. LEXIS 94930 at *4 (D.N.J. May 18, 2021).

**POINT II: RESPONDENT HAS FAILED TO MEET THEIR BURDEN TO PLEAD AND PROVE THE ADEQUACY AND INDEPENDENCE OF STATE PROCEDURAL GROUNDS**

**STANDARD OF REVIEW**

A State Court decision must clearly and expressly state procedural grounds for procedural analysis to apply. Coleman v Thompson, 501 U.S. 722, 750 (1991). When the last reasoned State Court decision asserts a State Procedural Bar as grounds for its decision, Federal Courts consider whether the bar is adequate as a matter of Federal Law. Johnson v Mississippi, 486 U.S. 578, 587 (1988); Johnson v Lee, 195 L.Ed.2d 92, 96 (2016). In order to establish the independence and adequacy of a State Procedural Rule, Respondent bears the burden of proving it: (1) Speaks in unmistakable terms; (2) All State Courts refuse to hear the claim on the merits; and (3) That refusal in consistent with other decisions. Nara v Frank, 488 F.3d 187, 199 (CA3 2007).

When a State Court doesn't indicate an alternative merits basis, and the adequacy and independence of the State Law ground is not clear from the opinion, claims are not procedurally defaulted. Munchinski v Wilson, 694 F.3d 308, 335 (CA3 2012). There is no adequate procedure where a State Rule forces resort to an "arid ritual of meaningless form." James v Kentucky, 466 U.S. 103, 124 (1984). When a State Rule's essential requirements are met, formal requirements are not adequate to bar Federal Habeas review. Lee v Kemna, 534 U.S. 362, 366, 385 (2002); Rolan v Coleman, 680 F.3d 311, 318-19 (CA3 2012); See Also Shotts v Wetzel, 724 F.3d 364, 371 (CA3 2013)(Strict adherence to technical requirements constitutes exorbitant application of State Law; if Petitioner has substantially complied, there is no procedural default). Oral motions made during open court do not require written elaboration

19

to be effective; formal requirements to the contrary are inadequate to bar habeas review. <u>Huffman v Florida</u>, 435 U.S. 1014, 1015 (1978).

## LEGAL ANALYSIS

Respondent admits that the last reasoned State Court decision "clearly and expressly relied on State Procedural Grounds." <u>ECF</u> 12 P.20; "Affirmative defenses". Johnson v Lee, 195 L.Ed.2d at 96 (When the last reasoned State Court decision asserts a procedural bar, the adequacy of the bar is a matter of Federal law to be determined by the Federal Courts). The burden of proving the adequacy and independence of State Procedural Grounds is on the Respondent. <u>Nara</u>, 488 F.3d at 199. Respondent admits that State Court cited "failure to comply with the Court Rules"; but does not cite which Court Rule nor how Petitioner failed to comply. As Respondent admits in "9" and "13" of their answer, Exhibit A to the Petition; <u>ECF</u> 1.7; is fully exhausted. On Page 1, it shows the filing receipt from the NJ Super Ct " Law Div.; which indicates there was no deficiency in the filing. That means the clerk admitted that all the moving papers required by the Court Rules for written motions must have been filed: notice, brief, proposed order, proof of service, and certification in support. Otherwise, the clerk would have "regularly followed" the practice of citing a deficiency and simply lodging the papers as "received" but not "filed." In fact, Respondent has included evidence of this   in their response to the show cause order: the State Court Docket shows that each of these documents were filed on December 27, 2018, then deleted by order of the trial court on January 10, 2019. See <u>ECF</u> 12.7, P55a-56a. Even if Petitioner had failed to meet formal requirements, which he didn't, "When a State Rule's essential requirements are met, formal requirements are not adequate to bar federal habeas review." <u>Lee v Kemna</u>, 534 U.S. at 366, 385. The State Trial Court's striking of the 12/27/18 and 1/7/19 <u>Brady</u> motion and moving papers; and the Respondent's inability to produce

even the brief appended as "Exhibit A" to the Petition; indicate that the State Trial Court attempted to remove all record of the moving papers from the Court Record. But since the Clerk admitted by filing the motion on 12/27/18 that it complied with formal requirements, the Respondent should be equitably estopped from claiming ex post facto that it didn't: just because they deliberately destroyed the moving papers. Equitable principles militate against letting them benefit from their wrongdoing in tampering with the record. See ECF 12.7, P55a-56a (Motion to dimiss indictment, proposed form of order, proof of service, certification/affidavit, and brief all deleted on January 10, 2019 by order of Robert A. Kirsch, the trial judge).

The Respondent claims as basis for their procedural default that "Petitioner did not file a motion to represent himself or a motion to dismiss at any time after 1/7/19." But the State fails to address Petitioner attempting 3 times on the record to address the Court at the 1/7/19 hearing. See ECF 12.34 P4L3-5, P19L14-15, P21L13-25. Of course Petitioner didn't: he wasn't allowed to. Nor was he required to, as a matter of federal law: "When a trial judge, in no uncertain terms, rejects Petitioner's Federal Constitutional argument, a requirement to raise the argument a second time is an arid ritual of meaningless form." Osborne v Ohio, 495 U.S. 103, 124 (1990). Respondent admits that the record shows Plaintiff basing his ore tenus argument on the 6th Amendment, and that the trial judge rejected it in no uncertain terms: "the trial judge clearly explained to him that the issue would not be reached." ECF 12.19 P.34. As such, Petitioner was not required to resort to "an arid ritual" of filing either of his motions again, since the Trial Judge had "clearly explained"; in no uncertain terms; that they were stricken.

Respondent has also failed to cite a single NJ decision which "the refusal is consistent with." Even apart from their failure to cite a clearly established procedure, their failure to

show it was regularly followed would be fatal to their claims in and of itself.

Respondent has not met their burden to plead and prove that its unspecified State Procedural Ground "Speaks in unmistakable terms"; nor that "Refusal [to hear the claim on the merits] is consistent with other decisions." Nara, 488 F.3d at 199. Respondent has failed to cite a "Court Rule" that speaks in any terms whatsoever; much less a single NJ case that's consistent with it. Procedural default therefore does not apply.

## POINT III: THE STATE HAS ADMITTED THAT PETITIONER IS IN STATE CUSTODY, HIS PETITION IS TIMELY, AND ALL CLAIMS ARE FULLY EXHAUSTED

Respondent explicitly admits in their answer that Petitioner is in State Custody Pursuant to a State Conviction; ECF 12 "1"-"11"; that his petition is timely; ECF 12 "18"; and that he has fully exhausted the factual and legal basis of all the Claims in his Petition; ECF 12 "9" and "13"

## POINT IV: 2254(d) DEFERENCE ADMITTEDLY DOES NOT APPLY TO PETITIONER'S CLAIMS; BECAUSE THERE WAS NO ALTERNATIVE ADJUDICATION OF THE MERITS IN THE APP. DIV.'S CLEAR AND EXPRESS RELIANCE ON PROCEDURAL GROUNDS FOR DENIAL OF PLAINTIFF'S 1/7/19 BRADY MOTION, WHICH STRIPS THE STATE TRIAL COURT'S ADJUDICATIONS OF ANY PRECLUSIVE EFFECT

### STANDARD OF REVIEW

Explicit reliance solely on a State Procedural Ground for denial of relief on a claim rebuts any presumption of adjudication of the merits of that claim. Bennett v Superintendent, 886 F.3d 268, 283-83 (CA3 2018). If the merits of Petitioner's claims are not reached by the State Court, review is de novo with Pre-AEDPA choice of law. Cone v Bell, 566 U.S. 449, 472 (2009); Everett v Beard, 290 F.3d 500, 508 (CA3 2002). If the last reasoned State Court decision explicitly relied on procedural grounds, it strips any prior adjudication of the merits by any State Court of preclusive effect under 2254(d). Thomas v Horn, 570 F.3d 105, 115 (CA3 2009). Reliance on Procedural grounds is not adjudication of

22

the merits. <u>Wilson v Beard</u>, 589 F.3d 651, 657 (CA3 2009); <u>Simmons v Beard</u>, 590 F.3d 223, 232-33 (CA3 2009).

<u>LEGAL ANALYSIS</u>

Respondent attempts to read into the App. Div.'s 8/4/21 opinion an alternative adjudication of the merits of Petitioner's <u>Brady</u> claim: "Petitioner raised these issues on direct appeal, but the Appellate Division rejected them, finding them lacking sufficient merit to warrant a written discussion." <u>ECF</u> 12 P.29-30. Respondent then cites P.44 of Petitioner's pro se App. Div brief; ("Exhibit C" to Petition, <u>ECF</u> 1.9); and P.36 of the App. Div.'s opinion; (<u>ECF</u> 12.19). But what the App. Div actually said was "any other claim of error not explicitly addressed in this opinion is too lacking in merit to warrant further discussion." <u>ECF</u> 12.19 P.36 (Emphasis added). The App. Div did, in fact, "explicitly address" the claim that "Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial." <u>Id.</u> At P.34. Petitioner specifically alleged in his pro se App. Div brief, in regards to his <u>Brady</u> motion which he renewed on 1/7/19: "Appellant's right to self-representation attached to said motion, which is attached hereto as DA1 and incorporated as if fully set forth herein." See <u>ECF</u> 1.9, "Db62" According to procedures "firmly established and regularly followed"; i.e. <u>N.J.C.R.</u> 1:4-3; Petitioner was allowed to incorporate by reference under the Court Rules. The App. Div opinion therefore "explicitly addressed" Petitioner's <u>Brady</u> motion; Exhibit A to petition, <u>ECF</u> 1.7; and denied relief thereon based on "procedural missteps"; with no alternative adjudication of the merits. Respondent's reliance on P.36 of the App. Div opinion to counter "Db44" of Petitioner's pro se App. Div brief admits that the App. Div did not reach the merits of Petitioner's <u>Brady</u> claims, only his State-law request for an adverse inference under <u>State v Dabas</u>, 215 N.J. 114 (2013). Indeed, in ruling on Petitioner's adverse inference claim from "Db44"-"Db55"; <u>ECF</u> 1.9; the App. Div

recognized in its opinion that Petitioner only cited <u>Brady</u>-related cases in his Dabas argument to show the 'spoliator destroyed or otherwise concealed [evidence that] would have been unfavorable" in the specific context of an adverse inference instruction under State law. See <u>ECF</u> 12.19, P.33. The State law Dabas claim is distinct from the Federal Constitutional <u>Brady</u> claim of a due process violation, requiring dismissal of the indictment; which was raised in "Exhibit A" to the Petition; <u>ECF</u> 1.7; which was fully incorporated by reference in "Db64" of Petitioner's pro se App. Div Brief; <u>ECF</u>  1.9; and which was denied by the App. Div based on clear and express reliance solely upon "procedural missteps": with no alternative adjudication of the merits. Any factfinding by the App. Div. on the Dabas claim, was in the perspective of a different legal standard than <u>Brady</u>: namely, Dabas. It therefore cannot provide the basis for a proper conclusion, even if <u>Brady</u> is later applied to the same set of facts. This federal Court  may therefore find the facts de novo in the correct perspective, namely <u>Brady</u>. <u>See</u> <u>Rogers v Richmond</u>, 365 U.S. 534, 547 (1961).

Respondent has admitted through their use of the plural "motions" that the 12/27/18 written motion was renewed and subsumed in the 1/7/19 ore tenus requests by Petitioner: "On the record on January 7, 2019, Judge [struck] the motions for failure to comport with the Court Rules." <u>ECF</u> 12, P.45.

Respondent desperately seeks to shore up their position with a post-trial hearing pursuant to <u>State v Coon</u>, 314 N.J. Super. 426 (App. Div. 1998). But the NJ Super. Ct. - App. Div. stripped all adjudications of the trial Court, or indeed any  of its own prior adjudications, on Petitioner's January 7, 2019 Faretta claim of preclusive effect: by relying solely on "procedural missteps" in its last reasoned opinion. And any findings of fact by the Trial Court on post-trial remand are not entitled to 2254(e)(1)'s presumption of correctness. <u>Kimmelman v Morrison</u>, 477 U.S. 365, 389, 390 n.10 (1986).

