IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CALEB L. MCGILLVARY, | ) ) ) 1:22-CV-04185-MRH |
| Petitioner | ) ) MARK R. HORNAK ) Chief United States District Judge |
| v. | ) ) RICHARD A. LANZILLO |
| THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, et al, | ) Chief United States Magistrate Judge ) ) AMENDED REPORT AND |
| Respondents | ) RECOMMENDATION ON PETITION ) FOR WRIT OF HABEAS CORPUS [ECF ) No. 1][1] ) |

I.      Recommendation

It is respectfully recommended that the Petition for Writ of Habeas Corpus filed by Petitioner Caleb L. McGillvary [ECF No. 1] be denied and that no certificate of appealability issue.

II.     Report

A.  Introduction

Petitioner, an inmate confined at the New Jersey State Prison in Trenton, New Jersey, initiated this action by filing a *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of New Jersey. ECF No. 1. Raising two separate grounds for relief, Petitioner challenges his first-degree

---

[1] This Amended Report and Recommendation corrects certain erroneous record and case citations included in the undersigned's original Report and Recommendation (ECF No. 55). It makes no substantive changes to the original.

murder conviction in the Superior Court of New Jersey, Law Division, Union County in criminal case number UNN-13-1703. For the following reasons, the Court should deny his petition.[2]

B. Factual Background

The Appellate Division of the Superior Court of New Jersey set forth the factual background of this case as follows:

> The charges against defendant arose from the May 13, 2013 discovery of the victim, Joseph Galfy, Jr., a seventy-four-year-old attorney. Police found Galfy beaten to death, lying face-down on his bedroom floor. Officers collected a variety of items and swabs from the scene, including a one-way train ticket from Rahway to Asbury Park from the day before, Sunday, May 12, 2013. Following that lead, Union County Prosecutor's Office Homicide Task Force Sergeant Johnny Ho located surveillance footage from the New Jersey Transit Rahway station, in which Galfy is seen that morning accompanied by another person, later identified as defendant. The video depicted Galfy purchasing a ticket from a vending machine and handing it to defendant, who then hugged the victim. The two men walked towards a train platform.
>
> Galfy's cell phone contact list included a number for "Kai" Lawrence, matching the telephone number on a piece of paper found in the bedroom. The victim and defendant exchanged calls on the evening of May 12, 2013. Galfy told defendant via text message at 5:33 p.m. that he would be at the train station in about ten minutes.
>
> As a result, officers obtained a court order permitting the retrieval of defendant's phone and phone GPS records. However, the phone had been recently deactivated, and the final recorded location was Clark, the town where Galfy lived.
>
> Defendant's last phone contact was with Kimberly Conley-Burns. She testified at trial that she contacted defendant on Facebook, as he was an internet personality, informing him that if he were ever in New Jersey, she could find him a place to stay. On Saturday, May 11, the day before the

---

[2] Pursuant to an Order issued by Chief Judge Michael A. Chagares of the United States Court of Appeals for the Third Circuit, this case has been specially assigned to Chief Judge Mark R. Hornak of the United States District Court for the Western District of Pennsylvania for intra-Circuit disposition pursuant to 28 U.S.C. § 292(b). ECF No. 40. The matter was subsequently referred to the undersigned United States Magistrate Judge, having been designated by Chief Judge Renee Marie Bumb of the District of New Jersey, in concurrence with Chief Judge Hornak, to perform any and all judicial duties contemplated under 28 U.S.C. § 636 in the District of New Jersey for such period of time as necessary for the resolution of this matter, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). ECF Nos. 41, 45.

murder, defendant told Conley-Burns that he had met a man in Times Square who drove him to New Jersey, and was planning to stay in Newark, which defendant mistakenly believed was where the victim lived. Defendant mentioned that the person was older, his name was Joe, and that he was a lawyer.

In a voicemail and text exchange, Conley-Burns warned defendant that Newark was dangerous and that he needed to be careful. He responded that he had found someone: "a good person who put [him] up for the night."

Defendant and Conley-Burns planned to meet in Asbury Park on May 12, which was Mother's Day. Because of a family brunch, Conley-Burns did not appear when defendant arrived that morning, so they changed their plan, agreeing to go to Philadelphia the following day. Defendant texted Conley-Burns that he had "to head up to Newark."

Conley-Burns then received a series of calls from defendant, which she was unable to answer. He told her that the place in Newark "fell through," asking if she could pick him up.

At approximately 10:00 to 10:15 p.m., defendant appeared at the White Diamond Diner in Clark, where he encountered Robert McNamara and his brother, initiating conversation and showing them an online video of himself. Defendant asked for directions to Rahway.

Alexander McCue was working at a 7-11 in Clark at around 11:30 p.m. when he saw defendant, whom he recognized from the internet because of defendant's distinctive face tattoo. Defendant asked McCue for directions to the Rahway train station, and McCue told him he thought there might be a train station in Clark. Defendant interrupted him, saying he was not returning to Clark, and was looking for the quickest way out. McCue told defendant to walk across the street since that was the border of Rahway, and defendant left.

Robert Scully, a New Jersey Transit train conductor, testified that while working the night shift, traveling between Long Branch and New York City, he collected defendant's ticket, noticing it was for Asbury Park. Scully explained defendant needed to catch a connecting train at Long Branch but would have to wait since none operated at that hour. Defendant borrowed Scully's ride's phone to ask his ride to meet him at Long Branch, although defendant had to place multiple calls, possibly because no one was answering at the other end. The train arrived in Long Branch shortly after 2:30 a.m.

The following day, Monday, May 13, defendant left another voicemail for Conley-Burns, describing his appearance so she could identify him when she arrived at the Asbury Park train station. Once they met, he immediately told her he had just been "raped." Defendant added that he had contacted police, but that they would not do anything because the assailant was an attorney. Defendant also told her that he had awakened to find that he had ejaculate in his mouth, on the side of his face, and on the side of his cheek. He said something to the perpetrator about it but Galfy denied that he did anything, so defendant just left. Defendant did not mention the rape again.

Conley-Burns saw no bruises, cuts, scratches, or scrapes on defendant's hands or face. Defendant told her he had cut his hair short, to about an inch or two, with a knife. He did not give a reason.