The merits of the Federal Due Process violation, requiring dismissal of the indictment, were not reached: 2254(d) does not apply to Petitioner's <u>Brady</u> claims. Because the App. Div based their decision on procedural grounds, with no alternative adjudication of the merits, it strips any prior adjudication of the merits of Petitioner's <u>Brady</u> claims by the State Trial Court of any preclusive effect under 2254(d).

<u>POINT V: PETITIONER HAS PLEADED EVERY ELEMENT OF A VALID BRADY CLAIM, INCLUDING BAD FAITH OF THE INVESTIGATORS; THE UNDISPUTED RECORD SUPPORTS THIS; AND RESPONDENT'S CONCLUSORY STATEMENTS TO THE CONTRARY ARE CONTRADICTED BY THE ADMITTED RECORD; CUMULATIVE ANALYSIS FOR PREJUDICE APPLIES, AND RESPONDENT HAS FAILED TO OPPOSE THE MATERIALITY, SUPPRESSION, AND PREJUDICE PRONGS OF BRADY CLAIM</u>

<u>STANDARD OF REVIEW</u>

There are 3 components of a valid <u>Brady</u> claim: (1) The evidence was favorable, either because it had exculpatory or impeachment value; (2) The evidence was suppressed by the State, either inadvertently or intentionally; and (3) The suppressed evidence, considered cumulatively, would have put the whole case in a different light; so as to undermine confidence in the verdict. <u>Strickler v Greene</u>, 572 U.S. 263, 281-82 (1999). Impeachment, as well as exculpatory, evidence falls within the purview of <u>Brady</u>. <u>United States v Bagley</u>, 473 U.S. 667, 676 (1985). Constitutional error occurs only if the suppression of the evidence undermines confidence in the outcome of the trial. <u>Id.</u> At 678. Materiality/prejudice and harmless error standards merge for <u>Brady</u> violations. <u>Haskell v Superintendent</u>, 866 F.3d 139, 150-51 (CA3 2017).

Petitioner must show the bad faith of the police to preserve potentially useful evidence, for that failure to preserve to constitute a denial of due process. <u>Arizona v Youngblood</u>, 488 U.S. 51, 58 (1988). If intoxication is relevant to the state of mind element on an offense, evidence of intoxication is material for <u>Brady</u> purposes. <u>Cone v Bell</u>, 566 U.S. 449, 475 (209).

Materiality is defined as a reasonable probability of a different result and evidence impeaching a prosecution witness may be material under this standard. <u>Slutzker v Johnson</u>, 393 F.3d 373, 387 (CA3 2004). Due diligence plays no part in <u>Brady</u> analysis. <u>Dennis v Secretary</u>, 834 F.3d 263, 291-92 (CA3 2016). Impermissible evidence can still be <u>Brady</u> material. <u>Id.</u> at 308. Evidence that could be used to attack the reliability of the investigation is <u>Brady</u> material. <u>Id.</u> Evidence that could attack the good faith of the investigation is material. <u>Wilson v Beard</u>, 589 F.3d 651, 667 CA3 2009). State Court materiality determinations are not entitled to AEDPA factual deference. <u>Id.</u> at 657 n.1. A State Appellate Court ruling on procedural grounds strips a Trial Court's adjudication of the <u>Brady</u> claims of preclusive effect. <u>Simmons v Beard</u>, 590 F.3d 223, 235 n.5 (CA3 2009). When a State Court doesn"t address the cumulative materiality of <u>Brady</u> violations, review is de novo with no deference under 2254(d). <u>Id.</u> at 273.

<u>LEGAL ANALYSIS</u>

Respondent can"t rely on the jury verdict to oppose Petitioner's <u>Brady</u> claims, because the <u>Brady</u> issue wasn"t before the jury: counsel foisted on Petitioner in violation of his 6th Amendment Right conceded the <u>Brady</u> issue against Petitioner's wishes. See <u>ECF</u> 12.43 P38L24-P39L3.

The same criminal proceeding, with the same set of underlying facts, that underlie this habeas proceeding; was found by this Court to underlie this Court's legal and factual determination of the <u>Brady</u> materiality of a certain drug effect expert: Dr. Robert Pandina. <u>McGillvary v Galfy</u>, 2022 U.S. Dist Lexis 134998 at *29-30 (D.N.J. 2022). These determinations took into consideration pre-trial evidence which was constructively, if not actually, available to Petitioner when he moved ore tenus to introduce expert testimony on 1/7/19: including the March 23, 2016 letter attached as "Exhibit A" to the complaint; <u>ECF</u> 1.3 in <u>McGillvary v Galfy</u>, 2:21-cv-17121-MCA-CLW (DNJ 2021). <u>See also</u>

26

**Branch v Sweeney**, 758 F.3d 226, 241-42 (CA3 2014)(Pre-trial evidence can be introduced in federal court to support claims, even under AEDPA's regime). This letter, and all the facts set forth in the complaint it's attached to, are judicially noticeable in the present proceeding; See F.R.E. 201(b); or in the alternative, this Court is authorized by Habeas Rule 7 to expand the record to include it; See Rules Governing Section 2254 Cases in the District Courts, Rule 7. But the determination of this Court on the Brady materiality of drug effect expert testimony is much more than judicially noticeable: it's res judicata. It judicially estops a contrary finding and  clearly shows Respondent making statements against interest  to the effect that a drug effect expert employed by the State made statements in support of Petitioner's claims, which investigators were aware of at the time. Considering that it is also res judicata that petitioner 'sufficiently alleged a conspiracy"; McGillvary v Galfy, 2022 U.S. Dist Lexis 134998 at P.29-30; By the Respondent and the Defense Counsel foisted upon him in violation of the 6th Amendment "to deprive [Petitioner] of his Due Process Rights"; Id.; Petitioner's prima facie showing the prosecutor's bad faith is Res Judicata. Petitioner is admittedly not at fault for failure to develop the factual record under 28 U.S.C. 2254(e)(2); and any finding to the contrary would otherwise be judicially estopped by the admissions of parties in privity with Respondent, which Respondent failed to object to or oppose, in McGillvary v Galfy.

    The Respondent misapprehends the App. Div.'s statement, "any other claim of error not explicitly addressed in this opinion is too lacking in merit to warrant further discussion."; and even admits that the App. Div "explicitly addressed" Petitioner's 1/7/19 plural "motions". See ECF 12 P.45. So there's admittedly no adjudication of the merits of Petitioner's Brady claims to defer to that hasn"t been stripped of preclusive effect by the App. Div.'s exclusive reliance on "Procedural Missteps." Simmons, 590 F.3d at

235 n.5. Neither are State Trial Court determinations of <u>Brady</u> materiality nor bad faith factual determinations accorded deference under 2254(e)(1). <u>Wilson</u>, 589 F.3d at 657 n.1.

The Respondent contends that "police do not collect everything from inside a crime scene"; yet a crime scene analysis expert who the Respondent qualified; <u>ECF</u> 12.42, P15L19-P16L12; Testified that the carpet stain should have been cut out, and the bodily fluids within it analyzed; <u>Id.</u> P19L2-P20L23, P80L6-8; See also <u>ECF</u> 1.13 (Depicting carpet stain, in which darker blood is clearly distinguishable from lighter urine stains); and that the glassware and containers from the house should also have been collected and analyzed for drug residue. <u>Id.</u> P20L24-P21L14, P79L9-22; See also <u>ECF</u> 1.14 (depicting glassware), <u>ECF</u> 1.15 (Depicting pill bottles), <u>ECF</u> 1.17 (Depicting numerous surfaces and containers).

The Respondent admits that Adrian Gardner testified numerous times "that the crime scene was taped off and sealed"; and that no one went inside or tampered with or removed evidence. So by conduct, the materiality of such sealing and preservation is admitted by Respondent. Respondent then relies on numerous other statements by Gardner about the carpet, glassware, and pill bottles. But Respondent left out the part where, at the end of her testimony, Gardner was confronted with photographs showing her statements about the crime scene being secure were false. She admitted that an unknown individual broke the crime scene tape, entered the active crime scene, and removed evidence which to this day is unaccounted for. See <u>ECF</u> 12.38 P168L3-P170L15. Samples of the carpet, if they had been preserved, would've provided even more convincing impeachment evidence of Galfy's semen and Petitioner's recently cut hair and drugged urine and vomit in the carpet under Galfy's chest and head. Respondent quotes Gardner that "all of the evidence on the floor just appeared to be consistent with blood evidence"; but let's confront her with that photograph, too: take a

28

look at the picture of the carpet stain on the floor, Exhibit G to the Petition ECF 1.13. The Court can take judicial notice that blood is red, and urine is not. You can see the red blood as distinguished from the not-red urine in the picture. There is no such distinguishment between blood and vomit, which further analysis would be necessary to differentiate. The crime scene expert also saw the difference from the photograph, between the blood and the urine. See ECF 12.42 P19L2-P20L23. Petitioner's Brady Motion Brief; Exhibit A to Petition ECF 1.7; specifically cites the "NJ Attorney General's Guide to Providing Services to Victims of Sexual Assault" ("AGVSA"). This Court can take judicial notice of AGVSA as a Public Record. See F.R.E. 201(b). The AGVSA mandates investigators to collect samples from and to analyze "the surface the alleged sexual assault happened on." The investigators knew this when they brought the red-herring bedsheets to the lab for analysis; despite knowing that the rape occurred on the carpet, not the bed.

Likewise, the AGVSA mandates investigators to collect containers that might have been used in a drug-facilitated sexual assault ("DFSA"). Once again, Respondent quotes Gardner, "the pill bottles from the refrigerator were also not collected because it appeared they were vitamins." Samples of contents of pill bottles from the fridge showing GHB or ketamine would've devastatingly impeached Gardner. But although Gardner admitted that "pill bottles from the house" were known to have exculpatory value as evidence of DFSA; See ECF 12.38 P156L16-21; and the lab technician testified that investigators knew the exculpatory value of analysis of pill bottles for drug residue as evidence of DFSA; See ECF 12.40 P177L8-20; Respondent has left out the most important part of Gardner's testimony concerning the pill bottles: "The contents of those bottles were never looked into." See ECF 12.38 P152L11-P153L3. Johnny Ho also testified that no one opened the pill bottles to see

what was actually inside the bottles, much less analyzed for drug residue. See ECF 12.41 P114L16-P115L3.

Respondent admits that "investigators examined empty bottles to determine if any residue needed to be removed"; and "performed a visual identification of the pills"; See ECF 12.40 P177L8-20; so they knew the exculpatory value of such an analysis, and that they were required to do it. Yet they didn"t do that on the pill bottles from the fridge. Respondent claims that "Dr. Wang also identified the vitamin bottles"; which misconstrues the record. Dr. Wang did not, in fact, open nor ascertain the contents of the pill bottles from the fridge. He only read the labels from the pictures and said the rapist "must have bought those over the counter." ECF 12.42, P29L4-13, L17, L20-21, P30L3-4; See also Id. at P30L6-11 ("Q: They were not prescribed, that Mr. Galfy was taking them, to your knowledge? A: Yes."). Samples of the contents of the pill bottles from the fridge showing GHB or ketamine would've impeached Wang's testimony about the pill bottles to its core.

Gardner's testimony that "the dishwasher was clean, and it appeared to have all clean, recently washed dishes in it" is clearly and convincingly rebutted by the following evidence:

1.) In the photograph from Exhibit H to the Petition; ECF 1.14; the inside of the dishwasher door has orange diluted pasta sauce drippings underneath the position where the plates would be if the bottom rack were pulled out. This corroborates petitioner's testimony that the rapist put the plates in the dishwasher after running water over them; because the diluted pasta sauce drippings are clearly under where the rapist put the plates. If the dishwasher had actually been run, the pasta sauce residue would have been washed away.