On the way to Philadelphia, Conley-Burns stopped to pick up a friend. She remembered defendant during that day as "very friendly," "talking to people," "rapping or beat boxing with these kids," "joking around," and "animated and playful." Defendant was "chatty. Off-beat. Quirky," and acted "weird." After spending time in Philadelphia, Conley-Burns drove defendant to the home of Marjory Erin Wagner, a friend who lived near Glassboro, because Wagner had agreed to let defendant stay there for the night.

Wagner testified that after Conley-Burns left, she, defendant, and her boyfriend spent the evening "listening to stories and drinking some beers." The following day, they drove defendant to a train station in Haddonfield around 7:00 or 8:00 in the evening. Defendant never said he had been raped, and she described his demeanor as "interesting" and "weird."

Defendant was eventually located in the Greyhound Bus terminal in Philadelphia on May 16, 2013, and taken to a precinct station. Ho and others arrived at approximately 9:00 p.m. and interviewed defendant after advising him that he was being charged with murder. Defendant waived his Miranda rights and gave a lengthy recorded statement, ending when he requested counsel. The video was shown to the jury.

When officers questioned defendant initially about what happened, defendant asked: "he died?" Defendant then told Ho that he met Galfy in Times Square by the bus depot, and told Galfy he was headed to New Jersey. The two got dinner from a restaurant near Galfy's house, and at first defendant "thought [Galfy] was real nice and then he [f***ing] raped me." After dinner, they drank beer while watching television in the living room, and defendant said Galfy wanted to put defendant's beer in a glass instead of leaving it in the bottle. Defendant drank about five beers and felt kind of groggy but walked to the guest bedroom by himself.

4

Defendant told detectives that before going to bed, Galfy asked defendant to shower with him. Defendant refused and showered alone before going to sleep. He awakened with a metallic taste in his mouth, a bad headache, and when he looked in the mirror in the morning, he thought he saw dried ejaculate on the side of his face. He did not confront Galfy and said he did not "really know what to think about it." Galfy drove him to a train station and purchased him a ticket to Asbury Park.

Defendant claimed that when he returned to Galfy's that night, they had dinner and a couple of beers. Defendant awakened on Galfy's bedroom floor, only to find Galfy pulling his pants. At that point, defendant began to hit him. Defendant could not remember how he struck Galfy. He said he "could have elbowed him.... kneed him. I don't know." He left the house, and remembered going to a diner and catching a train to Long Branch.

At trial, defendant explained his "home-free" lifestyle in which he played music and worked construction jobs when he needed money, but otherwise spent his time surfing. Around 2012 to 2013 he traveled from his home in Canada to the United States to continue this lifestyle. In February 2013, he achieved internet fame following an incident in California. He continued across the country, being offered food and places to stay by people who knew him from the internet.

Defendant testified that he encountered Galfy in New York City, that Galfy asked where he was headed, and remarked that he looked lost. Galfy put him up for the night, and he left after breakfast. Galfy told him to call if he was in the area and needed a place to stay. Defendant thanked Galfy and hugged him goodbye because he did not know "what he had done to [him] at the time." He gave Galfy his phone number and email address.

On the stand, defendant said he cut his hair short on May 12, 2013, because he was warm. He testified he was going to travel to Atlanta, and it would be "really hot" there. Defendant cut his jeans into shorts because he wanted to exercise.

After his original plans with Conley-Burns fell through, defendant decided to spend a second night at Galfy's house. He thought he was still in the greater Newark area, which Conley-Burns had described as a dangerous place. Defendant took the train to Long Branch, hoping that if he was geographically closer to Galfy, Galfy would be more likely to let him stay at his home. After getting off the train, defendant called and asked if Galfy could host him again. Galfy agreed but added he would have to wait to be picked up since Galfy was in New York City. Defendant waited approximately forty-five minutes.

5

Once back at Galfy's home, Galfy again gave defendant beer poured into a glass. After dinner and a few beers, defendant "was feeling like really warm and fuzzy and like relaxed." He recalled Galfy putting the dishes in the dishwasher; the last thing he remembered was hearing the Jeopardy theme song. He came to on the floor in Galfy's room on his back.

Defendant testified:

> [T]he next thing I knew he was shoving me into the bed and I was trying to get him away from me and then I was hitting him and then he shoved my head on the floor and body slammed me and I couldn't breathe. And I was trying to get out from underneath him and he kept humping and grinding me. And he, he was trying to put my dick in his mouth and I was trying to get him away from me. I -- that's, that's all I can remember.

After the incident, defendant could not recall how he left Galfy's house or where he went. He knew he "came to" in a parking lot, his muscles were sore, he had a headache, and a metal taste in his mouth. Defendant remembered going to the diner and the 7-11. At the diner, he went into the bathroom, dry heaved into a toilet, and splashed water on his face. He showed a video of himself on the internet to the other men in the diner, ate something, and went outside to smoke. Defendant had problems with his phone, and by the time he was on the train to Long Branch, had thrown it out because it smelled like urine and would not turn on.

Defendant could not recall the whereabouts of the things he wore during the alleged sexual assault, which he said were soaked in blood and urine. He wore different clothes when speaking to the detectives in Philadelphia, but "[a]t some point [he] had to have [changed] because when [he] came to," he was dressed differently. He also confirmed that in a photograph taken with an employee at the diner the night after the alleged sexual assault he was wearing different clothing. He claimed he was unaware that Galfy died until informed by the detectives.

*State v. McGillvary*, 2021 WL 3378024, at **1-4 (N.J. Super. Ct. App. Div. Aug. 4, 2021).

C. Procedural history

A grand jury in Union County returned a one-count superseding indictment against McGillvary on May 18, 2016, charging him with first-degree murder. ECF No. 12-4. Attorney John G. Cito was appointed to represent him. ECF No. 1-7 at p. 7. Through counsel, McGillvary

moved to dismiss the indictment, to suppress his initial statements, to recuse the Union County criminal bench, and to change the venue of his trial. ECF No. 12-43 at pp. 3-4. The trial court denied each of those motions. *Id.*

In addition to his counseled motions, McGillvary filed a *pro se* motion to dismiss the indictment on December 27, 2018, alleging a variety of *Brady* violations. ECF No. 1-7. Specifically, McGillvary argued that the police officers investigating Galfy's death had failed to properly investigate his claim of sexual assault or make a reasonable effort to preserve potentially exculpatory evidence that a sexual assault had taken place. *Id.* at 14. During a pretrial management conference on January 7, 2019, McGillvary, after identifying himself, stated: "For the record, Judge, I assert my Sixth Amendment right to litigate my motion pro se and I have requested pro se to argue my case." ECF No. 12-34 at p. 4. The following exchange then took place:

The Court:    The Court received on eCourts a filing of a motion pro se by the defendant. It's a motion to dismiss.