2.) In the photograph from Exhibit K to the Petition; ECF 1.17; the front of the dishwasher is shown prior to opening. On the upper right of the dishwasher, there are indicator lights for each of the wash cycles which light up, including one that says "clean";

but is not lit up. If the dishwasher had been run, the "clean" light would have been lit up prior to opening the dishwasher: but it is clearly and convincingly in the "off" position. See Also the Photograph from Exhibit H to the Petition ECF 1.14.

The State Trial Court's finding of fact concerning the glasses in the dishwasher explicitly relied on a reading of Petitioner's testimony that is squarely rebutted by Petitioner's actual testimony:

"Court: Mr McGillvary testified yesterday that he observed Mr Galfy run the dishwasher

Defendant: No I didn"t. I said he put stuff in the dishwasher." ECF 12.43 P11L12-15

But Petitioner's testimony reads, in relevant part:

Defendant: " he ran some water over the plates, he opened up the dishwasher and he went to put the plates in the dishwasher." ECF 12.42 P168L19-21

It is clear that samples of the glasses within the dishwasher showing residue of beer and GHB or ketamine, and DNA around the rim of the glass with Petitioner's saliva, would've been a grand slam impeachment of Gardner's testimony.

The importance of the suppressed evidence impeaching Gardner and Wang; the carpet samples, pill bottles, and drinking glasses; when considered cumulatively: is underscored by the Prosecutor's reliance on Gardner's and Wang's testimony throughout their summation, highlighting the prejudicial effect suppression of the impeachment evidence had upon the jury's verdict. See ECF 12.45, P48L19-P49L5 ("This area, if you want to believe that something in here could have been urine or anything else -- I submit to you as Sergeant Gardner told you, that wasn't the case. Everything was consistent with what the crime scene shows, and they say dead men tell no tales, but through the hard work of law enforcement officers they do. They tell the tale that this is blood. She walked around. What is this that she pointed out to you

31

on the rug? They look like steps to her, the trained eye that sees
it. She sees this. There's a lot of blood that was coming out but
then it dries up."); P50L11-17 ("And you want to talk oh, there's
some hairs over here. Well, anyone who has a bed sheet, there's
hairs everywhere. You live in the house, as Sergeant Gardner says.
Hairs are everywhere when you get to a crime scene. We're humans.
That's the crime scene? That's what he wants you to believe as he
fought for his life and didn't know what was happening?"); P50L19-
25 ("Now, when Joe is removed, what is that consistent with? Look
at number 3. Just like Sergeant Gardner told you. The blood had
come out and now it's starting to dry up, just like a river recedes
along the shore and you see it. Except the blood was receding,
drying up, changing color. There's nothing else there. Joe's watch
on the floor."); P53L23-P54L8 ("Remember, Sergeant Gardner never
took those vitamins out of the fridge. The expert Cheryl Kestlinger
came in and said yeah, they're all what they purported to be.
They're what his prescriptions were. There was no mickey in here.
He didn't make him a Roofie colada. This is just what the man's
drugs that he was taking because he's 74 years old. He has vitamins
in the fridge. You saw Dr. Wang when he read off his chart and Ms.
Reyes went through it. Fish oil, Vitamin C, Vitamin D. They're
vitamins that you take.").

Respondent describes "the surveillance from the Rahway Train
Station at approximately 9:34am on May 12, 2013; which Petitioner
stipulated as being true and accurate recordings." First of all,
"Petitioner" made no such stipulations because all proceedings
subsequent to 1/7/19 were in violation of his 6th Amendment Right
to self-representation; and counsel foisted upon him did not
"represent" him, as a matter of Federal Law. If he were allowed to
self-represent, he would have challenged the completeness of the
video evidence under Evidence Rule 106, which is the same in NJ as
in the Federal Rules.

Secondly, although Respondent claims "the lead detective testified that it was the only time the police found video surveillance of Petitioner at the Asbury Train Station"; Ho testified that he collected "all the video footage except for those 2 hours" during which Petitioner cut his hair. See ECF 12.41 P96L13-17. Petitioner raised the issue that additional video surveillance existed, showing him cutting his hair at the Asbury Station prior to returning on the 2nd day, and was destroyed by the investigators because it didn"t fit their narrative; See ECF 1.7 (Raising this issue at trial court), ECF 1.9, P.62 (Raising this issue at appellate court), ECF 1.10 (Raising this issue at highest state court). Video surveillance evidence from Asbury would've impeached Ho by showing Petitioner with short hair prior to going back to Clark, the importance of which impeachment evidence is shown by the prosecutor's summation accusing Petitioner of changing his appearance afterwards as supposed evidence of guilty state of mind. ECF 12.45, P40L6-P42L1 (Prosecutor claims Petitioner isn't Petitioner on video at Long Branch, because he walks differently and has a lower body temperature after waking up from a nap on a park bench); P54L25-P55L4 ("This person now leaves in a bloody mess on the floor and the footprints lead away from the scene getting away. A some point we know he cuts his hair. I submit to you that he did it then somewhere to change his identity. He leaves the house.")

Thirdly, the short recently cut hairs on the vertical side of the mattress; See Exhibit I to the petition ECF 1.15; and on the rapist's palms; See Exhibit A to Petition ECF 1.7, Junaid Shaikh's autopsy report, Page 43a of ECF 12.7 ("A single strand of hair was present on the palm[ of] the left hand [...] two strands of hair were present on the palm[ of] the right hand"); indicate that Petitioner's hair was cut prior to returning to the house. This wasn"t addressed by Respondent and so is deemed admitted under Fed R. Civ P. 8.

Lastly, the loss or destruction of the Asbury Park video surveillance from 12:44pm-2:44pm on 5/12/13 is unaccounted for by the "malfunction" on 5/13/13; See ECF 1.18 (Conspicuously missing entry for this time period in investigator's report). The fact that investigators only saved two 30 second clips, spaced 41 minutes apart, from hours of footage at Asbury; yet saved hours upon hours of footage from Rahway and Long Branch; Ibid.: shows that hour upon hours of footage also must have existed from Asbury, but was lost or destroyed by investigators. Investigators saving hours upon hours of video from Rahway and Long Branch is an admission by conduct of knowledge that hours upon hours of footage from Asbury is relevant, material, and exculpatory.

Respondent urges "Judge Kirsch's decision regarding Petitioner's motion to dismiss" as "instructive"; but misses two key points: (1) It was not Petitioner's motion, Counsel foisted upon him in violation of the 6th Amendment had conceded the Brady issue; See ECF 12.43 P38L25-P39L3; and (2) The NJ App. Div stripped Judge Kirsch's adjudication of preclusive effect under 2254(d) by relying exclusively on "procedural missteps" to deny relief for Petitioner's 1/7/19 Brady motion, which was admittedly subsumed in Petitioner's motion to self-represent; See ECF 1.7 (Brief in support of motion); ECF 1.9, P. 62 (Incorporating ECF 1.7 by reference in claim for relief on January 7, 2019 motions); ECF 12.19 P.34 (Denying relief on the Jnaury 7, 2019 motions based on nebulous "procedural missteps").

The Respondent's incredible conclusory statement that "nothing in the record suggested police suspected the carpet, glasses, or vitamin bottles were exculpatory" is contradicted by: (1) Gardner's testimony and police report stating that the investigators returned to the scene to collect evidence of a sexual assault; ECF 12.38 P138L14-P139L11, Exhibit E to Petition ECF 1.11 (Gardner's May 17, 2013 report, "He requested we collect ... any cups or glasses in the kitchen ... as well as any pill bottles in

the house"); Specifically Glasses; Id. P113L17-P114L18, P117L7-22;
Pill Bottles; Id. P156L16-21; and Surfaces upon which  the rape
might was alleged to have happened; Id. P114L19-P115L8; (2) The lab
technicians' testimony that the investigators recognized the
exculpatory value of analysis of the fabric form surfaces upon
which the rape was alleged to have happened; ECF 12.40 P103L3-
P105L20, P109L14-P113L9; and of containers in which rape drugs
might have been placed; Id. P153L18-P176L6; and containers from the
kitchen; Id. P178L11-13; and the Pill Bottles from the fridge; Id.
P177L8-20; (3) Johnny Ho's testimony that the investigators stopped
looking for evidence of sexual assault as soon as the suspect was
developed; ECF 12.41 P129L1-10; and (4) Judicially noticeable
public records from the Drug Enforcement Administration indicating
that containers of the same type were known by law enforcement to
be used in administration of rape drugs ketamine and GHB; ECF 1.17.

      The scope of the State Trial Court's 4/18/19 fact findings
did not include the carpet stains; ECF 1.13; nor the pill bottles
from the fridge; ECF 1.15; nor the missing NJT Video Surveillance;
ECF 1.18; nor the dark hairs from the vertical side of the bed; ECF
1.16; and the rapist's palms; ECF 12.7, P.43a: and so 2254(e)(1)'s
presumption of correctness doesn"t apply to these items of
evidence. Wiggins, 359 U.S. at 530. The State Trial Court and
Respondent admitted that no evidence concerning the contents or
procedure of a standard rape kit was presented; so any findings on
what contents were thereby lost, or who was at fault for that loss,
are outside of the scope of reference to the record. Id. The State
Trial Court's finding that the failure to collect a rape kit is due
to Petitioner's actions or inactions, is clearly and convincingly
rebutted by Johnny Ho's testimony that NJ procedures mandate
collection mandate collection up to 5 days after the assault. The
assault on 5/12/13 was 4 days before Petitioner was arrested and
stated to Ho he had been sexually assaulted. It is judicially
noticeable the 5/16/13 was 4 days after 5/12/13. Saranchak 802 F.3d

at 594. The State Trial Court's finding of no anal rape or Petitioner; fault for non-collection of a rape kit resting upon Petitioner; and inability to test for drug residue analysis or to test carpet fibers for drug metabolites from urine; were all made without evidentiary record about scientific analysis procedure thereon, indeed without any evidentiary record of the uncollected evidence itself, and this Federal Court is not required to defer to State fact findings made without an evidentiary record. Wellons v Hall 558 U.S. 220, 223 n.3 (2010).

Additionally, the position of Petitioner when the injuries were inflicted had a substantial effect on the jury's verdict: the false allegation that Petitioner stood over top of the rapist; stomped downwards, then pulled on the neck; was a centerpiece of the prosecution's case. So evidence that Petitioner was on the floor underneath the rapist, kicking upwards, was clearly material. Petitioner was not allowed to develop these facts and present them in a full and fair hearing, because counsel foisted upon him in violation of the 6th amendment did not "represent" his strategy to do so. The grab marks on the rapist's wrists; ECF 12.39 P51L22-25; short dark hairs in the rapist's palms; Page 43a, ECF 12.7; and short dark hairs on the vertical side of the bed; ECF 1.16: corroborate Petitioner's testimony of waking up, punching the rapist, and the rapist shoving Petitioner's head into the vertical side of the bed. Petitioner clearly grabbed the rapist's wrist and tried to shove him away. These grab marks clearly and convincingly rebut any presumption that the Petitioner "pulled up on the neck"; because there were no grab marks on the face, head, or neck to substantiate such pulling. Likewise, the correlation of the 3 facial fractures to the 3 neck fractures indicate that 3 upward kicks to the face snapped the rapist's neck backwards 3 times.

The 3 facial fractures also clearly and convincingly rebut any claim of the rapist's ear being 'stomped from overhead": The fractured skull in the frontal face region indicates that a direct

'stomp" would have fractured the skull around the ear, but the skull around the ear wasn"t broken. The medical examiner's testimony that "all the injuries were from the front right side" of the facedown rapist; together with that the torn ear "could be caused by one injury, but with a linear force to it, as well. So this is not a direct blow but a blow with an angle to it which also caused the area to tear"; ECF 12.39 P26L25-P27L3; shows that Petitioner must have been on his back in front of the rapist, kicking the rapist away from him. The bloody footprints from Petitioner's right heel staggering haphazardly around the room, then down the hallway, show that his jeans were down around his ankle. It's clear and convincing, together with the medical examiner's testimony, that one kick from that rough denim fabric abraded the ear. If it had been from an overhead direct blow, the skull around the ear would"ve fractured like the skull of the face did.