First of all, while of course a motion to dismiss can be filed at any time, this matter has been pending for years. I know there was a prior motion to dismiss, I believe on different grounds, filed and Judge Caulfield had an evidentiary hearing and then issued a rather voluminous opinion on that. Correct, Mr. Cito?

Mr. Cito:    Yes, Your Honor.

The Court:    I was advised . . . that it was improperly filed in light of the fact that it was during basically a court hiatus with a skeletal staff. It was mistakenly filed. It would not have been filed – it never would have been filed on eCourts and I never would have known about it, frankly. It would have been returned to you, Mr. Cito.

The Court will not accept the motion, will not entertain the motion. I am striking it.

First of all, it didn't – it failed to comply with the rules. The filing itself. Secondly, Mr. Cito, any and all motions will be filed through you. Okay? So, I am striking it. I will issue an order to that effect.

|  | I do note, Mr. Cito, the matter is going to be tried, I believe on April the 2nd. As a courtesy to you, I will allow you to review the pro se submission. Have you received a copy of it? |
|---|---|
| Mr. Cito: | I've gotten three copies, Your Honor. Yes. And I spoke to my client about it. I have narrowed down the issue as to the dismissal. He's based it on a <u>Brady</u> violation. I'm going to refile with the appropriate language as to – which is a new ground separate and apart from the old motion. |
| The Court: | I – listen, Mr. Cito. I will review whatever it is that you submit to me, but of course there has to be a basis in law and fact and the Rules of Professional Conduct for you to file a motion. |
| Mr. Cito: | I understand, Your Honor. |

ECF No. 12-34 at pp. 5-7.[3] An exacting review of the record indicates that McGillvary never reasserted a request to proceed pro se until after his trial.

McGillvary's trial commenced on April 9, 2019. ECF No. 12-38. On April 24, 2019, a Union County jury found him guilty of first-degree murder. ECF No. 12-5 at p. 1. Prior to sentencing, the trial court received a pro se application from McGillvary seeking to represent himself at the sentencing proceeding. ECF No. 12-47 at p. 4. That application consisted of an eight-page motion, with attachments, and a fifteen-page brief in support. *Id.* At a presentencing hearing held pursuant to *Feretta v. California*, McGillvary addressed the court and stated:

> Your honor, I unequivocally and clearly assert my Sixth Amendment right to represent myself, and I renounce and waive Cito as a counsel. I have terminated his . . . representation of me in writing with original signature, and I proffer that letter with the attached motions onto the court record now.

*Id.* at p. 3. After conducting a lengthy colloquy to test McGillvary's competence and general understanding of the law, the court recounted McGillvary's extensive history of disruptive,

---

[3] The trial court amplified its reasoning in a subsequent filing, observing that McGillvary's oral request "specifically referenced his pro se motion and was not a clear and unequivocal invocation of his Sixth Amendment privilege to represent himself at trial." ECF No. 12-17 at p. 3 n. 1. The court also noted that "[McGillvary] did not raise the issue of self-representation again until after the conclusion of the trial and on the eve of sentencing, when he did so with formal written submissions." *Id.*

combative, manipulative, and obstructive conduct at every preceding stage of the proceedings. *Id.* at pp. 16-35. Noting that a trial judge retains the authority to deny self-representation to a defendant who deliberately engages in abusive or obstructionist behavior, the court denied McGillvary's motion. *Id.* at pp. 23-27, 35. McGillvary was ultimately sentenced to fifty-seven years in prison, with the requirement that he serve eighty-five percent of that term under the New Jersey No Release Act, followed by a five-year term of parole supervision. ECF No. 12-5 at p. 1

Through counsel, McGillvary filed a timely appeal. In his counseled brief, he presented several claims for review including sufficiency of the evidence, prosecutorial misconduct, ineffective assistance of trial counsel, and cumulative error. ECF No. 12-6. In a pro se brief, Petitioner raised several additional claims, only one of which is relevant to the instant petition: his argument that the "DENIAL OF APPELLANT'S SUBSTANTIAL SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS STRUCTURAL ERROR REQUIRING REVERSAL OF APPELLANT'S CONVICTION." ECF No. 1-9. McGillvary also filed a motion to relieve appellate counsel. ECF No. 12-11.

Following a hearing, the trial court again denied McGillvary's request to proceed *pro se* based on his demonstrated inability to abide by the rules of courtroom decorum and dignity. ECF No. 12-17. Specifically, the trial court noted that, during McGillvary's testimony at trial, the court had been compelled to admonish or strike portions of his testimony on twenty-eight occasions because of his "hostile, aggressive, noncompliant, 'serially contemptuous,' and 'deviously calculating" behavior. *Id.* at p. 4. Other instances of misconduct included referring to the court as a "kangaroo court," comparing the court to the Ku Klux Klan, repeatedly engaging in profanity, and describing his own attorney as a "slovenly lawyer" and a "disgusting slob." *Id.* The Appellate

Division denied his motion to relieve appellate counsel based on the trial court's findings. ECF No. 18.

On August 4, 2021, the Appellate Division affirmed Petitioner's conviction and sentence. *McGillvary*, 2021 WL 3378024. Addressing his contention that the trial court had violated his right to self-representation, the Appellate Division held:

> Finally, defendant contends that he should have been permitted to represent himself. Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial. Defendant never refiled even though the judge clearly explained to him that the issue would not be reached at that point.

*Id.* at *12. Notably, neither the trial court nor the Appellate Division had an opportunity to address the underlying *Brady* claim.