Circumstantial evidence, such as that heretofore described, was a key basis in the jury's verdict. ECF 12.45 P73L23-P74L1, P86L11-14. Evidence concerning Petitioner's position in relation to the rapist, kicking upwards from underneath; of the time of day which petitioner cut his hair, earlier in the day before going back; and of rape drugs influencing "all that was said or done by Defendant preceding, connected with, and immediately succeeding the events leading to the death of Joseph Galfy, Jr. are among the circumstances to be considered." Id. P86L15-20. The cumulative evidence listed in Ground Two of Petitioner's Petition, including all the lost and/or destroyed evidence depicted in exhibits incorporated by reference therein, if considered by the jury; would have drastically altered their determination of the circumstances of those events.

Because Petitioner testified in his own defense, credibility determinations by the jury necessarily affected their verdict. Petitioner testified regarding intoxication, self-defense, and his

innocence of the purpose and knowledge element of murder. The jury was instructed that their credibility determinations may be based on evidence such as that which was heretofore described. See Id. P77L14-16, P77L23-24. It follows that any evidence which supported or corroborated Petitioner's testimony was material to the jury's determinations on intoxication, self-defense, and murder: and the cumulative effect of the evidence listed in Ground Two of Petitioner's habeas petition would have "Put the entire case in a different light" by supporting and corroborating Petitioner's testimony.

It is of note that, in addition to waiving the harmless error defense, Respondent has also failed to deny that the cumulative effect of the Brady violations had a prejudicial effect on the outcome of trial. Under Fed. R. Civ P. 8; Petitioner's allegations to that effect are therefore admitted as true.

Petitioner has alleged the bad faith of the investigators; exculpatory and impeachment value of the evidence; suppression, loss, or destruction of the evidence by the State; and the cumulative prejudice to Petitioner caused by that suppression, loss, or destruction of evidence: all the elements of a valid Brady claim. The State has failed to oppose Petitioner's allegations concerning the materiality, suppression, and prejudice prongs; and their opposition to the allegations of bad faith of the investigators fails for all the foregoing reasons. Respondent has claimed that Petitioner has failed to show "Prejudice" to excuse a procedural default, but this is not the "Prejudice" contemplated by Brady, and is not applicable to this case. Respondent has failed to plead or prove the adequacy or independence of any state procedural grounds for default, and so the "Cause and Prejudice" standard does not apply. See Point II, Above.

Since Petitioner has pleaded, and the undisputed material facts show that, the carpet, the pill bottles from the fridge, the drinking glasses from the kitchen, containers from the kitchen, the

**rape kit that was supposed to have been done on Petitioner, and the missing video from Asbury Park; (1) (a) Were    material to the location and state of mind of Petitioner and to corroborating his testimony which would prove his innocence either through cirucmstantial and direct evidence, or by substantiating the affirmative defenses of involuntary intoxication or self-defense by showing that he cut his hair earlier in the day, was drugged by Galfy, was sexually assaulted by Galfy, awoke on the floor, and urinated out of fear; and/or (b) Could have been used to impeach Gardner by showing that the carpet contained Gafly's semen and Petitioner's urine, vomit, and recently cut hair, to impeach Gardner and Wang by showing that the pill bottles from the fridge and containers from the kitchen contained rape drugs or rape drug residue, to impeach Gardner by showing that there was residue of beer and rape drugs in the glass which Petitioner drank from, and to impeach Ho by showing video of Petitioner from Asbury Park with short hair during the period from 12:44pm-2:44pm on May 12, 2013; (2) Was suppressed by Respondent, by their failure to collect it and/or their loss or destruction of it; (3) Due to the bad faith of the investigators, i.e. with their knowledge of its exculpatory or impeachment value at the time it was suppressed; (4) Cumulatively having an effect on the jury's determinations of direct and circumstantial evidence, credibility determinations of Petitioner, Gardner, Ho, and Wang, Intoxication, Self-defense, and the mental element of murder, so as to render the verdict unworthy of confidence: Plaintiff has shown a valid Brady claim and is entitled to declaratory relief vindicating his rights thereon, and to the writ of habeas corpus issuing and ordering the Respondent to release him from his unconstitutional confinement and restraint.**

**39**

## CONCLUSION

The material facts contained in the record before the Court cannot be genuinely disputed. The State has previously admitted the truth of these material facts, unreservedly, by including them in their Answer. As a matter of federal law, these facts establish all the elements of a <u>Brady</u> Claim to which 2254(d) does not apply, entitling Petitioner to judgment granting him the writ of habeas corpus: (1) The Respondent suppressed evidence; (2) The evidence was material to innocence, or had impeachment value; (3) The investigators knew of the exculpatory value of the evidence at the time it was suppressed; (4) Petitioner was prejudiced by the cumulative effect of the suppressed evidence on the verdict; (5) The last reasoned State Court decision was explicitly based on inadequate procedural grounds, without an alternative adjudication of the merits; (6) Petitioner fully exhausted this claim on direct appeal; (7) He timely filed his habeas petition raising this claim; (8) The Respondent has failed to plead and prove the adequacy of State procedural grounds to meet their burden for the affirmative defense of procedural default; and (9) Petitioner is being held in state custody pursuant to a state conviction. Therefore, Petitioner is being held in violation of the 6th Amendment of the U.S. Constitution, applicable to the States by the 14th Amendment; and he has met all the pre-requisites of 28 U.S.C. 2254, which entitles him to the writ of habeas corpus, ordering the Respondent to release him from his unconstitutional confinement and restraint. He requests the Court to forthwith issue the writ.

Date: 8/12/24

Respectfully Submitted,

Caleb L. McGillvary, ProSe
#1222665/SBI#102317GNJSP
PO Box 861, Trenton, NJ08625

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ 08625


                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
_____
                              )
Caleb L. McGillvary           ) CIVIL ACTION NO.
      PLAINTIFF               ) 1:22-cv-04185-MRH
                              )
      V.                      ) Hon. Mark R. Hornak, USDJ
                              ) Hon. Richard A. Lanzillo, USMJ
Bruce Davis, Administrator    ) Motion Date: September 16, 2024
NJSP, Attorney General of NJ  )
      DEFENDANT               )
                              )
_____

      DECLARATION IN SUPPORT OF PETITIONER'S MOTION FOR SUMMARY
      JUDGMENT ON GROUND TWO OF HIS HABEAS PETITION PURSUANT TO
         CARTER V RAFFERTY, 826 F.2d  1299, 1303 (CA3 1987);
           WILSON V BEARD, 589 F.3d 651, 657 n.1 (CA3 2009);
                       AND FED. R. CIV. P. 56
_____

I, Caleb L. McGillvary, hereby declare pursuant to 28 U.S.C. 1746
the folowing:

1.) I am the pro se plaintiff in the above-captioned matter.

2.) I prepared the statement of material facts not in dispute in
support of this motion for summary judgment. Those facts are either
taken directly from the record below, or if they are not, they are
true and accurate to the best of my knowledge and belief. I
incorporate same by reference herein.

3.) The letter attached as Exhibit A to this declaration is a true
and accurate copy of the letter Respondent sent to Petitioner's
counsel on March 23, 2016.

4.) The letter described in "3" states that the drug effect expert Robert Pandina stated to Respondent, prior to Petitioner's December 27, 2018 motion, "that the immediate or acute effects of date rape drugs typically last between two to four hours, that residual effects can last longer (dependent on other factors such as dosage), and that the window of detection is eight to ten hours". Pandina also indicated that his workplace received funds from the estate of Joseph Galfy within the year leading up to the letter, and after he had been retained by the Respondent to provide testimony. In this letter, Respondent indicates that this action by the estate of Joseph Galfy created a conflict of interest.

5.) The letter described in "3" is judicially noticeable as filed in the US District Court for the District of New Jersey as Exhibit A to ECF 1.6 in McGillvary v. Galfy, Dkt. No. 2:21-cv-17121-MCA-CLW; or in the alternative, the Court may expand the record under Habeas Rule 7 to include it. Respondent was a party in that case and did not object to or oppose the authenticity or admissibility of the document. The letter was in existence prior to the December 27, 2018 motion and request for evidentiary hearing, and could have been proferred at that hearing if the hearing was conducted as requested, and constitutes pre-trial evidence.

6.) The Check attached as Exhibit B to this declaration is the same as that attached as Exhibit B to James Galfy's declaration filed in support of his motion to dismiss; ECF 43.2 in McGillvary v. Galfy, Dkt. No. 2:21-cv-17121-MCA-CLW (USDC-DNJ); and is judicially noticeable as being filed in that case; or in the alternative, the Court may expand the record under Habeas Rule 7 to include it. Respondent was a party in that case and did not object to or oppose the authenticity or admissibility of the document. The check was in existence prior to the December 27, 2018 motion and request for evidentiary hearing, and could have been proferred at that hearing if the hearing was conducted as requested, and constitutes pre-trial evidence.

2

7.) **The last will and testament of Joseph Galfy attached as Exhibit C to this declaration is the same as that attached as Exhibit A to James Galfy's declaration filed in support of his motion to dismiss; ECF 43.2 in McGillvary v. Galfy, Dkt. No. 2:21-cv-17121-MCA-CLW (USDC-DNJ); and is judicially noticeable as being filed in that case; or in the alternative, the Court may expand the record under Habeas Rule 7 to include it. Respondent was a party in that case and did not object to or oppose the authenticity or admissibility of the document. The will was in existence prior to the December 27, 2018 motion and request for evidentiary hearing, and could have been proferred at that hearing if the hearing was conducted as requested, and constitutes pre-trial evidence.**

8.) **The document described in "7" above shows that James Galfy was named the executor of the Estate of Joseph Galfy, and that the document directs $150,000 to be paid to the workplace of Robert Pandina, the Rutgers University Center for Alcohol Studies; and another $150,000 to be paid to the workplace of Junaid Shaikh, the UMDNJ.**

31.) **Richard DeCaprio stated to investigators during a video recorded interview on May 13, 2013 that the first responding Clark Police Officer Keith Meehan was a law client of Joseph Galfy's, the alleged victim in this case. DeCaprio also stated that Meehan regularly had lunch with him at the local restaurant "Just Plain Dave's". DeCaprio stated that he was at the crime scene when Meehan arrived. The Respondent is in possession of this Video Recorded interview, which faithfully records and provides evidence of DeCaprio's Statements, and I know this from personal knowledge because I watched this video at the Union County Jail at 10 Elizabethtown Plaza, Elizabeth, NJ at or about 1PM on or about May 21, 2018. DeCaprio's Video Recorded Interview was pre-trial evidence and this Court may expand the record to include it under Habeas Rule 7.**

3

9.) I declare under penalty of perjury that all documents attached
hereto are true and accurate copies of the originals.

10.) I declare under penalty of perjury that all of these facts are
true and correct as of my own, personal knowledge.

Dated: _August 12, 2024_

By: _____
Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ
08625-0861

4

EXHIBIT  A



# UNION COUNTY PROSECUTOR'S OFFICE

32 RAHWAY AVENUE
ELIZABETH, NEW JERSEY 07202-2155
(908) 527-4500
FAX: (908) 289-1267



GRACE H. PARK
Acting Prosecutor of Union County

THOMAS K. ISENHOUR
First Assistant Prosecutor

ANN M. LUVERA*
Deputy First Assistant Prosecutor

March 23, 2016

\* CERTIFIED CRIMINAL ATTORNEY

Peter Liguori, Deputy Public Defender Union Region
Office of the Public Defender
65 Jefferson Avenue
Elizabeth, New Jersey 07201

Re: *State v. Caleb McGillvary*
      Indictment No.: 13-11-00946-I

Dear Mr. Liguori:

As you are aware, the above-captioned defendant has filed a *pro-se* civil lawsuit naming, among others, the Union County Prosecutor's Office, Dr. Robert Pandina and me, as named parties. In his civil complaint, defendant references a report issued to the State by Dr. Pandina. Please advise your client that Dr. Pandina did not issue a report. As you are aware, the grand jury testimony relevant to Dr. Pandina is brief. Most specifically, the State elicited that "Dr. Pandina opined that the effects of the date rape drugs typically last eight to ten hours after the ingestion," and "that any individual would be groggy, vomiting, not able to move around, and would be otherwise incapacitated." GJ Transcript, 92:19 to 93:1.