McGillvary filed a pro se petition for certification to the New Jersey Supreme Court raising, among other things, the following arguments:

1. THE TRIAL COURT'S DENIAL OF DEFENDANT'S JANUARY 7, 2019 SUA SPONTE MOTION DURING A HEARING IN OPEN COURT TO PROCEED PRO SE WAS SUBSTANTIAL AND STRUCTURAL ERROR WHICH REQUIRES REVERSAL.

2. THE TRIAL COURT'S REFUSAL TO REMEDY THE DESTRUCTION OF BRADY MATERIAL WITH AN ADVERSE INFERENCE JURY INSTRUCTION WAS SUBSTANTIAL ERROR REQUIRING REVERSAL.

ECF No. 1-10. The New Jersey Supreme Court denied certification on December 10, 2021, ECF No. 12-21, and denied Petitioner's subsequent motion for reconsideration on March 11, 2022. ECF No. 12-24.

On March 2, 2022, McGillvary filed a petition for writ of certiorari in the United States Supreme Court. ECF No. 12-25. He presented a single question:

> If Defendant's motion to self-represent is denied without a *Faretta* inquiry, does his cooperation thereafter with defense counsel constitute a waiver of his right to self-representation?

ECF No. 12-25. On April 18, 2022, the petition was denied. ECF No. 12-28.

The instant 2254 Petition ensued. As outlined above, McGillvary raises the following two grounds for relief:

| | |
|---|---|
| Ground One: | THE TRIAL COURT'S JANUARY 7, 2019 DENIAL OF APPELLANT'S SUBSTANTIAL SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS A STRUCTURAL ERROR REQUIRING REVERSAL OF APPELLANT'S CONVICTION THROUGH WRIT OF HABEAS CORPUS |
| Ground Two: | THE TRIAL COURT'S JANUARY 7, 2019 ORDER DENYING PETITIONER'S DECEMBER 27, 2019 PRO SE MOTION TO REMEDY THE DESTRUCTION OF <u>BRADY</u> MATERIALS; DEPRIVED PETITIONER OF HIS DUE PROCESS AND CONFRONTATION RIGHTS, IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS OF THE US CONSTITUTION; WHICH REQUIRES REVERSAL OF HIS CONVICTION THROUGH ISSUANCE OF THE WRIT OF HABEAS CORPUS WITH DECLARATORY RELIEF TO REMEDY THE <u>BRADY</u> VIOLATIONS |

ECF No. 1 at pp. 7, 10. In addition to his petition, McGillvary has filed a memorandum brief in support and several motions for summary judgment. *See* ECF Nos. 2, 15, 26, 44. Respondent, in turn, has filed an answer to the Petition and a response to McGillvary's motions for summary

judgment. ECF Nos. 12, 46. McGillvary filed a reply brief, *see* ECF No. 16, rendering this matter ripe for adjudication.[4]

### D. Applicable Legal Standard

The Court has jurisdiction pursuant to 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. Under § 2254, a district court may entertain an application for a writ of habeas corpus filed by a person in state custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). It is the petitioner's burden to demonstrate that relief is warranted. *See, e.g., Vickers v. Sup't Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017).

Habeas corpus is an "'extraordinary remedy' reserved for defendants who were 'grievously wronged' by the criminal proceedings." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998). Where the merits of a habeas claim have been adjudicated at the state level, federal courts must give considerable deference to determinations made by state trial and appellate courts. 28 U.S.C. § 2254(d). *See also Renico v. Lett*, 599 U.S. 766, 773 (2010). In such circumstances, the habeas petitioner bears the burden of showing that the state court's decision was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. *Moreno v. Ferguson*, 2019 WL 4192459, at *3 (W.D. Pa. Sept. 4, 2019). On the other hand, "[if] a claim was not adjudicated on the merits in state court" – as in the instant case – then a federal court's review of "legal questions and mixed questions of law and fact" in a habeas petition is "*de novo*." *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 281-82 (3d Cir. 2018). In either case, "the state court's factual determinations are still presumed

---

[4] Petitioner's motions for summary judgment should be dismissed as duplicative of the relief sought in the underlying habeas petition.

to be correct, rebuttable upon a showing of clear and convincing evidence." *Id.* (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

E. Analysis[5]

Before addressing McGillvary's claims for relief, the Court notes that neither claim received an adjudication on the merits in the state courts. As recounted above, McGillvary filed his pro se motion to dismiss the indictment based on the alleged *Brady* violation shortly before the January 7, 2019 hearing. At the hearing, McGillvary interrupted the proceedings to address the trial judge and request an opportunity to personally argue his motion before the court. Because he was represented by counsel, the trial court struck his pro se motion as procedurally improper and never reached the merits of McGillvary's underlying *Brady* claim. And because the trial court did not perceive his request to argue his pro se motion as a demand to terminate his attorney and proceed alone, the court denied that request without a merits analysis. Consequently, because neither claim was adjudicated on the merits in state court, the Court will review each claim under a *de novo* standard of review.[6] *Bennett*, 886 F.3d at 281-82.

---

[5] Before the Court can address the merits of Petitioner's petition, it must first decide whether it was timely filed. *Romansky v. Superintendent Green SCI*, 933 F.3d 293, 298 (3d Cir. 2019). Pursuant to AEDPA, a state prisoner must file his federal habeas claims within one year of the date his judgment of sentence became final. 28 U.S.C. § 2244(d)(1)(A). Because he pursued his direct appeal to the United States Supreme Court, Petitioner's sentence became final for purposes of the one-year PCRA statute of limitations and the one-year federal habeas statute of limitations on April 18, 2022, when the Supreme Court denied his petition for writ of certiorari. *See* 28 U.S.C. § 2244(d)(1)(A) (the one-year federal limitations period generally begins on the date the petitioner's judgment of sentence became final "by the conclusion of direct review or the expiration of the time for seeking such review"). The instant 2254 petition, filed approximately two months later, was timely by almost ten months.