During a recent conversation, in the presence of Sergeant Johnny Ho, I reviewed this portion of the grand jury transcript with Dr. Pandina. Dr. Pandina confirmed that the effects of a date rape drug include grogginess, vomiting, not being able to move around, and otherwise being incapacitated. Dr. Pandina, however, clarified that the immediate or acute effects of date rape drugs typically last between two to four hours, that residual effects can last longer (dependent on other factors such as dosage), and that the window of detection is eight to ten hours.

In addition, Dr. Pandina informed me that within the last year his research institute at Rutgers University, (The Center for Alcohol Studies), unexpectedly received charitable funds from the Estate of Joseph Galfy, (the victim in this case), meant to further the research of his team. Although Dr. Pandina reports never knowing or meeting Mr. Galfy, this presents a conflict of interest if the State were to call Dr. Pandina as an expert in any matters regarding this case. Therefore, the State will not be able to use Dr. Pandina as a witness in this case.



14

Peter Liguori, Deputy Public Defender Union Region
Page 2
March 23, 2016

In light of this new information, it is the State's intention to re-present this case to a new Grand Jury panel without any mention of the prior statements made by Dr. Pandina.

Should you have any questions or concerns please feel free to contact me at (908) 527-4682.

Very truly yours,

GRACE H. PARK
Acting Prosecutor of Union County

By: SCOTT M. PETERSON
    Special Deputy Attorney General/
    Acting Assistant Prosecutor

c   Dr. Robert Pandina
    File

15

# EXHIBIT B

EXHIBIT B

| | | | |
|---|---|---|---|
| Amount: | $150,000.00 | Sequence Number: | 9192171279 |
| Account: | 381034636525 | Capture Date: | 05/22/2015 |
| Bank Number: | 02120033 | Check Number: | 1075 |

THE ESTATE OF JOSEPH J GALFY, JR
JAMES T GALFY ADM
26 EMILY TER
WARREN, NJ 07059

1075
55-33/212 NJ
2556

April 28, 2015

Rutgers University Foundation          $ 150,000.00

One Hundred Fifty Thousand and 00/100 ——————— Dollars

**Bank of America**

ACH R/T 021200339

For  Alcohol Studies                    Jack, Executer

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|---|---|---|---|---|---|---|
| 05/22/2015 | 000002688329942 | 122105278 | Rtn Loc/BOFD | Y | | Wells Fargo Bank NA |
| 05/22/2015 | 009192171279 | 111012822 | Pay Bank | N | | Bank of America NA |

EXHIBIT C

# State of New Jersey
# Union County Surrogate's Court

In the Matter of the Estate of:
**Joseph J. Galfy Jr. (Never Married), Deceased**
**AKA: Joseph John Galfy, Jr.**

**EXECUTOR**
**SHORT FORM CERTIFICATE**
**OF LETTERS TESTAMENTARY**

Date of Death: **May 13, 2013**

I, **James S. LaCorte**, Surrogate of the County of Union, do hereby certify that the Last Will and Testament of the decedent, late of Union County, State of New Jersey, was admitted to Probate by the Surrogate of Union County, on July 3, 2013; and that Letters Testamentary were issued to:

**James T. Galfy AKA: James Galfy,**

the Executor(s) named therein, who is duly authorized to administer the estate of said deceased agreeably to said Will and said Letters Testamentary have never been revoked and still remain in full force and effect.

WITNESS my hand and seal of office this
**21st day of March, 2016.**

James S. LaCorte
Surrogate & Deputy Clerk of Superior Court of the
Chancery Division, Probate Part, Union County

L A S T   W I L L   A N D   T E S T A M E N T

O F

J O S E P H   J .   G A L F Y ,  J R .

I, JOSEPH J. GALFY, JR., residing and domiciled in the Township of Clark, County of Union, and State of New Jersey, declare this to be my Last Will and Testament, hereby revoking all Wills and Codicils previously made by me.

FIRST: I direct my Executor to pay my debts, funeral expenses, the expenses of my last illness, and the expenses of administering my estate as soon as practicable after my death.

SECOND: I give, devise and bequeath all of my clothing, jewelry, and personal effects, and all furniture, furnishings, household effects, and other tangible personal property in accordance with a written list or memorandum which I may have executed and which may be in existence at the time of my death. The term "tangible personal property" shall not include currency, coins or ingots of gold or other precious metals, or commodities

1

ﬁⁿˡₓ by me as an investment.  If I have prepared such a written list or memorandum, it will be found with the original or with a copy of my Will.  To the extent that all such property is not effectively disposed of by such written list or memorandum, or if no such list or memorandum exists, I devise the same, including insurance policies thereon, to my brother JAMES T. GALFY, presently residing at in Warren, New Jersey. I authorize my Executor to pay all reasonable charges incurred in the storage, safekeeping and delivery of such property to my beneficiaries.  I direct that all expenses of distribution of my tangible personal property shall be considered as administration expenses of my estate.

THIRD:  (A)  All the rest, residue and remainder of my estate is hereinafter referred to as my "residuary estate."

(B)  I give, devise and bequeath my residuary estate as follows:

(1)  To the Liver Transplant and Hepatobiliary Diseases Program at the University Hospital, University of Medicine and Dentistry of New Jersey, Newark, New Jersey, I give, devise and bequeath the sum of $150,000.00 in the name of my late friend EUGENE J. FRAWLEY to be used for research into the cause, prevention and treatment of liver related diseases.

(2)  To the Center of Alcohol Studies, at Rutgers University, New Brunswick, New Jersey, the sum of $150,000.00 in the name of my late friend EUGENE J. FRAWLEY to be used for

2

research into the cause, prevention and treatment of alcoholism and alcohol related illnesses.

(3) To the Lambda Law Forum at the Seton Hall University School of Law, Newark, New Jersey, the sum of $50,000.00 in my name to be used as they see fit for the advancement of sexual orientation and gender identity rights and issues

(4) To the Healthy Heart Center at the Robert Wood Johnson University Hospital at Rahway, New Jersey to be used for new or replacement equipment or other needs, as the Director of the Healthy Heart Center shall determine, the sum of $50,000.00.

(5) I give, devise and bequeath the balance of my residuary estate, including my current permanent residence at the time of my death, as follows:

(a) To my brother JAMES T. GALFY, thirty three and one third (33 1/3%) percent of the remaining balance of my residuary estate.  In the event that my brother JAMES T. GALFY predeceases me, I direct that his share of my estate shall pass equally to his issue surviving at my death.

(b) To my longtime administrative assistant, MARION A. GROSSHANS, thirty three and one third (33 1/3%) percent of the remaining balance of my residuary estate.

(c) To my friend NORMAN H. SPRINGER of Las Vegas, Nevada, thirty three and one third (33 1/3%) percent of the remaining balance of my residuary estate.

3

(d) The share of either residuary beneficiary named in (b) or (c) above who fails to survive me shall lapse, and that share shall be added to my residuary estate and distributed to my remaining surviving residuary beneficiaries as set forth herein.

FOURTH: (A) I appoint my brother JAMES T. GALFY, as Executor of this my Last Will and Testament. If he shall fail to qualify or for any reason shall cease to serve as Executor, I appoint my friend NORMAN H. SPRINGER, Esq., as Executor in his place and stead.

(B) I direct that the Executor serving hereunder shall not be required to give bond or security in any jurisdiction.

FIFTH: (A) I authorize my Executor to pay all estate, inheritance and succession taxes (including any interest and penalties thereon) payable by reason of my death in respect of any property passing under this Will or in respect of any other property out of my residuary estate, however the same shall be apportioned against specific or residuary beneficiaries under this Will or any person receiving property outside of this Will that is subject to such taxes, and the same shall be reimbursed to the Estate.

(B) Whenever a choice is given to my Executor with respect to the dates as of which to value property for federal estate tax purposes, my Executor may elect the date deemed advisable by my Executor, and I further direct that my Executor

4

shall not be required to make any compensating adjustments between or among any of my beneficiaries for the results of such election. Whenever my Executor shall have the right to elect whether any expenses of administration of my estate shall be claimed as deductions for federal income tax or for federal estate tax purposes, I authorize my Executor to exercise such right of election as deemed advisable by my Executor, and I direct that no compensating adjustment between the income and principal beneficiaries of my estate shall be required to be made as a result of such election.

SIXTH:  In the administration of my estate and of any fund held hereunder, my Executor shall have the following powers, exercisable without Court approval and in the absolute discretion of my Executor, upon such terms and conditions as they shall deem advisable, in addition to, and without limitation upon any other powers granted by this Will or by law:

(A)  To retain any property owned by me or at any time held hereunder, including any business or interest therein;

(B)  to invest and reinvest in any property whatsoever, without regard to any legal limitations upon investments, and without regard to the principle of diversification;

(C)  to invest and reinvest in shares of common trust funds whether or not maintained by any corporate fiduciary serving hereunder;

5

(D)  to hold cash uninvested for a reasonable period of time without liability for interest thereon;

(E)  to sell or exchange any property at public or private sale, for cash or on credit, with or without security, and to comply with the terms of any stock buy-sell agreement or any similar agreement to which I may be a party and which continues after my death;

(F)  to mortgage, pledge or lease, or grant options with respect to any property, for any period of time, whether or not extending beyond the administration of my estate or any fund held hereunder;

(G)  to demolish, abandon, or otherwise dispose of any property;

(H)  to manage, insure, repair, improve, develop, subdivide, partition and alter any property;

(I)  to borrow money for any purpose in connection with the administration of my estate or any fund held hereunder from any person or corporation, including a fiduciary hereunder, on such terms as deemed advisable by my Executor;

(J)  to register and hold securities in the name of a nominee, and to hold securities in bearer form;

(K)  to incorporate any business or property; and thereafter to hold a majority or minority interest in such corporation;

6

(L)   to transfer any business or property to a general or limited partnership, and thereafter to be a general or limited partner in such partnership;

(M)   to vote stock or securities, in person or by proxy, discretionary or otherwise, or pursuant to a voting trust agreement;

(N)   to exercise subscription and conversion rights, and to participate or refuse to participate in any type of reorganization, recapitalization, merger, consolidation, liquidation, dissolution or other action with respect to any corporation;

(O)   to settle, compromise or refer to arbitration, any claim or obligation in favor of or against my estate or any fund held hereunder;

(P)   to continue, renew, extend or modify any note, bond, other indebtedness or mortgage and to enforce payment of such indebtedness or mortgage by foreclosure or otherwise;

(Q)   to employ and terminate the employment of legal counsel, accountants, brokers, investment advisors, custodians, managers, and other agents and employees, and to pay them reasonable compensation out of my estate or any fund held hereunder to which such is attributable and to appoint and pay reasonable compensation to an ancillary administrator;

(R)   to allocate receipts and disbursements and gains

and losses between income and principal, in such manner as my Executor shall deem equitable;

(S)  to distribute any legacy or share of my estate or any fund held hereunder in cash or in kind or partially in each, pro rata or non pro rata, in such manner as my Executor shall deem equitable;

(T)  to move the situs of any fund established hereunder from New Jersey or any other state to any other state in the United States;

(U)  to exercise any and all of the powers, authorities and discretions conferred hereunder in respect of any securities of any corporate fiduciary acting hereunder, or in respect of any securities of a holding company or corporation owning securities of any corporate fiduciary acting hereunder; and

(V)  in general, to exercise any additional powers which I might exercise if I were living, competent and the absolute owner of any property at any time held hereunder.

SEVENTH: (A) Notwithstanding any contrary provisions herein contained, if pursuant to this Will any property shall become payable or distributable to a minor, and if no other trust is then to be held under this Will for his or her benefit, my Executor shall have the power, exercisable in his sole and absolute discretion and without Court approval, either to defer payment of such property, or to pay such property, in whole or in part, to

8.

such minor, to a parent or guardian of such minor, to a custodian for such minor under the New Jersey Uniform Gifts to Minors Act or any subsequent act, or under the corresponding legislative provisions of any other jurisdiction where such minor may reside, or to any adult with whom such minor may reside.