[6] For the same reason – McGillvary's "failure to file a proper motion to raise a *Brady* violation and assert his right to self-representation" – Respondent also argues that McGillvary procedurally defaulted each of his claims. ECF No. 12 at p. 20-22. The doctrine of procedural default stems from the well-settled principle that a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address the merits of those claims "in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). Such claims may not ordinarily be reviewed in federal court. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) ("[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule.") (citations omitted). However, several caveats exist, including the possibility that a petitioner can overcome procedural default by

1.  Ground One

McGillvary first maintains that the trial court violated his Sixth Amendment right to self-representation when it denied his request to "litigate [his] motion [to dismiss] pro se" and to "pro se . . . argue [his] case." ECF No. 12-34 at p. 4. McGillvary relies on the legal principle that a criminal defendant has the right to "proceed without counsel when he voluntarily and intelligently elects to do so." *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (quoting *Faretta*, 422 U.S. at 807). Because the trial court failed to conduct a hearing before denying his motion, McGillvary maintains that the court's decision "was a structural error requiring reversal of [his] conviction through writ of habeas corpus." ECF No. 1 at p. 7. Respondent, in turn, argues that McGillvary never properly asserted his right to self-representation and that, even if he did, his behavior throughout the proceedings amounted to a waiver of that right.

Sixth Amendment claims based on an alleged denial of the constitutional right to self-representation are governed by the United States Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975). In *Faretta*, the trial court initially appointed a public defender to represent the defendant during his criminal trial. However, "[w]ell before the date of trial, . . . Faretta requested that he be permitted to represent himself. *Faretta*, 422 U.S. at 807. After initially granting his request, the trial court later reversed its decision and reappointed counsel after observing that Faretta appeared to lack knowledge "of certain rules of law" and "court practice

---

demonstrating cause and prejudice or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Because of the complexity of this analysis, the United States Supreme Court has acknowledged that a court need not resolve the more complex issue of procedural default if the underlying claim has no merit, even under a *de novo* review. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [merits] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."). *See also Woods v. Lamas*, 631 Fed Appx. 96, 99 (3d Cir. 2015) ("Given the straightforward merits issues and comparatively difficult state procedural issues, we will . . . ignore the procedural default and decide the case on the merits.") (citing 28 U.S.C. § 2254(b)(2) (permitting a federal court to deny a habeas petition on the merits notwithstanding the applicant's failure to exhaust state remedies)). That course is followed here.

and procedure." *Buhl v. Cooksey*, 233 F.3d 783, 790 (3d Cir. 2000) (citing *Faretta*, 422 U.S. at 808). Proceeding with counsel, Faretta was ultimately convicted at trial.

Faretta appealed, arguing that he was entitled to a new trial because the trial judge had denied his Sixth Amendment right of self-representation by forcing him to proceed with counsel. *Faretta*, 422 U.S. at 807. The United States Supreme Court agreed. After "carefully reviewing the historical underpinnings of the right to counsel," the Court concluded "that a state may not force a criminal defendant to be represented by a lawyer if the defendant properly asserts his/her right to self-representation." *Buhl*, 233 F.3d at 790-91 (citing *Faretta*, 422 U.S. at 836). Accordingly, the Court vacated Faretta's conviction and remanded for a new trial. *Faretta*, 422 U.S. at 835-36.

In the wake of *Faretta*, the Court of Appeals for the Third Circuit has articulated several factors to consider when determining whether a request for self-representation has been "properly" asserted. First, the defendant's "request of self-representation . . . must be made clearly and unequivocally." *Buhl*, 233 F.3d at 792. This requirement "prevents defendants from making casual and ineffective requests to proceed pro se, and then attempting to upset adverse verdicts after trials at which they had been represented by counsel." *Id.* (internal quotation and quoting source omitted). It also protects defendants from inadvertently waiving counsel "based upon occasional musings on the benefits of self-representation." *Id.* (internal quotation and quoting source omitted).

Once a clear and unequivocal assertion of the right to dispense with counsel has been lodged, the trial court must next "undertake an appropriate inquiry under *Faretta*" to determine whether the request was knowing, intelligent, and voluntary. *Id.* at 794. The court must "make some inquiry about a defendant's reason for the request," *Buhl*, 233 F.3d at 798, and inform the

defendant "of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835. Specifically, the court should advise the defendant as to "the technical problems he may encounter in acting as his own attorney" and the "nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Buhl*, 233 F.3d at 799 (quoting *U.S. v. Welty*, 674 F.2d 185 (3d Cir. 1982)).

Finally, "[i]t is well established that a defendant can waive the right of self-representation after asserting it." *Id.* at 800 (collecting cases). "[C]ourts have commonly found waiver [of the right to self-representation] where the defendant has vacillated between being represented by counsel and self-representation, where defendant abandons his or her request for self-representation, and where the defendant elects to act as co-counsel." *Gaines v. D'Ilio*, 2019 WL 851592, at *18 (D.N.J. Feb. 22, 2019) (quoting *Flanker v. Warren*, 2013 WL 5937423, at *14-15 (D.N.J. Nov. 1, 2013)). A defendant may also waive the right by "deliberately engaging in serious and obstructionist misconduct." *Law v. May*, 2021 WL 3857634, at *6 (D. Del. Aug. 30, 2021) (citing *Buhl*, 233 F.3d at 800-01). On the other hand, a defendant's acquiescence following a trial judge's "categorical" denial of a request for self-representation "cannot be read to signify a waiver." *Williams v. Bartlett*, 44 F.3d 95, 101 (2d Cir.1994). Nor is a defendant "required continually to renew a request once it is conclusively denied or to make fruitless motions or forego cooperation with defense counsel" to avoid a waiver. *Buhl*, 233 F.3d at 803 (quoting *Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989)).