(B)  If my Executor shall defer payment of any such property, I authorize him to hold such property as a separate fund for the benefit of such minor with all the powers given to my Executor in this Will and by law to invest and reinvest the same and to apply for such minor's benefit, so much of the income and principal thereof as my Executor may deem necessary or desirable for the support, maintenance, health and education (including, without limitation, a primary, secondary, vocational and college education) of such minor, either by paying the expenses of such minor directly, or by making payments to such minor, to a parent or guardian of such minor, to a custodian for such minor under the New Jersey Uniform Gifts to Minors Act or any subsequent act, or under the corresponding legislative provisions of any other jurisdiction where such minor may reside, or to any adult with whom such minor may reside.  My Executor shall accumulate in such fund the balance of any income which is not so applied or paid and shall add the same to the principal of such fund.  When such minor shall attain the age of majority, the balance of such fund then remaining shall be distributed to him.  If such minor shall die before attaining

9

the age of majority the balance of such fund remaining at his or her death shall be paid and distributed to his or her then living issue, per stirpes, or in default thereof, to my then living issue.

(C)   My Executor shall not be responsible for the proper application or use of any authorized payment made under this Article, and the receipt of any person receiving such authorized payment shall be a sufficient discharge therefor even though the Executor hereunder may be such a person.   With respect to any property held under this Article, my Executor shall be entitled to such commissions thereon as are payable to a testamentary trustee.

(D) Throughout this Will all references to the age of minority or majority of a beneficiary are deemed to refer to the age of minority or majority under the laws of the State of New Jersey then in effect or the laws of the jurisdiction in which the beneficiary is domiciled, whichever age is older.

EIGHTH:  If any beneficiary referred to in this Will shall die within thirty (30) days after my death, such person shall be considered as not having survived me, for all purposes of this Will.  By this Article, I modify all otherwise provisions of this Will, notwithstanding any law or rule of construction to the contrary.

NINTH:   (A)   Throughout this Will, when the masculine, feminine or neuter gender is used inappropriately, it shall mean the appropriate gender, and unless the context requires otherwise,

10

number shall include the plural, and vice versa.

(B)   Any references in this Will, to "children"or "issue" shall include adopted persons and persons born before and after the date of this Will.

IN WITNESS WHEREOF, I have on this 6th day of September Two Thousand and Seven signed, sealed, published and declared the foregoing instrument as and for my Last Will and Testament.

JOSEPH J. GALFY, JR.

The foregoing instrument, each page of which is identified by the signature of the Testator, JOSEPH J. GALFY, JR., was signed, sealed, published and declared by the said Testator to be his Last Will and Testament, in the presence of us, and each of us, who at his request and in his presence and in the presence of each other, all being present at the same time, have subscribed our names as witnesses the day and year above written.

Dara A. Fioccak     residing at 1275 Westfield Ave. Rahway NJ 07065

Martha E. Gray     residing at 1275 Westfield Ave Rahway N.J. 07065

11

I, JOSEPH J. GALFY, JR., the Testator, sign my name to this instrument this 6th day of September, 2007, and being duly sworn, do hereby declare to the undersigned authority that I sign and execute it as my free and voluntary act for the purposes therein expressed; and that I am 18 years of age or older, of sound mind and under no constraint or undue influence.

_____
JOSEPH J. GALFY, JR., Testator

We, DARA A. FLORCZAK     and   MARTHA E. CRAY

the witnesses, sign our names to this instrument, and, being duly sworn, do hereby declare to the undersigned authority that the Testator signed and executed this instrument as his Last Will and that he signed it willingly; that each of us, in the presence and hearing of the Testator, hereby signs this Will as witness to the signing thereof by the Testator; and that to the best of our knowledge the Testator  is 18 years of age or older, of sound mind and under no constraint of undue influence.

_____  New Jersey
Witness
Dara A. Florczak  Address

_____ New Jersey
Witness  Martha E. Cray.
Address


STATE OF NEW JERSEY ]
                     ] SS:
COUNTY OF UNION      ]


Subscribed, sworn to and acknowledged before me by JOSEPH J. GALFY, JR.,  the Testator, and subscribed and sworn to before me by DARA A. FLORCZ and  MARTHA E. CRAY     , the witnesses, this 6 th day of September  , 2007.

_____
Andrew M. Baron
Attorney at Law
State of New Jersey

12

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ 08625

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Caleb L. McGillvary | ) CIVIL ACTION NO. |
|    PLAINTIFF | ) 1:22-cv-04185-MRH |
|  | ) |
| V. | ) Hon. Mark R. Hornak, USDJ |
|  | ) Hon. Richard A. Lanzillo, USMJ |
| Bruce Davis, Administrator | ) Motion Date: September 16, 2024 |
| NJSP, Attorney General of NJ | ) |
|    DEFENDANT | ) |
|  | ) |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Fed. R. Civ. P. 56 and DNJ L. Civ. R. 56.1, pro se petitioner Caleb L. McGillvary (Petitioner) submits the following statement of material facts not in dispute.

All exhibits and statements referenced herein are annexed to the accompanying declaration of Petitioner Caleb L. McGillvary.

Plaintiff incorporates his statement of material facts not in dispute from ECF 15.6, and sets forth same herein.

1.) The Notice of filing attached as P.1 to Exhibit A of the Petition for Habeas Corpus in this matter is a true and accurate copy of the Notice of filing filed by the Clerk of the New Jersey Superior Court on December 27, 2018. See ECF 1.

2.) The Notice of filing referred to in "1" above indicates there was no deficiencies in the motion to dismiss the indictment filed by Petitioner on December 27, 2018. The State Court Docket shows that the notice of motion to dismiss the

1

indictment filed by Petitioner on December 27, 2018 was accompanied by a proposed form of order, proof of service, certification/affidavit, and brief; which were each and all deleted by order of the trial judge, Robert A. Kirsch, on January 10, 2019. ECF 12.7, P55a-56a

3.) The brief attached as Exhibit A, and the exhibits filed in support thereof attached as Exhibits E-L, to the Petition for Habeas Corpus in this matter are true and accurate copies of the brief and attached certified exhibits in support of the motion to dismiss the indictment filed by Petitioner, which raised a claim under Brady v. Maryland, 373 U.S. 83, 87 (1963). See ECF 1.7, 1.11-1.18.

4.) Plaintiff set forth in his brief described in "3" above that the NJ Attorney General's Guide to Providing Services to Victims of Sexual Assault (AGVSA); was judicially noticeable regulation mandating procedure for investigators at crime scenes involving sexual assault during the period from May 13-16, 2013; and that the Drug Enforcement Agnecy's Drug Fact Sheets; were judicially noticeable public records showing the effects of GHB and Ketamine caused amnesia and memory impairment. ECF 1.7; See also ECF 1.12 (DEA Drug Fact Sheets).

5.) The transcript of the January 7, 2019 proceeding shows Plaintiff's sworn statement in open court: "I assert my 6th Amendment right to litigate my motion pro se, and I have requested pro se to argue my case." See ECF 12.34, P4L3-5

6.) Plaintiff's ore tenus motion described in "5" above specifically referenced and renewed his pro se motion to dismiss the indictment, raising a claim under Brady v. Maryland, 373 U.S. 83, 87 (1963), described in "1"-"3" above; and complied with all the essential requirements of N.J.C.R. 1:6-2(a): it was made in open court, it described the relief sought, and it stated the grounds for relief.

2

7.) The State Court denied Plaintiff's motion resting solely on procedural grounds, with no alternative adjudication on the merits; but failed to cite which Court Rule was being invoked or to make any showing of its adequacy or independence.

8.) Plaintiff tried again twice during the January 7, 2019 hearing in open court to address the Court and renew his request for an evidentiary hearing on his motions, but was silenced by the Court both times. On the third attempt Plaintiff made, the Court went off record for exactly one minute, and the record shows that during that time, Petitioner attempted to introduce drug effect expert testimony in support of his motion to dismiss the indicictment. See ECF12.34, P19L14-15, P21L12-25.

10.) The letter attached as Exhibit A to the declaration in support of this motion is a true and accurate copy of the letter Respondent sent to Petitioner's counsel on March 23, 2016.

11.) The letter described in "10" states that the drug effect expert Robert Pandina stated to Respondent, prior to Petitioner's December 27, 2018 motion, "that the immediate or acute effects of date rape drugs typically last between two to four hours, that residual effects can last longer (dependent on other factors such as dosage), and that the window of detection is eight to ten hours". Pandina also indicated that his workplace received funds from the estate of Joseph Galfy within the year leading up to the letter, and after he had been retained by the Respondent to provide testimony. In this letter, Respondent indicates that this action by the estate of Joseph Galfy created a conflict of interest.

12.) The letter described in "10" is judicially noticeable as filed in the US District Court for the District of New Jersey as Exhibit A to ECF 1.3 in McGillvary v. Galfy, Dkt. No. 2:21-cv-17121-MCA-CLW; or in the alternative, the Court may expand the record under Habeas Rule 7 to include it. Respondent was a party in that case and did not object to or oppose the authenticity or

admissibility of the document. The letter was in existence prior to the December 27, 2018 motion and request for evidentiary hearing, and could have been proferred at that hearing if the hearing was conducted as requested, and constitutes pre-trial evidence.

13.) The Check attached as Exhibit B to the declaration in support of this motion is the same as that attached as Exhibit B to James Galfy's declaration filed in support of his motion to dismiss; ECF 43.2 in McGillvary v. Galfy, Dkt. No. 2:21-cv-17121-MCA-CLW (USDC-DNJ); and is judicially noticeable as being filed in that case; or in the alternative, the Court may expand the record under Habeas Rule 7 to include it. Respondent was a party in that case and did not object to or oppose the authenticity or admissibility of the document. The check was in existence prior to the December 27, 2018 motion and request for evidentiary hearing, and could have been proferred at that hearing if the hearing was conducted as requested, and constitutes pre-trial evidence.

14.) Adrian Gardner was an investigator at the crime scene at 46 Starlite Drive, Clark, NJ in the state criminal matter underlying this habeas action.

15.) On April 9, 2019, Adrian Gardner testified that, while the crime scene at 46 Starlite Drive Clark, NJ was supposed to be secure, an unidentified male broke the crime scene tape, entered the crime scene, and removed a bag of evidence from the scene. She admitted that the person was not authorized to enter the scene, nor to remove evidence, and that she had no idea what he did in the crime scene; nor what he removed from the scene. There is no record of what was in the bag. ECF 12.38, P168L3-P170L15. Gardner also testified that she did not collect the glasses from the dishwasher or the kitchen. Id. at P139L12-P141L3; that she did not collect samples of the capret despite it appearing to be covered in evidence; Id. at P143L8-P144L14; and that she did not at any point look inside pill bottles from the fridge to ascertain their contents; Id. at P152L11-P153L3. She admitted that investigators

**4**

were aware of the exculpatory nature; Id. at P138L14-P139L11; of analysis of the glasses and containers from the kitchen; Id. at P113L17-P114L18, P117L7-22; Pill bottles from the house; Id. at P156L16-21; and surfaces upon which the sexual assault was alleged to have occured; Id. at P114L19-P115L8; at the time such evidence was lost or destroyed. Finally, Gardner testified that bloody footprints indicated that Petitioner's "Pants fabric was under the heel of the foot." ECF 12.38, P108L22-P109L8

16.) On April 9, 2019, Clark Police Department Officer Keith Meehan, who was the first responder to the crime scene at 46 Starlite Drive Clark, NJ; testified that Galfy was found laying facedown on the carpet; See ECF 12.38, P45L13-17 ("Upon getting to the entrance  of what I believe was the master bedroom, I looked inside at the entrance and I saw who was later identified as Joseph Galfy laying face down on the floor"); and there was no furniture in disarray to suggest he ahd been kicked in the face with enough force to send him flying backwards into furniture; Id. at P69L14-16 (The furniture was not disturbed). Meehan stated that he arrived at the crime scene at around 12:26pm on May 13, 2013. P40L11-P41L6.