Applying these principles to the instant case, McGillvary's Sixth Amendment claim is deficient in several regards. First, he has failed to demonstrate that his comments at the hearing

on January 7, 2019, amounted to a clear and unequivocal waiver of his right to counsel. As noted above, McGillvary had recently filed a pro se motion to dismiss the charges against him based on the alleged *Brady* violation. The wording of his verbal request – that he wanted to "litigate [his] motion pro se and . . . argue [his] case" – strongly suggests that his purpose in speaking up was to obtain a ruling on his pro se motion to dismiss.[7] The trial court expressly interpreted it as such. *See* ECF No. 1217 at p. 3 n. 1 (explaining that the trial court did not hold a *Faretta* hearing because McGillvary's oral request "specifically referenced his pro se motion and was not a clear and unequivocal invocation of his Sixth Amendment privilege to represent himself at trial"). *See also Walker v. Phelps*, 910 F.Supp.2d 734 (D. Del. Dec. 19, 2012) ("Considering that petitioner's initial motion was an unauthorized pro se filing by a represented defendant, the court could reasonably conclude that petitioner did not 'adequately' assert his right to self-representation."); *Barney v. D'Illio*, 2018 WL 2018054, at *11 (D.N.J. May 1, 2018) (contrasting the facts in *Buhl*, where it was "undisputed that Buhl filed a written motion to proceed pro se . . . and it [wa]s very clear that the trial court understood that Buhl was asserting [th]at right because the court held a hearing on that motion a month later," with an ambiguous letter written by the petitioner that the trial court "[n]ever read or understood" to be such a request). At no point during the remainder of that hearing, or, indeed, throughout the subsequent pretrial proceedings and the trial itself, did McGillvary make any attempt to clarify or correct the trial court's interpretation of his request.[8]

---

[7] At a minimum, McGillvary's request was ambiguous. As noted by one Court of Appeals, a criminal defendant who files a pro se motion while represented by counsel "could be requesting to substitute new counsel, be seeking to proceed pro se entirely, or be requesting to present a particular motion pro se even though represented by counsel." *United States v. Cross*, 962 F.3d 892, 898 (7th Cir. 2020).

[8] While most defendants would likely be uncomfortable contradicting a trial judge's interpretation of a legal matter, McGillvary was one of the few with no such reservations. The transcripts from his state court proceedings are replete with examples of McGillvary lodging verbal objections, often vigorously, when he perceived that he was being mistreated or misunderstood. Based on a thorough review of the record, it is almost inconceivable that McGillvary would remain quiet while the trial court misconstrued his motion in such a fundamental manner.

*See United States v. Torres*, 2023 WL 3318567, at \*3 (D.N.J. May 9, 2023) ("If the defendant equivocates, he is presumed to have requested the assistance of counsel."). Nor did he express dissatisfaction with his attorney's performance at that time. Indeed, after the trial court offered defense counsel time to review the motion with his client and refile it with appropriate language, McGillvary demonstrated his apparent satisfaction with that course of action by discussing the matter with Attorney Cito and allowing him an opportunity to refile the motion. ECF No. 12-34 at p. 21. *See Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994) (noting that, in the Sixth Amendment context, equivocation "takes into account conduct as well as other expressions of intent."). Nothing in the record supports McGillvary's claim that his focused remarks about his pro se motion cloaked a broader intent to take the drastic step of firing his attorney and representing himself at trial. *Compare U.S. v. Long*, 597 F.3d 720 (5th Cir. 2010) (request to fire a particular attorney did not amount to a clear and unequivocal request to proceed pro se), and *United States v. Cross*, 962 F.3d 892 (7th Cir. 2020) (ambiguous request to "terminate counsel" did not amount to a clear and unequivocal request to proceed alone), *with Brathwaite v. Phelps*, 418 Fed. Appx. 142 (3d Cir. 2011) (defendant explicitly requested "permission to exercise his constitutional right to proceed pro se" in a written motion), and *United States v. Stubbs*, 281 F.3d 109 (3d Cir. 2002) (defendant's statements that "I am going to represent myself as of now" and "I'm entitled to represent myself if I wish to" amounted to clear and unequivocal waiver).

A careful review of the complete record reinforces this conclusion. On each of the two subsequent occasions on which McGillvary sought to terminate his attorney and proceed alone, he declared his intentions in an exceedingly clear and unambiguous manner. Prior to sentencing, McGillvary announced to the court that he "unequivocally and clearly" asserted his Sixth Amendment right to represent himself and "renounce[d] and waive[d] Cito as a counsel." ECF

No. 12-47 at 3. He also submitted an eight-page motion, an appendix of exhibits, and a signed letter that he had mailed to counsel terminating his representation. *Id.* McGillvary's request to terminate appellate counsel was similarly formal, consisting of a motion and signed certification indicating that he had "formally discharged [his attorney] in writing and ended [his] representation" and "[would] appear pro se and substitute [himself] for [counsel] in this matter." ECF Nos. 12-12. While the Court recognizes that no "talismanic formula" or "magic words" are required to invoke *Faretta*, McGillvary's "casual and ineffective" remarks at the January 7, 2019 hearing contrast sharply with his clear and unambiguous requests during subsequent stages of the proceedings. *Buhl*, 233 F.3d at 792. Because McGillvary routinely voiced his requests in the plainest possible terms, the trial court reasonably concluded that his request on that occasion amounted to nothing more than a request for an adjudication on his pro se motion to dismiss.

For many of the same reasons, the Court alternatively concludes that, even if McGillvary's remarks did represent a clear and unequivocal request to represent himself, he abandoned that request through his subsequent conduct. As noted above, a defendant may waive the right to self-representation if the defendant "later vacillates or accepts the representation of counsel at trial." *Pitts v. Redman*, 776 F.Supp. 907, 915-916 (D. Del. 1991) (citing *Brown v. Wainwright*, 665 F.2d 607, 609-10 (5th Cir. 1982)). *See also McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984) (defendant may waive right to proceed pro se by vacillating on his or her decision or "giving his or her 'express approval' to counsel's participation."). In this context, however, "acceptance" does not always equate to abandonment. Where a defendant accepts the assistance of counsel, perhaps reluctantly, because his request to proceed alone has already been "conclusively denied" by the trial court, he is not obligated to "continually . . . renew [the] request . . . or to make fruitless motions or forego cooperation with defense counsel in order to preserve the issue on appeal." *Buhl*, 233 F.3d at 803.

*See also Orazio v. Dugger*, 876 F.2d 1508, 1522 (11th Cir. 1989) (finding no waiver where defendant "acquiesced in being represented by counsel because his request to defend himself had already been denied."). On the other hand, a defendant who voluntarily elects to proceed with counsel after an ineffective, ambiguous, or unresolved request to represent himself will typically be found to have abandoned his self-representation efforts. *See, e.g., Wilson v. Walker*, 204 F.3d 33, 38 (2d Cir. 2000) (defendant abandoned his attempt to proceed pro se by accepting the appointment of a different lawyer and failing to reassert the right after the trial court left the matter open for discussion); *Raulerson v. Wainwright*, 732 F.2d 803, 809 (11th Cir. 1984) (defendant waived his right to self-representation by proceeding with assigned counsel and walking out of a *Faretta* hearing); *Brown v. Wainwright*, 665 F.2d 607 (5th Cir. 1982) (defendant waived right to represent himself when, after the court deferred ruling on his request to conduct his own defense, he resolved his differences with counsel and allowed counsel to represent him at trial).