17.) Dr. Junaid Shaikh was the medical examiner who conducted an autopsy on Joseph Galfy at Shaikh's workplace, the University of Medicine and Dentistry of New Jersey (UMDNJ), on May 14, 2013.

18.) The autopsy report submitted as Exhibit S-225 at trial by the Respondent indicates that the brother of Joseph Galfy, James Galfy, attended the autopsy and identified Joseph Galfy in the presence of Junaid Shaikh, and thereby personally met Junaid Shaikh at his workplace, the UMDNJ. See ECF 12.39, P14L2-14 (Shaikh authenticates report); See also ECF 12.7 (Autopsy Report, on Da42a of Defendant's Appendix, states verbatim "The body was identified by James Galfy")

19.) The last will and testament of Joseph Galfy attached as Exhibit C to this motion is the same as that attached as Exhibit

A to James Galfy's declaration filed in support of his motion to dismiss; ECF 43.2 in McGillvary v. Galfy, Dkt. No. 2:21-cv-17121-MCA-CLW (USDC-DNJ); and is judicially noticeable as being filed in that case; or in the alternative, the Court  may expand the record under Habeas Rule 7 to include it. Respondent was a party in that case and did not object to or oppose the authenticity or admissibility of the document. The will was in existence prior to the December 27, 2018 motion and request for evidentiary hearing, and could have been proferred at that hearing if the hearing was conducted as requested, and constitutes pre-trial evidence.

20.) The document described in "19" above shows that James Galfy was named the executor of the Estate of Joseph Galfy, and that the document directs $150,000 to be paid to the workplace of Robert Pandina, the Rutgers University Center  for Alcohol Studies; and another $150,000 to be paid to the workplace of Junaid Shaikh, the UMDNJ.

21.) On April 10, 2019 Junaid Shaikh, the medical examiner who performed the autopsy on Joseph Galfy, testified that there were grab marks on Galfy's wrists. ECF 12.39, P50L3-P51L25. There were broken ribs and related brusing on the right side of Galfy's sternum consistent with a kick. Id. at P48L20-P49L6, P52L22-P54L13. Galfy had 3 neck fractures from his head being hyperextended backwards (as opposed to sideways or forwards). Id. at P43L8-P45L4. These fractures must have been caused by "significant force", much more force than what caused the grab mark bruising on the forearms, consistent with a kick to the face. Id. at P44L13-19. There were no grab mark bruises on the face, head, or neck. Id. at P19L25-P37L14. There were, however, 3 fractures to the skull; Id. at P37L15-P39L21; which were caused by a "significant impact to the face region"; Id. at P38L13-14, P39L16-21; See also  ECF 12.38, P45L13-17 (Galfy was found laying facedown on the carpet). Galfy's ear was torn by one injury with a linear force, which means that the force was horizontal, as opposed to vertically overhead. ECF 12.39,

6

P26L23-P27L8; See also ECF 12.42, P169L12-P172L7 (Petitioner was on his back on the carpet). The abrasion was caused by clothing fabric swiping across Galfy's ear; the abrasion could not be caused by rugburn. Id. at P23L22-P24L5; See also ECF 12.38, P108L22-P109L8 (Bloody footprints indicate Petitioner's "Pants fabric was under the heel of the foot"). There were no fractures to the skull in the area of the injury to the ear. Id. at P19L25-P39L21.

22.) On April 11, 2019, Monica Ghannam, a crime laboratory techinician, testified that the investigators in the state criminal proceeding underlying this habeas action submitted surface fabrics to the crime lab for analysis for blood and semen; and indicated knowledge of the potentially exculpatory nature of such analysis of fabric from surfaces upon which a sexual assault was alleged to have happened for blood and semen. ECF 12.40, P103L23-P105L20, P109L14-P113L9.

23.) On April 11, 2019, Cheryl Kestlinger, a crime laboratory techinician, testified that the investigators in the state criminal proceeding underlying this habeas action submitted pill bottles and containers from the crime scene, for the contents to be analyzed for drugs or drug residue; and indicated knowledge of the potentially exculpatory nature of analysis of pill bottles and containers from the scene for drugs or drug residue. Id. at P153L18-P176L6. Kestlinger admitted that the investigators did not submit the pill bottles from the fridge for analysis of drugs nor drug residue. Id at P177L8-20; nor the glasses from the kitchen for analysis for drugs nor drug residue; Id. at P178L11-13.

24.) On April 16, 2019, Johnny Ho, a supervising Union County Prosecutor's Office investigator in charge of the crime scene at 46 Starlite Drive during the period from May 13-16, 2013, testified that he was required to follow the AGVSA. ECF 12.41, P117L3-14. Ho testified that the AGVSA mandatorily required him to collect a rape kit if a sexual assault was reported within 5 days of the assault. Id. at P102L2-9; and that Petitioner told him on

7

May 16, 2013 that he was assaulted on May 12, 2013, yet Ho did not collect a rape kit from Petitioner; Id. at P102L20-P103L10. Ho also testified that no one ever opened the pill bottles from the fridge to ascertain their contents; Id. at P114L16-P115L3; nor collected samples of the carpet visibly stained with evidence; Id. at P100L13-25; nor collected glassware in the dishwasher or the sink; Id. at P101L1-8. Ho also testified that he "obtained all other videos except for that two-hour period of time [at] Asbury Park"; Id. at P96L13-17. Ho admitted that the investigators stopped looking for DNA evidence as soon as a suspect was developed, despite knowing that Petitioner had stated he was sexually assaulted by Joseph Galfy; Id. at P129L1-10.

25.) The AGVSA mandates that investigators providing services to victims of sexual assault collect samples of the surface the sexual assault was alleged to have occured on.

26.) The AGVSA mandates that investigators providing services to victims of sexual assault collect samples of the containers from which the victim of a drug-facilitated sexual assault drank prior to the assault.

27.) The police report attached as Exhibit L to the habeas petition in this matter shows that an entry for the video surveillance from Asbury Park was created for the time period of 12:44pm onwards on May 12, 2024. ECF 1.18

28.) The described in "27" shows descriptions for every entry denoting a time period, except that the substance of the description for the time period of 12:44pm onwards on May 12, 2024 is missing.

29.) On April 17, 2019, Crime Scene expert Leonard Speckin was stipulated by the Respondent to be qualified; ECF 12.42, P15L19-P16L12. Speckin testified that proper police procedures required the investigators to remove the stained area of the carpet and bring it to the crime laboratory for analysis of the body fluids it evidently contained; Id. at P19L2-P20L23, P80L6-8; and to

8

collect the glassware and analyze it for residue of rape drugs; Id. at P20L24-P21L14, P79L9-22.

30.) On February 8, 2018, prior to the start of trial, Robert Mega testified that he was a judge at the New Jersey Superior Court, Union County Vicinage - Criminal Division during May of 2013. ECF 12.32, P15L7-16. He stated that he was partners with Joseph Galfy, the alleged victim in this case, at the law firm Kochanski Mega & Galfy prior to acceding to the bench. P15L17-P16L1. Mega testified that a Clark Police officer called him around 12:30pm on May 13, 2013, and informed him of the circumstances of the crime scene. P17L13-20. Mega stated that the Clark Police officer who called him was a client of his and Galfy's. P17L18-20. The time of the call coincides with immediately after Clark Police officer Keith Meehan entered the crime scene, Meehan having arrived at the scene at around 12:26pm on May 13, 2013. P40L11-P41L6.

31.) Richard DeCaprio stated to investigators during a video recorded interview on May 13, 2013 that Clark Police Officer Keith Meehan was a law client of Joseph Galfy's, the alleged victim in this case. DeCaprio stated that Meehan regularly had lunch with him at the local restaurant "Just Plain Dave's". DeCaprio was at the crime scene when Meehan arrived. DeCaprio's Video Recorded Interview was pre-trial evidence and this Court may expand the record to include it under Habeas Rule 7.

32.) On April 17, 2019, Petitioner testified in his own defense. During his testimony, he stated that he cut his hair at the Asbury Park Transportation Center bathroom, using his pocket knife. Id. at P145L16-P146L7. He took the train back to Long Branch and called Galfy to ask for a place to stay. Id. at 150L24-P153L10. While he was at Long Branch, he made a call to Kim, leaving her a message indicating that he had made other arrangements for the night. A surveillance camera showed him with short hair, on the phone to Kim, during the very time the message indicated he had called her: from 5:11pm-5:13pm on May 12, 2013. Id. at P153L11-

9

P161L13; See also ECF 12.40, P25L25-P26L14 (Kim testified to a dropped call and voice message from Petitioner at 5:11pm on May 12, 2013). Petitioner went back to Galfy's house with Galfy, who made them both food and poured Petitioner's beer into a glass. ECF 12.42, P161L14-P168L13. After eating and drinking, Petitioner saw Galfy rinse the plates and put the dishes in the dishwasher, but Galfy did not run the dishwasher. Petitioner began to feel fuzzy aNd relaxed, then cannot remember anything until waking up on the floor of the master bedroom. Id. at P168L16-P169L7. Petitioner noticed Galfy over top of him, tugging on Petitioner's pants, and so Petitioner sat up abruptly and punched Galfy in the face. Id. at P169L12-L25. Petitioner blacked out after sitting up so fast, and the next thing he can remember is Galfy shoving Petitioner's head into the side of the bed, then frantically fighting his way out from under Galfy as Galfy slammed into him from over top and began writhing on top of him. Id. at 170L1-P172L7. His phone, which he kept in the pocket of his pants, was inundated with urine during the struggle from underneath Galfy. Id. at P178L9-13, P180L4-8; See also Id. at P209L7-P210L19 (Petitioner had urinated underneath Galfy, and the urine had soaked his pants and inundated his phone), P223L13-P224L15 (Same).

33.) On April 23, 2024, Respondent argued during summations to the jury that the video depicting a male at Long Branch with short hair, on the phone at the exact same time as Kim's phone records indicate the message being left, was not depicting Petitioner at all. ECF 12.44, P40L6-P42L1. The State claimed instead that Petitioner cut his hair after the incident, to "change his identity". Id. at P55L2-4. The State reiterated Petitioner's statement that he had been drugged by Galfy, then said "it didn't happen, because none of the evidence here shows there's any kind of drugs or anything used on [Petitioner]." Id. at P44L1-6. The State claimed that Petitioner would have had to been dragged by Galfy down the hall if he had been drugged in the kitchen. Id.

10

at P44L14-P45L4. The State claimed that Petitioner  knocked Galfy
down, and kicked him from overhead. Id. at P46L22-P47L5, P63L18-21
The State claimed that Petitioner "pull[ed] back on the neck", from
overhead, despite the absence of any grab marks on the head, face,
or neck. Id. at P47L7-10, P48L2. The state claimed that the urine
stain in the carpet was nothing but blood, basing its reliance on
Gardner's testimony. Id. at P48L19-P49L5 ("This area, if you want
to believe that something in here could have been urine or anything
else -- I submit to you as Sergeant Gardner told you, that wasn't
the case. Everything was consistent with what the crime scene
shows, and they say dead men tell no tales, but through the hard
work of law enforcement officers they do. They tell the tale that
this is blood. She walked around. What is this that she pointed out
to you on the rug? They look like steps to her, the trained eye
that sees it. She sees this. There's a lot of blood that was coming
out but then it dries up."); P50L19-25 ("Now, when Joe is removed,
what is that consistent with? Look at number 3. Just like Sergeant
Gardner told you. The blood had come out and now it's starting to
dry up, just like a river recedes along the shore and you see it.
Except the blood was receding, drying up, changing color. There's
nothing else there. Joe's watch on the floor."). The state claimed
that the hairs found on the vertical side of the bed were
insignificant, basing its reliance on Gardner's testimony. Id. at
P50L11-17 ("And you want to talk oh, there's some hairs over here.
Well, anyone who has a bed sheet, there's hairs everywhere. You
live in the house, as Sergeant Gardner says. Hairs are everywhere
when you get to a crime scene. We're humans. That's the crime
scene? That's what he wants you to believe as he fought for his
life and didn't know what was happening?"). The state claimed that
the pill bottles in the fridge were not valid evidence, basing its
reliance on Gardner's and Wang's testimonies. P53L23-P54L8
("Remember, Sergeant Gardner never took those vitamins out of the
fridge. The expert Cheryl Kestlinger came in and said yeah, they're

all what they purported to be. They're what his prescriptions were. There was no mickey in here. He didn't make him a Roofie colada. This is just what the man's drugs that he was taking because he's 74 years old. He has vitamins in the fridge. You saw Dr. Wang when he read off his chart and Ms. Reyes went through it. Fish oil, Vitamin C, Vitamin D. They're vitamins that you take."). The state capped their summation by making Petitioner's credibility the centerpiece of their case, indicating that self defense and intoxication hinged upon the jury's determination of Petitioner's credibility. Id. at P63L10-25.