McGillvary's case falls into the latter category. After he informed the court that he wanted to argue his motion to dismiss "pro se," McGillvary accepted the court's suggestion that he confer with his attorney and refile the motion with the assistance of counsel. He then proceeded to trial without renewing his request to represent himself. As in *Wilson* and *Raulerson*, McGillvary's decision to continue with counsel after the court allegedly misinterpreted his request to proceed pro se amounted to an abandonment of the right. *Raulerson*, 732 F.2d at 809 (defendant who wishes to proceed pro se must "pursue the matter diligently"); *Buhl*, 233 F.3d at 790 (courts must "indulge every reasonable presumption against a waiver of counsel").

In short, McGillvary has failed to establish that the trial court's dismissal of his request to proceed pro se violated clearly established federal law. There is nothing in the record to indicate that he made a clear and unequivocal request to terminate his attorney, and even if he did, he

abandoned that request by uncomplainingly proceeding to trial with counsel. No relief is warranted.

    2.  Ground Two

McGillvary next contends that the trial court deprived him of his Fourteenth Amendment right to due process when it "issued an order effectively denying [his] pro se *Brady* motion and striking it from the record" without adjudicating it on the merits. ECF No. 1 at p. 11. The underlying motion asserted a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), based on McGillvary's contention that the police officers investigating Galfy's death failed to collect and preserve potentially exculpatory evidence. *Id.* at pp. 12-13.

Before turning to the merits of McGillvary's *Brady* claim, the Court notes that nothing in the "Constitution or laws of the United States" prevents a state court from striking motions filed by pro se individuals represented by counsel. *See McKaskle*, 465 U.S. 168 at 183 (no constitutional right to hybrid representation). As our Court of Appeals has noted, "[t]he Constitution does not confer a right to proceed simultaneously by counsel and pro se," and thus courts are not constitutionally obligated to consider pro se motions filed by individuals represented by counsel. *United States v. D'Amario*, 268 Fed. Appx. 179, 180 (3d Cir. 2008). Because McGillvary failed to raise his *Brady* claim in a procedurally appropriate motion, the trial court did not err in failing to consider the merits of that pro se claim. Nothing in the Constitution or laws of the United States counsels otherwise.

In any event, McGillvary's claim lacks merit. The core of his contention is that the investigating police officers failed to properly investigate and secure the crime scene, causing potentially exculpatory evidence to be lost or destroyed. ECF No. 1 at p. 11. At trial, McGillvary

testified that Galfy served him dinner and a couple of beers on the night of the incident. The beers caused him to feel "really warm and fuzzy and like relaxed." He testified that the alcohol caused him to pass out and that, when he awoke, Galfy was attempting to sexually assault him. McGillvary maintained that he then attacked Galfy in self-defense. Given this version of events, McGillvary maintains that investigators violated *Brady* by: (1) failing to secure "the glassware in the dishwasher and the pill bottles from the fridge" in Galfy's home to test them for drug residue; (2) failing to determine "what bodily fluids or hair" may have been present in "the stains in the carpet" in Galfy's bedroom; and (3) failing to obtain video evidence from New Jersey Transit surveillance videos that would have shown "that petitioner cut his hair earlier in the day prior to the incident" rather than afterwards to change his appearance, as state witnesses testified at trial. *Id.* at 12.

Under *Brady*, the prosecution has a duty to disclose exculpatory evidence to a criminal defendant. *Brady*, 373 U.S. at 87. There are three components to a typical *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). If all three components are established, the government's conduct violates due process "irrespective of the good faith or bad faith of the prosecution." *United States v. Henry*, 842 Fed. Appx. 809, 813 (3d Cir. 2021) (citing *Brady*, 373 U.S. at 87). *See also Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) ("The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.").

A different standard applies, however, when the government fails to preserve evidence that is only <u>potentially</u> exculpatory. *See Youngblood*, 488 U.S. at 57 (addressing a failure to preserve evidence that "<u>could</u> have been subjected to tests, the results of which <u>might</u> have exonerated the defendant.") (emphasis added). "To establish a due process violation based on law enforcement's failure to preserve potentially exculpatory evidence, a defendant must show: that the potentially exculpatory nature of the evidence was apparent at the time of destruction or loss; the lack of 'comparable evidence by other reasonably available means'; and that the government acted in 'bad faith.'" *Henry*, 842 Fed. Appx. 809 (quoting *Youngblood*, 488 U.S. at 58, and *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Unless a criminal defendant can show bad faith on the part of police, "failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.

Here, there is no question that the evidence targeted in McGillvary's petition was, at most, potentially exculpatory. The United States Supreme Court's decision in *Youngblood* is instructive. In *Youngblood*, the Arizona Court of Appeals overturned the defendant's conviction for sexual assault and related crimes because "the State had failed to preserve semen samples from the victim's body and clothing." 488 U.S. at 52. The Supreme Court reversed, opining that "there was no violation of the Due Process Clause" because "the failure of the police to refrigerate the clothing and to perform tests on the semen samples [collected from the victim] can at worst be described as negligent." *Id.* at 58. The Court explained that "the possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality" because the missing evidence was "simply an avenue of investigation that might have led in any number of directions," including, presumably, further incriminating the defendant. *Id.* at 56.

As in *Youngblood*, McGillvary's argument that police officers should have preserved and tested various items implicates the State's alleged failure to preserve "<u>potentially</u> useful evidence" that "<u>might</u> [have been] of conceivable evidentiary significance." *Id.* at 58 (emphasis added). McGillvary appears to concede this point. *See* ECF No. 1 at pp. 12-13 (discussing the bad faith requirement of his *Brady* claim). Consequently, he cannot prevail unless he can identify evidence suggesting "bad faith on the part of the police." *Id. See also U.S. v. Seibart*, 148 F.Supp.2d 559, 568 (E.D. Pa. 2001) (if petitioner can demonstrate "only negligence and not bad faith on the part of the police, there is no due process violation").