34.) Circumstantial evidence was part of the the jury instructions. ECF 12.45 P73L5-P74L1, P86L11-14. The jury was instructed that evidence of "all that was said or done by Defendant preceding, connected with, and immediately succeeding the events leading to the death of Joseph Galfy, Jr. are among the circumstances to be considered." Id. P86L15-20. Because Petitioner testified in his own defense, credibility determinations of his testimony by the jury necessarily affected their verdict. Petitioner testified regarding intoxication, self-defense, and his innocence of the purpose and knowledge element of murder. The jury was instructed that their credibility determinations may be based on direct or circumstantial evidence. See Id. P76L22-P78L4. The jury was instructed that, if it found the facts of an adequate provocation, it could acquit Petitioner of murder and convict him instead of the lesser offense of passion/provocation manslaughter. Id. at P88L23-P91L19. The jury was instructed that they could acquit Petitioner if they found he used deadly force reasonably believing he did so to protect himself against aggravated sexual assault or sexual assault. Id. at P99L7-21. Aggravated sexual assault includes sexual contact with a person the assailant believes to be incapacitated by drugs. See N.J.S.A. 2C:14-2(a)(7). The trial judge also gave the jury a charge that placed the burden of proving intoxication "by clear and convincing evidence" on the

12

Petitioner, without distinguishing intoxication per se from intoxication constituting an affirmative defense. ECF 12.45, P103L9-15.

35.) Based on the State's summation and the jury instructions, successful impeachment of Ho's, Gardner's and Wang's testimony would be likely to have an effect on the jury's verdict, and impeachment evidence of those witnesses would be material.

36.) Based on Petitioner's testimony and the jury instructions, evidence bolstering or corroborating Petitioner's testimony would be likely to have an effect on the jury's verdict, and bolstering or corroborating evidence of Petitioner's testimony would be material.

37.) Based on the jury instructions, evidence showing that Petitioner reasonably believed he was being sexually assaulted at the time he used force in self-defense was material, and would be likely to have an effect on the jury's verdict.

38.) Based on the jury instructions, evidence showing that Petitioner was intoxicated at the time he used force in self-defense was material and would be likely to have an effect on the jury's verdict.

39.) On April 16, 2019 the Trial Court indicated that presenting evidence that "would impugn somehow bad faith to the prosecutor" would be "inappropriate." ECF 12.41, P125L4-13.

40.) On April 18, 2019, the State Trial Court found that counsel foisted upon Petitioner did not present the Brady claim to the Trial Court. ECF 12.43, P38L24-P39L3.

41.) The State Trial Court did not make any findings of fact upon the carpet in the master bedroom; the glasses in the dishwasher or sink; the pill bottles in the fridge; nor the 2 hours of missing NJT video surveillance from Asbury Park on May 12, 2013 from 12:44pm to 2:44pm. ECF 12.43, P38L18-P45L15.

42.) The Brady claim raised in the instant habeas petition was never presented to the jury for its consideration.

**43.)** Respondent admitted at trial that "There has been no testimony in this case about what a rape kit actually is or how it works. ECF 12.43, P27L22-23.

**44.)** On June 3, 2020, Petitioner filed a pro se supplemental brief in support of his plenary appeal; in which, he raised his December 27, 2018 pro se Brady motion. Plaintiff adopted by reference his entire Brady motion in substantial complaince with the New Jersey Court Rule R. 1:4-3, by stating on P.62 of his pro se supplemental brief: "Appellant's right to self-representation attached to said motion, which is attached hereto as Da1 and incorporated as if fully set forth herein." A true and correct copy of this June 3, 2020 pro se supplemental brief is attached to the habeas petition in this matter as Exhibit C. ECF 1.9, ECF 12, "9" and "13" (State admits factual basis of grounds exhausted).

**45.)** The New Jersey Superior Court - Appellate Division based its decision on the December 27, 2018 motion, renewed ore tenus with a motion to self-represent on January 7, 2019, solely on procedural grounds, without any alternative adjudications of the merits. See ECF 12.19, P.34; See also ECF 12, P.45 ("On the record on January 7, 2019, Judge Kirsch informed Petitioner that he was striking the motions for failure to comply with the court rules)(Plural "motions" in original).

**46.)** On August 25, 2021, petitioner filed a pro se petition for certification with the Supreme Court of New Jersey. Petitioner adopted by reference his entire pro se Brady motion, which was incorporated into and attached to his June 3, 2020 pro se supplemental plenary brief; in substantial compliance with the New Jersey Rules of Court R. 1:4-3. Petitioner additionally sent 5 copies of his pro se Apellate brief and appendix, including his December 27, 2018 Brady motion; to the NJ Supreme Court: together with and in the same box as his petition, as required by the Court Rules. Petitioner thereby presented his pro se Brady motion to the highest State Court for review. A true and correct copy of this

14

August 25, 2021 petition for certification is attached to the habeas petition in this matter as Exhibit D. See ECF 1.10, ECF 12, "9" and "13" (State admits factual basis of grounds exhausted).

47.) The last reasoned state Court opinion clearly and expressly relied solely on state procedural grounds to deny relief for grounds one and two of Petitioner's habeas petition. ECF 12, P.20, "Affirmative Defenses Point I", P.45 (Respondent referes to "motions" in the plural).

48.) Respondent has pleaded no Court Rule or clearly established, regularly followed procedure in support of their affirmative defense of procedural default. See ECF 12.

49.) The true docket report of the state court proceeding is attached as 52a-58a to Defendant's Appendix; ECF 12.7. This docket report shows on pages 55a-56a at entries CRM2018822401, CRM2018822465, and CRM201924411 that Plaintiff submitted a Notice of Motion to Dismiss the indictment together with a Brief, proposed form of order, proof of service, and certification/affidavit in support thereof, on December 27, 2019; which the trial Court deleted on January 10, 2019.

50.) The docket shows that Respondent has deleted the documents described in "49", thereby destroying its records thereof.

51.) The documents described in "49" constitute the essential requirements of supporting documents for written motions as set forth by N.J.C.R. 1:6-2(a)

52.) Plaintiff has fully exhausted the factual and legal basis of both his grounds for relief in this action, ECF 12, "9" and "13" (State admits factual and legal basis of grounds exhausted).

53.) Petitioner is in State custody pursuant to a state conviction, ECF 12, "1"-"11" (State admits Petitioner's allegations that he is in State Custody pursuant to a State conviction).

15

54.) Petitioner's petition for writ of habeas corpus filed June 22, 2022 in this matter is timely, ECF 12, "18" (State admits factual basis of grounds exhausted).

Date: 8/12/24

_____

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ
08625-0861

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ 08625


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

|                              |   |                                   |
| Caleb L. McGillvary          | ) | CIVIL ACTION NO.                  |
|     PLAINTIFF                | ) | 1:22-cv-04185-MRH                 |
|                              | ) |                                   |
| V.                           | ) | Hon. Mark R. Hornak, USDJ         |
|                              | ) | Hon. Richard A. Lanzillo, USMJ    |
| Bruce Davis, Administrator   | ) | Motion Date: September 16, 2024   |
| NJSP, Attorney General of NJ | ) |                                   |
|     DEFENDANT                | ) |                                   |
|                              | ) |                                   |

---

ORDER

---

THIS MATTER having been opened to the Court on motion by Plaintiff Caleb L. McGillvary for an order granting summary judgment on Ground Two; pursuant to Rule 56 and Binding Third Circuit Precedent; in this proceeding, and the Court having considered the papers submitted and the arguments therein, and FOR GOOD CAUSE SHOWN

It is on this ___ Day of _____, 20___

ORDERED that Plaintiff's motion is hereby GRANTED; and it is further

ORDERED the the declaratory relief requested in Petitioner's petition for writ of habeas corpus is hereby GRANTED and the declaration, of the exculpatory nature of the Brady evidence at issue in Petitioner's motion, set forth in the accompanying opinon is incorporated into this order; and it is further

1

**ORDERED** that the Respondent release Petitioner from his unconstitutional confinement and restraint; and it is further

**ORDERED** that a copy of this order be served upon all parties appearing in this matter within 7 days of this order

_____

**Hon. Mark R. Hornak, U.S.D.J.**

2

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ 08625

August 12, 2024

Clerk, US Dist. Ct. - D.N.J.
4th & Cooper Sts.
Camden, NJ 08101-2792

    RE: Caleb L. McGillvary v. Bruce Davis, Adm'r NJSP
    Civil Action No. 1:22-cv-04185-MRH
    Hon. Mark R. Hornak, U.S.D.J.
    Hon. Richard A. Lanzillo, U.S.M.J.

Dear Clerk;

    Please find enclosed and file onto the docket my notice, proposed order, memorandum of law, statement of material facts not in dispute, and declaration in support of my motion for summary judgment on Ground Two of my habeas petition pursuant to Rule 56, Carter v. Rafferty, 826 F.2d 1299, 1303 (CA3 1987), and Wilson v. Beard, 589 F.3d 651, 657 n.1 (CA3 2009); and proof of service thereof; in the above-captioned matter.

                                                    Kind Regards,

                                        Caleb L. McGillvary
                                        In Propria Persona

ENCL:
CC: FILE

**PROOF OF SERVICE**

I, Caleb L. McGillvary, declare pursuant to 28 U.S.C. 1746 that on today's date, I placed in the institutional mailing system here where I'm incarcerated at NJ State Prison 3rd & Federal Streets Trenton, NJ 08625; with First Class Postage prepaid to be sent via USPS Mail; the original of my notice, proposed order, memorandum of law, statement of material facts not in dispute, and declaration in support of my motion for summary judgment on Ground Two of my habeas petition pursuant to Rule 56, Carter v. Rafferty, 826 F.2d 1299, 1303 (CA3 1987), and Wilson v. Beard, 589 F.3d 651, 657 n.1 (CA3 2009); to the Clerk of the District Court at the District of New Jersey, 4th & Cooper Sts. Camden, NJ 08101-2792; and a copy of said document to counsel for Respondent in Dkt. No. 1:22-cv-04185;

Amanda G. Schwartz

Office of the Attorney General

25 Market St., PO Bx 085

Trenton, NJ 08625-0085

I hereby invoke the prison mailbox rule. See Houston v. Lack, 487 U.S. 266 (1988).

I declare under penalty of perjury that the foregoing statements made by me are true and accurate.

Executed this ⎰2 Day of ＡＵＧＵＳＴ , 20 24

Caleb L. McGillvary, Pro Se
#1222665/SBI#102317G NJSP
PO Box 861 Trenton, NJ
08625-0861

C MCGILLVARY
#1222665/SBi #1023174
NJSP PO BOX 861
TRENTON, NJ
08625











RECEIVED

AUG 16 2024

AT 8:30 _____ M
CLERK, U.S. DISTRICT COURT - DNJ

**X-RAYED**

CLERK
US. DISTRICT - D.N.J.
4TH & COOPER STS.
CAMDEN, NJ
08101-2797

RECEIVED

AUG 16 2024

AT 8:30 _____ M
CLERK, U.S. DISTRICT COURT - DNJ

LEGAL MAIL