In determining whether police acted in bad faith, courts focus on "the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Griffin v. Spratt*, 969 F.2d 16, 20 (3d Cir. 1992) (quoting *Youngblood*, 488 U.S. at 51). "Mere negligence" or an "honest error" on the part of the police will not suffice. *Seibart*, 148 F.Supp.2d at 568 (citing *Youngblood*, 488 U.S. at 58); *Reed v. Davis*, 2023 WL 3775300, at *5 (D.N.J. June 2, 2023). Rather, the presence or absence of bad faith hinges on whether "officers actually knew . . . that they were destroying potentially exculpatory evidence." *Seibart*, 148 F.Supp.2d at 571 ("To show bad faith, Seibart must demonstrate that the PPD made a conscious effort to harm him or violate his rights.") (citing *Trombetta*, 467 U.S. at 488).

A careful review of his papers and the record indicates that McGillvary has failed to meet this burden. His allegations in this regard are entirely conclusory; for example, while he insists that "[a]ny of the containers and surfaces, including the unsearched cupboards and drawers . . . could have and should have been analyzed with a black light for drug residue and further analyzed with chemical tests for drug composition," he offers only the unsupported averment that "it was bad faith on the part of the investigators not to do so." ECF No. 1 at p. 12. He similarly opines,

without support, that the police destroyed or failed to preserve New Jersey Transit surveillance videos "in bad faith, with knowledge that the video showed petitioner with short hair returning to the platform on the West side of the tunnel." *Id.* None of these averments is supported by citation to the record or evidence of bad faith. *See, e.g., Reed,* 2023 WL 3775300, at *3 (rejecting Brady claim based on deleted radio calls because the petitioner failed to produce evidence that they were destroyed in bad faith); *Seibart,* 148 F.Supp.2d at 571 ("To show bad faith, Seibart must demonstrate that the [police] made a conscious effort to harm him or violate his rights. Seibart has fallen short of making such a showing.") (internal citations omitted). In the absence of such evidence, the conduct of the police investigators "in no way demonstrates bad faith of the kind required by *Trombetta* and *Youngblood.*" *Id.*

Nor is McGillvary entitled to an evidentiary hearing on this claim. When a petitioner has failed to develop the factual basis of a claim in state court, a district court cannot hold a hearing on that claim unless the petitioner shows that the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). He must also show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense. *Id. See also Shinn v. Ramirez,* 596 U.S. 366 (2022). McGillvary has not satisfied any of these standards. *Campbell v. Burris,* 515 F.3d 172, 184 (3d Cir. 2008) ("[B]ald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing.") (quoting *Mayberry v. Petsock,* 821 F.2d 179, 185 (3d Cir. 1987)).

Finally, the Court notes that McGillvary's claim is refuted by the record. At trial, crime scene investigator Adrian Gardner testified regarding the evidence that was gathered, the methods used to collect it, and the rationale behind the conduct of the investigative team. She explained that police do not collect everything from inside a crime scene because otherwise the investigation "would never end." ECF No. 12-38 at p. 97. She explained that the crime scene had been taped off and secured throughout the entire investigation and that investigators had collected a host of evidence including bedding, electronics, swabs of suspected blood, wine glasses, cups, a coffee mug, a towel, empty beer and alcohol bottles from the garbage, and a vodka bottle from the kitchen. *Id.* at pp. 62-63, 74, 113, 161-162. On a subsequent visit, police collected pill bottles, a toiletry bag, and daily pill containers from the master bathroom. *Id.* at pp. 118-119. The officers did not collect anything from the dishwasher because it was "clean and appeared to have all clean, recently washed dishes in it." *Id.* at p. 95. Similarly, the officers did not collect the pill bottles in the refrigerator because "[t]hey were vitamins." *Id.* at p. 166.

As to the stains on the floor, police investigators noted a pool of suspected blood beneath the victim's head but did not observe any sort of stain where the victim's penis would have been. *Id.* at p. 100. Officers did not collect the carpet underneath the victim's head because it appeared to be "just blood pooling from his head injury" and police did not think "it was necessary to cut it." *Id.* at pp. 143-144. Instead, police secured and tested the blood on a towel that had been recovered from beneath the victim's head. ECF No. 12-40 at p. 113. Finally, the police contacted the New Jersey Transit Authority to examine the surveillance footage related to the details found on a train ticket discovered in the victim's bedroom. ECF No. 12-38 at p. 218.

A crime scene analyst, testifying for the defense, opined as to the errors that he believed police made during their investigation. ECF No. 12-42 at pp. 4, 16. In the expert's opinion, the

police failed to adequately cordon off the crime scene and neglected to test certain pieces of evidence that should have been tested. *Id.* For example, the expert explained that the carpet and towel under the victim's head should have been tested for body fluids and semen and that the glasses and bottles should have been tested for drug residue. *Id.* at pp. 19-23. Notably, however, he did not offer any evidence suggesting that those omissions stemmed from anything more than purportedly negligent police work.

Based on the foregoing, the Court is constrained to reject McGillvary's argument that the police investigation violated his right to due process. McGillvary has failed to show that police "actually knew," while investigating the crime scene, "that they were destroying potentially exculpatory evidence." *Seibart*, 148 F.Supp.2d at 572. Consequently, even if the failure to collect and test certain items might have been negligent, there is simply nothing in the record to suggest the type of bad faith required by *Trombetta* and *Youngblood*. This deficiency is fatal to his claim. *See Youngblood*, 488 U.S. at 58 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

### 3. Certificate of Appealability

A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, "a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Here, the undersigned concludes that jurists of reason would not find it debatable whether each of McGillvary's claims should be denied for the reasons given herein. Accordingly, a certificate of appealability should be denied.

III.    Notice

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, the parties may seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days of the filing of this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of Objections to respond thereto. *See* Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may constitute a waiver of appellate rights. *See Brightwell v. Lehman*, 637 F.3d 187, 194 n.7 (3d Cir. 2011); *Nara v. Frank*, 488 F.3d 187 (3d Cir. 2007).


DATED this 15th day of May, 2025.


SUBMITTED BY:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE